UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW MEXICO

In re:
MARKET CENTER EAST RETAIL PROPERTY, INC.,
        Debtor.                                    No. 11-09-11696 SA

**MEMORANDUM OPINION ON ORIX CAPITAL MARKET, LLC'S
MOTION TO ALLOW SECURED CLAIM PURSUANT TO
11 U.S.C. § 506 AND TO ORDER PAYMENT THEREOF
-and-
ON DEBTOR'S OBJECTION TO ORIX CAPITAL MARKET'S CLAIM**

        This matter came before the Court on 1) Orix Capital Market,

LLC's ("ORIX") Motion to Allow Secured Claim Pursuant to 11

U.S.C. § 506 and to Order Payment Thereof ("Motion to Allow")(doc

120) and the objection thereto ("Objection") filed by Market

Center East Retail Property, Inc. ("Debtor")(doc 124), and 2)

Debtor's Objection to Orix Capital Market's Claim ("Claim

Objection")(doc 121).  ORIX was represented by its attorney Thuma

& Walker, P.C. (David T. Thuma and Stephanie L. Schaeffer).

Debtor was represented by its attorney Cuddy & McCarthy, LLP

(Daniel J. Behles).  This is a core proceeding.  28 U.S.C.

157(b)(2)(K).

        The Court conducted a two day hearing on February 24 and 25,

2010 on the issues presented and the parties then submitted

simultaneous briefs and responses (docs. 146, 147, 150 and 151).

The matter was submitted on April 15, 2010.  The Court has

considered the evidence presented at trial, reviewed the

arguments of the parties and consulted applicable authorities and

now issues its decision.  The Court finds that Debtor's objection

to the ORIX claim is not well taken and will be overruled.  The
Court fixes the amount of the ORIX claim to conform to the proof
at trial.  The Court finds that the Debtor's objections to the
Motion to Allow are well taken in part and are sustained in part
as set out below.  The Court also orders the Clerk to disburse to
ORIX the unpaid balance of its claim.

**FACTS**

**INTRODUCTION**

Debtor is a limited liability company that has operated a
retail commercial shopping center in Albuquerque, New Mexico
since 2006.  See Debtor's Disclosure Statement for Chapter 11
Plan Dated June 16, 2009 ("First Disclosure Statement"), doc. 24,
p. 3.  It acquired the property by purchase from a former owner
in 2006 by assuming that owner's obligations under various loan
documents and by executing new guaranties.  Id.  Mr. Danny Lahave
is the 100% owner of the Debtor and its sole officer.  Id.  He is
a guarantor for the transaction.  ORIX Exhibit 4, p. 1.  The
transaction is also guaranteed by Top Terraces, Inc., id., which
is a California corporation wholly owned by Mr. Lahave.  Doc. 24,
p. 8.

**HISTORY OF THE LOAN OBLIGATIONS**

On April 9, 1999, MCE Associates, L.P. ("Maker") executed a
Deed of Trust Note ("Note") and promised to pay PW Real Estate
Investments, Inc. ("Payee") $9,175,000.00 at the "Applicable

Page -2-

Interest Rate" in installments. (ORIX Exhibit 1) Relevant

portions of the Note include:

1. Interest only on May 1, 1999;
2. A constant payment of $65,667.43 ("Monthly Debt Service Payment Amount") on June 1, 1999 and the first day of each calendar month thereafter up to and including the first day of April, 2009; each of the payments to be applied (a) to interest computed at the Applicable Interest Rate, and (b) the balance applied toward reduction of the principal sum;
3. The balance of the principal sum and all interest thereon shall be due and payable on May 1, 2009 ("Maturity Date").

Interest on the principal sum shall be calculated on the basis of the actual number of days elapsed in a three hundred sixty (360) day year. The constant payment required hereunder is based on an amortization schedule of 30 years (360) months ("Amortization Term").

The term "Applicable Interest Rate" shall mean from the date of this Note through and including the Maturity Date, a rate of Seven and Seventy-four Hundredths percent (7.74%) per annum.

The whole of the principal sum of this Note, together with all interest accrued and unpaid thereon and all other sums due under the Deed of Trust (hereinafter defined), the Other Security Documents (hereinafter defined), and this Note (all such sums hereinafter collectively referred to as the "Debt") shall without notice become immediately due and payable at the option of Payee if any payment required in this Note is not paid on or before the fifth (5th) day after the date when due or on the happening of any other default, after the expiration of any applicable notice and grace periods, herein or under the terms of the Deed of Trust or Other Security Documents (hereinafter collectively an "Event of Default"). All of the terms, covenants and conditions contained in the Deed of Trust and the Other Security Document are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein. In the event that it should become necessary to employ counsel to collect the Debt or to protect or foreclose the security

Page -3-

hereof, Maker also agrees to pay a reasonable
attorney's fee for the services of such counsel whether
or not suit be brought.

...

Maker does hereby agree that upon the occurrence of an
Event of Default or upon the failure of Maker to pay
the Debt in full on the Maturity Date, Payee shall be
entitled to receive and Maker shall pay interest on the
entire unpaid principal sum at the rate of the greater
of (i) 5% above the Applicable Interest Rate or (ii) 5%
above the Base Rate (hereinafter defined), in effect at
the time of the occurrence of the Event of Default (the
"Default Rate").  The term "Base Rate" shall mean the
annual rate announced by Citibank, N.A., in New York
City, New York as its base rate in effect at the time
of the occurrence of the Event of Default.  The Default
Rate shall be computed from the occurrence of the Event
of Default until the actual receipt and collection of
the Debt.

     This Note is secured by the Deed of Trust and the
Other Security Documents.  The term "Deed of Trust" as
used in this Note shall mean the Deed of Trust,
Security Agreement and Financing Statement dated the
date hereof in the principal sum of $9,100,000[1] given
by Maker for the use and benefit of Payee covering the
fee estate of Maker in certain premises located in
Bernalillo County, State of New Mexico.  The term
"Other Security Documents" as used in this Note shall
mean all and any of the documents other than this Note
or the Deed of Trust now or hereafter executed by Maker
and/or others and by or in favor of Payee, which wholly
or partially secure or guarantee payment of this Note
or are otherwise executed and delivered in connection
with the Note and/or the Deed of Trust.

...

     If any sum payable under this Note is not paid on
or before the fifth (5th) day after the date on which
it is due, Maker shall pay to Payee upon demand an
amount equal to the lesser of five percent (5%) of such
unpaid sum or the maximum amount permitted by

---

[1] Sic.

Page -4-

applicable law to defray the expenses incurred by Payee
in handling and processing such delinquent payment and
to compensate Payee for the loss of the use of such
delinquent payment and such amount shall be secured by
the Deed of Trust and Other Security Documents.

...

This Note shall be governed and construed in
accordance with the laws of the State of New Mexico and
the applicable laws of the United States of America.

Pages four through six of the Note establish that it is

basically a non-recourse Note, with some exceptions that are not

particularly relevant to this matter. However, on page six it

also states:

Notwithstanding anything to the contrary in this
Note, the Deed of Trust or in any of the Other Security
Documents, the Debt shall be fully recourse to the
Maker and any general partner of Maker in the event
that ... a receiver, liquidator or trustee of Maker or
of any guarantor shall be appointed, or if Maker or any
guarantor shall be adjudicated a bankrupt or insolvent,
or if any petition for bankruptcy, reorganization or
arrangement pursuant to federal bankruptcy law or any
similar federal or state law, shall be filed by,
consented to, or acquiesced in by, Maker or any
guarantor or if any proceeding for the dissolution or
liquidation of Maker or of any guarantor shall be
instituted by Maker or any guarantor.

On April 9, 1999, MCE Associates, L.P. ("Trustor") executed

a Deed of Trust, Security Agreement, Assignment of Leases and

Rents and Financing Statement ("Deed of Trust") that transfers

the "Premises" described in Exhibit A and all improvements

(collectively "Improvements") to First American Title Insurance

Company ("Trustee") for the benefit of PW Real Estate

Investments, Inc. to secure the payment of the $9,175,000.00 Note

Page -5-

together with all extensions, renewals or modifications thereof.
(ORIX Exhibit 2)  The Deed of Trust incorporates the Note's
provisions and provides many more details regarding the
transaction.  Paragraph 5 establishes an "Insurance and Tax
Escrow Fund", a "Replacement Escrow Fund" and a "Rollover Escrow
Fund" into which the Trustor shall[2] make payments to the
Beneficiary to cover the items listed.  For each fund, "Trustor
hereby pledges to beneficiary any and all monies now or hereafter
deposited into the [name of fund] as additional security for
payment of the Debt."  Also, for each fund, "upon the occurrence
of an Event of Default, Beneficiary may apply any sums then
present in the [name of fund] to the payment of the Debt in any
order in its sole discretion."

    Deed of Trust ¶ 20 lists "Events of Default" that are
referred to in the Note.  This paragraph provides that the "Debt
shall become immediately due and payable at the option of the
Beneficiary, without notice or demand, upon any one or more of
the following events ("Events of Default"): (a) failure to make
any payment on or before the fifth day after it is due, (b) if
any taxes or similar items such as assessments or government

---

[2]Trustor "shall" deposit into the Replacement Escrow Fund
and Rollover Escrow Fund monthly.  Trustor "shall, at the option
of Beneficiary or its designee" pay monthly into the Tax and
Insurance Escrow Fund.  Evidence at trial established that there
were funds in the Tax and Insurance Escrow Fund, so the Court
assumes that the Beneficiary exercised its option to get paid
monthly.

charges relating to the Improvements are not paid when due, (c) if insurance lapses or Trustor fails to deliver any policies of insurance to the Beneficiary, (d) if the Trustor violates any provision in paragraphs 7 (dealing with an unconditional assignment of all leases and rents and Trustor's duties relating thereto), 9 (dealing with a promise to not sell, convey, pledge, or transfer any interest in the Trust Property), 33 (dealing with hazardous materials), or 34 (dealing with asbestos), (e) if Trustor or any guarantor made any false or misleading representation or warranty to Beneficiary, (f) if Trustor or any guarantor makes an assignment for the benefit of creditors or generally not pay its debts as they become due, (g) if a receiver, liquidator or trustee of Trustor or any guarantor is appointed or if any of them files bankruptcy or reorganization or arrangement or dissolution or liquidation, unless the proceeding is involuntary and dismissed within sixty days[3], (h) is in default on any other deed of trust or security agreement covering any part of the Trust Property, (i) if any mechanic's, materialman's or other lien remains unpaid for 30 days, (j) if

---

[3] This language is largely repeated in the Guaranty. ORIX exhibit 3. Debtor's counsel characterized the Guaranty as a "bad boy" guaranty, loosely summarizing it, consistent with Lahave's testimony, as effective primarily if Lahave or Top Terraces engaged in fraud, gross mismanagement or similar acts. As a reading of the Guaranty discloses, those were not the only sorts of behaviors or acts which would trigger liability under the Guaranty. The bankruptcy filing clause turned out to have by far the most impact of the Guaranty provisions.

Trustor fails to cure promptly any violation of law or ordinance affecting the Trust Property, or (k) remains in default for more than 30 days after notice of any term, covenant or condition in the Note, the Deed of Trust, or Other Security Document.

Paragraph 21 deals with interest after default. It is substantially the same provision contained in the Note.

Paragraph 22 is entitled "Right to Cure Defaults" but is not related to that topic. Rather, Paragraph 22 states:

> Upon the occurrence of any Event of Default or if Trustor fails to make any payment or to do any act as herein provided, Beneficiary may, but without any obligation to do so and without notice to or demand on Trustor and without releasing Trustor from any obligation hereunder, make or do the same in such manner and to such extent as Beneficiary may deem necessary to protect the security hereof. Beneficiary is authorized to enter upon the Trust Property for such purposes or appear in, defend, or bring any action or proceeding to protect its interest in the Trust Property or to foreclose this Deed of Trust of collect the Debt, and the cost and expense thereof (including reasonable attorney's fees to the extent permitted by law), with interest as provided in this Paragraph 22, shall constitute a portion of the Debt and shall be due and payable to Beneficiary upon demand. All such costs and expenses incurred by Beneficiary in remedying such Event of Default or in appearing in, defending, or bringing any such action or proceeding shall bear interest at the Default Rate, for the period after notice from Beneficiary that such cost or expense was incurred to the date of payment of Beneficiary. All such costs and expenses incurred by Beneficiary together with interest thereon calculated at the above rate shall be deemed to constitute a portion of the Debt and be secured by this Deed of Trust and the Other Security Documents and shall be immediately due and payable upon demand by Beneficiary therefor.

Paragraph 23 is entitled "Late Payment Charge." It is substantially the same provision contained in the Note.

Paragraph 26 lists the remedies available to the Beneficiary and the Trustee. It provides that upon an Event of Default, either the Beneficiary or the Trustee may accelerate the debt, file for foreclosure and sell the property, file for partial foreclosure, sell the Trust Property for cash or credit, sue for specific performance, recover a judgment on the Note, apply for the appointment of a trustee, receiver, liquidator or conservator, and enforce the Beneficiary's interest in the Leases and Rents. Subparagraph (g) repeats the provision for the collection of reasonable attorney fees and costs that accrue interest at the default rate and become a part of the Debt.

Paragraph 55 is entitled "Recourse Obligations." It substantially tracks the language of the Note.

Paragraph 60 provides that the Deed of Trust shall be governed, construed, applied and enforced in accordance with the laws of the State in which the Trust Property is located. Therefore, New Mexico law governs.

Sometime between April 9, 1999 and January 13, 2006 LaSalle Bank National Association, as Trustee for the Registered Holders of Painewebber Mortgage Acceptance Corporation V Commercial Mortgage Passthrough Certificates, Series 1999-C1 ("LaSalle") became the "Noteholder" of the "Loan Documents" (defined in ORIX

Exhibit 4 as "a certain Note (herein defined), security agreements, deeds of trust, mortgages and other documents and instruments executed by Borrower and others from time to time" that are listed on Exhibit A to Exhibit 4.) ORIX Exhibit 4, Recital B.

## ACQUISITION OF THE PROPERTY AND ASSUMPTION OF LIABILITIES

On January 13, 2006 LaSalle as successor to PW Real Estate Investments, Inc. and Debtor agreed to allow Debtor to assume the rights, benefits and obligations under the Loan Documents, with Top Terraces, Inc. and Danny Lahave becoming "Substitute Guarantor".[4] ORIX Exhibit 4, Agreement, ¶¶ 1-2. The parties acknowledged and agreed that the principal balance of the Note as of January 10, 2006 was $8,591,488.94, determined after taking into account the payment received by Noteholder due for January, 2006. Id. ¶ 3. They also agreed that the reserve account balances on January 10, 2006 were: Tax, $52,035.07, Insurance, $81,730.54, and Replacement, $336,343.62. Id. ¶ 4. The previous borrower(s) and guarantor(s) were released from all further liabilities. Id. ¶ 6.

## EVENTS AFTER ACQUISITION

---

[4] Paragraph 9(g)(v) of the Deed of Trust, captioned "Transfer or Encumbrance of the Trust Property", provides that "no such transfer shall be to a person or entity which does not have a satisfactory credit history, financial wherewithal and moral turpitude [sic]." Apparently P.W. Real Estate Investments agreed to the transfer despite Debtor's or Mr. Lahave's lack of moral turpitude.

Case 09-11696-nlj11    Doc 167    Filed 08/03/10    Entered 08/03/10 16:01:23 Page 10 of 77

The following excerpt from the First Disclosure Statement[5] summarizes the events to the end of 2008:

> During the last 2 years [2007-2009] Market Center and Lowe's [Home Centers, Inc.] were engaged in negotiations for acquisition of the center. Lowe's was planning on replacing the major buildings in the center with a new Lowe's Home Improvement store. The deal was complicated. It was necessary to obtain all permits and satisfy city requirements prior to closing, which resulted in many delays in obtaining government approvals. There were multiple extensions to closing the deal, to allow the satisfaction of all contract conditions. Last December [2008], with closing scheduled only two weeks away, Lowe's informed us that due to the bad economy, they had decided to walk away and pay Market Center the earnest money deposit of $105,000. During the two years while the sale was pending the economy has progressively gotten worse and worse. Tenants with expired leases did not wish to exercise their renewal options, and so MCE's vacancy rate kept going up to 35% in Dec. 08. In Jan 2009 a major anchor (Sports Authority) with 53,000 square feet leased, vacated due to poor sales figure and gloomy retail outlook. At that point vacancy jumped to about 70% and MCE was no longer able to meet its mortgage payments. Given the overall area retail situation it was unlikely that the center could have retained any of the major tenants, whether or not Lowe's transaction had been pending.

Debtor was current on the Note through the end of December 2008. It failed to make the January 2009 payment when due, and did not make any subsequent monthly payments. ORIX Exhibit 6. As of January 1, 2009, the outstanding principal balance was

_____

[5]The Court is not "finding" that the facts stated in the First Disclosure Statement are true. They are presented only to place the overall transaction in context.

Page -11-

$8,220,320.67[6] and the trust accounts[7] had $29,095.11 (Tax), $37,063.90 (Insurance), $127,130.76 (Replacement Reserve), $474,098.30 (TI Reserve History), $60.66 (Remediation Reserve History), and $345,000.00 (Other Reserve History). Id. See also Debtor Exhibit L. Thus, the total in escrow on January 1, 2009, was $1,012,448.73.

On March 5, 2009, ORIX filed a complaint to foreclose, appoint a receiver, and enforce guaranties in the Second Judicial District Court, Bernalillo County, New Mexico as Case D-202-CV-200902638.[8] On March 18, 2009, ORIX filed a motion for the immediate appointment of a receiver. The state court set the motion for hearing on April 23, 2009.

Effective April 15, 2009, ORIX applied the escrow reserves as permitted by the Note to the January through April payments (four payments of $65,667.43, for a total of $262,669.72), January through April late fees (four at 5% of $65,667.43, for a

---

[6]Debtor disputed this number, but provided no actual evidence that it was otherwise. In fact, Debtor uses this number as its starting point in all of its calculations (except for a $0.20 difference). See Debtors Exhibit A, B. See discussion below at pp. 24-25.

[7]The parties did not explain what the "History" reserves were, but did agree that they contained these funds.

[8]The Court has taken judicial notice of the docket of this case. See St. Louis Baptist Temple, Inc. v. Federal Deposit Ins. Co., 605 F.2d 1169, 1172 (10th Cir. 1979).

Page -12-

total of $13,133.48), default interest ($114,171.12[9]) and the remaining balance to principal ($622,267.97[10]). ORIX Exhibit 6. Therefore, as of April 15, 2009, the principal balance was $7,548,776.47. Id.

**BANKRUPTCY FILING TO DATE**

On April 22, 2009, Debtor filed a voluntary Chapter 11 petition in the District of New Mexico as a single asset real estate case. (Doc 1). Debtor remained a Debtor-in-possession. 11 U.S.C. § 1107.

The Note matured on May 1, 2009. No payments were made.

On May 9, 2009, ORIX voluntarily dismissed Count 2 of its state court complaint regarding enforcement of guaranties of the debt. On June 11, 2009, ORIX filed an action in California against Lahave and Top Terraces to collect on the guaranties.

On June 17, 2009, Debtor filed its Chapter 11 Disclosure Statement and Chapter 11 Plan of Reorganization. (Docs 23, 24). The relevant parts of the Plan classified ORIX as a Class 2 secured claimant, secured by a first deed of trust on the shopping center. Doc. 24, p. 7. The Plan proposes to allow ORIX

---

[9]Calculated as follows: principal $8,220,320.67 * .05 default interest increment * 100 days ÷ 360 day year. The Note explicitly provides for this method of computation. ORIX Exhibit 1. Debtors Exhibits A and B purport to calculate interest, but are both based on a 365 day year and are therefore incorrect.

[10]These total $1,012,242.20, which is $206.44 less than the amount on deposit January 1, 2009. Debtor Exhibit L shows a miscellaneous advance in the amount of $206.44.

the option of electing one of two alternative treatments: A)
interest only at a reduced rate for 2 years, followed by a
balloon payment of all amounts due, or B) interest only at a
reduced rate for 150 days, and then a discounted payoff of
approximately $6,000,000 cash.  _Id._  ORIX would retain its lien
until it received full payment under either option.  The default
option is option A.  _Id._  The sources of payments would be net
rental income from the shopping center, plus rents from Top
Terraces, Inc.[11]  Doc. 24, pp. 7-8.  Other creditors are either
unimpaired or receive 100% of their claims with interest.  Doc.
24.

On August 30, 2009, Debtor filed an Amended Disclosure
Statement and Amended Chapter 11 Plan. (Docs 64, 65).  The
Amended Disclosure Statement, doc 65, p. 4, reports a significant
event:

> Danny Lahave has filed suit in California against
> Lowe's alleging breach of contract and various other
> causes of action.  A tentative settlement has been
> reached in that litigation, which would require Lowe's
> to purchase the property for $9.75 million.  As of the
> date of this disclosure the settlement has not been
> consummated.

The Amended Disclosure Statement also adds a third possibility to
repay ORIX, _i.e._, through a sale to Lowe's for $9.75 million.
_Id._, p. 9.

---

[11]Alleged to be $25,080 per month for 50% of a building
purchased in 2007 for $5 million with no debt.  Forty thousand
square feet are available to lease.

On September 16, 2009, Debtor made an adequate protection payment of $150,000.00 to ORIX. ORIX Exhibit 7. This $150,000.00 payment is not reflected on ORIX Exhibit 6, which does not have a column for accruing interest. This payment properly would have been applied all to interest so would not impact the principal balance.[12]

On October 6, 2009, Debtor filed a Motion to Sell Real Estate. (Doc 82). On October 9, 2009, Debtor filed an Amended Motion to sell real property free and clear of liens. (Doc 86). The Amended Motion requests that Debtor be allowed to sell three of the four parcels that contain the shopping center for $9.75 million which will pay all creditors in full, to close by November 30, 2009. Debtor proposes to pay at closing the costs and expenses of sale, including title policy and closing fees, real estate broker commission, real property taxes due, and any other necessary costs and expenses of sale. Debtor disputes, however, the asserted claim of ORIX and proposes only to pay the balance due on the secured claim, plus interest at the non-default rate through closing, less any offsets or payments credited to or received by ORIX post-petition. Any remaining lien claim of ORIX not paid from closing would be transferred to the sale proceeds and put in escrow pending this proceeding.

---

[12]Interest alone at 12.74% from April 15, 2009 to August 15, 2009 was over $320,500.00.

ORIX filed a limited objection to the sale. (Doc 90.) It did not object to sale, but wanted its entire claim paid at closing, with a proviso that it would return any overpayment after judicial determination of its claim.

On November 6, 2009, the Court entered an Order Granting Debtor's Motion to Sell Real Estate Free and Clear of Liens. (Doc. 99). ORIX agreed to the proposed treatment to ensure that the sale closed. The sale closed.

On December 2, 2009, the Clerk entered a Notice of Registry Deposit in the amount of $9,331,056.63. (Doc. 110). On the same date the Court entered an order authorizing the disbursement to ORIX of $7,948,574.00, representing the current unpaid principal balance of $7,548,776.47, and unpaid interest at the non-default contract rate of $399,797.53, without prejudice to ORIX's right to seek further disbursements from the Court Registry. (Doc. 112). On December 22, 2009, the Court entered a stipulated order that released an additional $45,000 from the Court Registry to ORIX representing a portion of the attorney fees incurred by ORIX in this bankruptcy case. (Doc. 117).

On December 29, 2009, ORIX filed a Proof of Claim (Claim 3) in the amount of $7,594,379.71, secured by real estate of an unknown value, and accruing interest at the rate of 12.74%. An attachment states that the principal balance was $7,548,776.47 and lists other items such as interest, document fees, and

Case 09-11696-nlj11    Doc 167    Filed 08/03/10    Entered 08/03/10 16:01:23 Page 16 of 77

miscellaneous expenses. On December 29, 2009, ORIX also filed the Motion to Allow. (Doc. 120). The Motion to Allow states that the total amount of ORIX's claim as of December 29, 2009, was $8,785,971.44, consisting of the following:

| AMOUNT | TYPE OF CHARGE |
|---|---|
| $7,548,776.47 | principal balance |
| $399,797.53 | interest at non-default rate |
| $377,438.82 | late fees on principal balance |
| $241,141.47 | default rate interest |
| $8,500.00 | appraisal |
| $5,527.22 | environmental study |
| $46,953.89 | ORIX's bankruptcy attorney fees |
| $123,652.00 | ORIX's non-bankruptcy attorney fees |
| $350.00 | lien/delinquent tax search fees |
| $18,428.36 | other third party fees |
| $10,800.00 | survey |
| $4,605.68 | travel expenses |
| $8,785,971.44 | SUBTOTAL OF CHARGES |
| | |
| LESS | PAYMENTS |
| $-150,000.00 | from cash collateral account 9/16/09 |
| $-7,948,574.00 | from Court Registry 12/02/09 |
| $-45,000.00 | from Court Registry 12/21/09 |
| $-8,143,574.00 | SUBTOTAL OF PAYMENTS |
| | |
| $642,397.44 | REMAINING BALANCE |

On December 29, 2009, Debtor filed a response to the Motion to Allow, admitting most factual allegations, but denying 1) the amount of the debt on the petition date, 2) the reasonableness, appropriateness or necessity of interest, fees, out-of-pocket expenses and other charges, 3) the total amount due as of December 29, 2009, 4) that the amounts listed are all provided for under the loan documents, 5) that the amounts are allowable under 11 U.S.C. § 506, and 6) that any amounts left should be disbursed to ORIX along with additional interest, costs and fees that accrue in pursuit of the Motion to Allow.

On December 29, 2009, Debtor also filed an Objection to Claim #3 of ORIX:

> Debtor claims that the principal balance claimed due by ORIX is improperly calculated. Prior to the filing of the petition herein ORIX liquidated certain reserve accounts established by the debtor in the amount of $1,012,448.73. The reserve accounts were improperly applied, post-petition, to amounts and charges ORIX was not entitled to charge or collect. As a result, the portion of the reserve accounts applied to principal was insufficient, resulting in a principal balance claimed due that is overstated.

(Doc. 121).

## DISCUSSION

In this proceeding, the Debtor challenges ORIX's right to collect various items claimed in its Motion to Allow. Bankruptcy Code sections 502[13] and 506[14] govern this matter. See Travelers

---

[13]That section provides, in part:

(continued...)

Page -18-

## § 502. Allowance of claims or interests

(a) A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects.
(b) Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that--
> (1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured;
> (2) such claim is for unmatured interest;
> (3) if such claim is for a tax assessed against property of the estate, such claim exceeds the value of the interest of the estate in such property;
> (4) if such claim is for services of an insider or attorney of the debtor, such claim exceeds the reasonable value of such services;
> (5) such claim is for a debt that is unmatured on the date of the filing of the petition and that is excepted from discharge under section 523(a)(5) of this title;
> (6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds--
>> (A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of--
>>> (i) the date of the filing of the petition; and
>>> (ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus
>> (B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates;
> (7) if such claim is the claim of an employee for damages resulting from the termination of an employment contract, such claim exceeds--
>> (A) the compensation provided by such contract, without acceleration, for one year following the earlier of--
>>> (i) the date of the filing of the petition; or
>>> (ii) the date on which the employer directed the
(continued...)

Page -19-

<u>Casualty & Surety Co. of America v. Pacific Gas & Electric Co.</u>,

549 U.S. 443, 449 (2007):

> When a debtor declares bankruptcy, each of its creditors is entitled to file a proof of claim- <u>i.e.</u>, a document providing proof of a "right to payment," 11 U.S.C. § 101(5)(A)-against the debtor's estate. Once a proof of claim has been filed, the court must determine whether the claim is "allowed" under § 502(a) of the Bankruptcy Code: "A claim or interest, proof of which is filed under section 501 ... is deemed allowed, unless a party in interest ... objects."
>
> But even where a party in interest objects, the court "shall allow" the claim "except to the extent

---

[13](...continued)
> employee to terminate, or such employee terminated, performance under such contract; plus
(B) any unpaid compensation due under such contract, without acceleration, on the earlier of such dates;
(8) such claim results from a reduction, due to late payment, in the amount of an otherwise applicable credit available to the debtor in connection with an employment tax on wages, salaries, or commissions earned from the debtor; or
(9) proof of such claim is not timely filed, except to the extent tardily filed as permitted under paragraph (1), (2), or (3) of section 726(a) of this title or under the Federal Rules of Bankruptcy Procedure, except that a claim of a governmental unit shall be timely filed if it is filed before 180 days after the date of the order for relief or such later time as the Federal Rules of Bankruptcy Procedure may provide, and except that in a case under chapter 13, a claim of a governmental unit for a tax with respect to a return filed under section 1308 shall be timely if the claim is filed on or before the date that is 60 days after the date on which such return was filed as required.

[14]That section provides:
**§ 506. Determination of secured status**
(b) To the extent that an allowed secured claim is secured by property the value of which, ..., is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

that" the claim implicates any of the nine exceptions enumerated in § 502(b). Ibid.

ORIX's Motion to Allow contains both pre-petition and post-petition claims. The pre-petition claims do not fit into any of the categories of 11 U.S.C. § 502(b)(2) through 502(b)(9). Therefore, they must be allowed under § 502(b) unless they are unenforceable under § 502(b)(1): "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured."

> This provision is most naturally understood to provide that, with limited exceptions, any defense to a claim that is available outside of the bankruptcy context is also available in bankruptcy. See 4 Collier ¶ 502.03[2][b], at 502-22 (explaining that § 502(b)(1) is generally understood to "make available to the trustee any defense" available to the debtor "under applicable nonbankruptcy law"–i.e., any defense that the debtor "could have interposed, absent bankruptcy, in a suit on the [same substantive] claim by the creditor").

Id. at 450. "That principle requires bankruptcy courts to consult state law in determining the validity of most claims." Id.

One exception to the simple application of state law is Bankruptcy Code section 506(b). This section applies to over-secured creditors[15] and allows post-petition interest and any "reasonable" post-petition fees, costs, or charges provided for

---

[15]ORIX's claim is oversecured.

under the agreement or state statute under which such claim

arose.  Rushton v. State Bank of Southern Utah (In re Gledhill),

164 F.3d 1338, 1340 (10th Cir. 1999):

> In general, the amount of a creditor's bankruptcy
> claim is measured "as of the date of the filing of the
> petition."  11 U.S.C. § 502(b).  Thus, holders of an
> oversecured consensual claim or an oversecured
> nonconsensual claim are entitled to interest,
> penalties, attorney fees, and costs that accrue before
> the debtor's bankruptcy petition is filed.  See In re
> Brentwood Outpatient, Ltd., 43 F.3d 256, 263 (6th Cir.
> 1994).  Interest, fees, costs, and charges that accrue
> after the petition has been filed, or post-petition,
> are permitted only if authorized under 11 U.S.C. §
> 506(b)[.]

Federal law determines the reasonableness of post-petition fees,

costs or charges.  Blackburn-Bliss Trust v. Hudson Shipbuilders,

Inc. (In re Hudson Shipbuilders, Inc.), 794 F.2d 1051, 1056-8

(5th Cir. 1986).  The statute does not specifically require that

post-petition interest be reasonable.  United States v. Ron Pair

Enterprises, Inc., 489 U.S. 235, 241 (1989)("Recovery of

postpetition interest is unqualified."); Hepner v. PWP Golden

Eagle Tree, LLC (In re K & J Properties, Inc.), 338 B.R. 450, 458

(Bankr. D. Colo. 2005)("The statute, without qualification,

dictates that interest 'shall be allowed' on over-secured claims.

... Unlike interest, the statute mandates a further qualification

for the enforceability of the over-secured creditor's 'fees,

costs, or charges.' ... [T]hey must also be reasonable.")  ORIX's

post-petition claims are governed by Section 506(b).

Page -22-

Once ORIX filed its proof of claim, it was deemed allowed. 11 U.S.C. § 502(a). "When a proof of claim is executed and filed in accordance with the provisions of Rule 3001 (including Official Form 10), it 'constitutes prima facie evidence of the validity and amount of the claim.' Fed. R. Bankr. P. 3001(f)." Caplan v. B-Line, LLC (In re Kirkland), 572 F.3d 838, 840 (10th Cir. 2009). Upon objection, the proof of claim provides some evidence as to its validity and amount and is strong enough to carry over a mere formal objection without more. Lundell v. Anchor Const. Specialists, Inc., 223 F.3d 1035, 1039 (9th Cir. 2000): "To defeat the claim, the objector must come forward with sufficient evidence and 'show facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves.'" (Citation omitted.) See also Southland Corp. v. Toronto-Dominion (In re Southland Corp.), 160 F.3d 1054, 1059 (5th Cir. 1998)(citing Simmons v. Savell (In re Simmons), 765 F.2d 547, 552 (5th Cir. 1985)). "[T]he creditor has the ultimate burden of persuasion as to the validity and amount of the claim." B-Line, LLC, 572 F.3d at 841 (quoting Agricredit Corp. v. Harrison, 987 F.2d 677, 680 (10th Cir. 1993)).

**DEBTOR'S SPECIFIC OBJECTIONS**

Debtor specifically objects to seven different items. First, Debtor objects to the beginning principal balance claiming that it has been amortized incorrectly. Second, and related to

the first reason, Debtor claims that interest has been incorrectly calculated.  Third, Debtor denies that ORIX is entitled to interest at the default rate or any late fees. Fourth, Debtor claims that ORIX is not entitled to a late fee of 5% on the principal balance.  Fifth, Debtor opposes assessment of Jeffer, Mangels attorney fees through December 28, 2009.  Sixth, Debtor objects to certain other out of pocket charges: appraisal, environmental work, a lien/delinquent tax search fee, other third party fees, a survey, and travel expenses.  Seventh, Debtor objects to a portion of ORIX's bankruptcy attorney fee charges for Thuma & Walker.  Each will be discussed.

**BEGINNING PRINCIPAL BALANCE**

The parties acknowledged and agreed that the principal balance of the Note as of January 10, 2006, was $8,591,488.94 after receipt of the January 2006 payment.  Under New Mexico law "the general rule is that stipulations are ordinarily binding on the parties absent fraud, mistake, improvidence, material change in circumstances, or unless equitable considerations require otherwise."  Jones v. Lee, 126 N.M. 467, 472, 971 P.2d 858, 863 (Ct. App. 1998).  At trial, Debtor presented an alternate amortization schedule for the Note which showed a different opening balance as of January, 2006.  Debtor Exhibit M.  Debtor did not provide any evidence that ORIX's opening balance was

Case 09-11696-nlj11    Doc 167    Filed 08/03/10    Entered 08/03/10 16:01:23 Page 24 of 77

incorrect.  Rather, it showed that using different assumptions[16] resulted in an opening balance different from ORIX's opening balance.  Furthermore, Debtor's exhibit is pure speculation because Debtor had no firsthand knowledge of whether all previous payments had been timely.  The Court therefore finds that Debtor did not meet its burden of showing fraud, mistake, improvidence, material change in circumstances or equitable considerations to justify setting aside the stipulation.

Debtor then claims that ORIX's exhibits incorrectly amortize the loan over the next three years by charging more interest than allowed and deducting less principal than proper.  Debtor makes the calculations it believes are correct and ties them to an amortization schedule that shows the balloon amount should be lower.  Again, however, this argument is pure speculation.

In contrast, ORIX provided exhibits that showed the balances at various dates (including monthly bills mailed to Debtor) and offered credible testimony regarding where the numbers came from.  In conclusion, the Court finds that Debtor has not met its burden of persuasion that ORIX's principal balance on its proof of claim was incorrect.

**CALCULATION OF INTEREST**

---

[16]Exhibit M did not calculate the amortization on a 365/360 basis, so it is actually irrelevant to the matters at issue.

Page -25-

Debtor claims that the Note is ambiguous regarding calculation of interest. Under New Mexico law a contract is ambiguous if separate sections appear to conflict with one another or when the language is reasonably and fairly susceptible of more than one meaning. Heye v. American Golf Corp., Inc., 134 N.M. 558, 563, 80 P.3d 495, 500 (Ct. App. 2003)(citing Allsup's Convenience Stores, Inc. v. N. River Ins. Co., 127 N.M. 1, 976 P.2d 1 (1999)).

> The present law in this state concerning the interpretation of ambiguous or unclear language in written agreements may be summarized as follows: An ambiguity exists in an agreement when the parties' expressions of mutual assent lack clarity. C.R. Anthony [Co. v. Loretto Mall Partners], 112 N.M. 504,] at 509 n. 2 [817 P.2d 238,] at 243 n. 2 [(1991)]. The question whether an agreement contains an ambiguity is a matter of law to be decided by the trial court. Levenson v. Mobley, 106 N.M. 399, 401, 744 P.2d 174, 176 (1987). The court may consider collateral evidence of the circumstances surrounding the execution of the agreement in determining whether the language of the agreement is unclear. C.R. Anthony, 112 N.M. at 508-09, 817 P.2d at 242-43. If the evidence presented is so plain that no reasonable person could hold any way but one, then the court may interpret the meaning as a matter of law. Id. at 510, 817 P.2d at 244. If the court determines that the contract is reasonably and fairly susceptible of different constructions, an ambiguity exists. Vickers v. North Am. Land Dev., Inc., 94 N.M. 65, 68, 607 P.2d 603, 606 (1980). At that point, if the proffered evidence of surrounding facts and circumstances is in dispute, turns on witness credibility, or is susceptible of conflicting inferences, the meaning must be resolved by the appropriate fact finder, C.R. Anthony, 112 N.M. at 510, 817 P.2d at 244.
> Once the agreement is found to be ambiguous, the meaning to be assigned the unclear terms is a question of fact. Segura v. Molycorp, Inc., 97 N.M. 13, 18, 636 P.2d 284, 289 (1981). **However, in the event the**

> **parties do not offer evidence of the facts and circumstances surrounding execution of the agreement and leading to conflicting interpretations as to its meaning, the court may resolve any ambiguity as a matter of law by interpreting the contract using accepted canons of contract construction and traditional rules of grammar and punctuation.** <u>C.R. Anthony</u>, 112 N.M. at 510 n. 5, 817 P.2d at 244 n. 5.

<u>Mark V, Inc. v. Mellekas</u>, 114 N.M. 778, 781-82, 845 P.2d 1232, 1235-36 (1993). (Emphasis added.)

Neither ORIX or the Debtor were original parties to the loan documents in this case. Both received their interests through assignment. Therefore, at the trial neither party offered evidence of the facts and circumstances surrounding execution of the agreement that lead to conflicting interpretations as to its meaning. Therefore, the Court must first determine if the contract is ambiguous. Then it must interpret the contract with the accepted canons of contract construction to determine the meaning.

Debtor argues that the computation method for interest set out in the Note is ambiguous. The Note provides:

> Interest on the principal sum of this Note shall be calculated on the basis of the actual number of days elapsed in a three hundred sixty (360) day year. The constant payment required hereunder is based on an amortization schedule of 30 years (360 months)(the "Amortization Term").
> The term "Applicable Interest Rate" as used in this Note shall mean from the date of this Note through and including the Maturity Date, a rate of Seven and Seventy-four Hundredths percent (7.74%) per annum.

Page -27-

ORIX Exhibit 1, p. 1. The Note also provides "the balance of said principal sum and all interest thereon shall be due and payable on the first day of May, 2009 (the "Maturity Date").

The Court does not find this set of provisions ambiguous. The first sentence clearly states that interest is computed on the "365/360" method of computation. This is one of the three methods generally used. <u>Staab v. Northfield Sav. Bank</u>, 134 Vt. 44, 45, 349 A.2d 214, 215 (1976).[17] The second sentence states that the required monthly payment is computed as if the Note were amortized over 360 months. This does not imply that the Note is

---

[17]     In computing interest, because of the asymetrical [sic] nature of the Gregorian calendar, there are three methods generally used. The 365-day year approach, generally referred to as the 365/365 basis of computation, is where the rate of interest is divided by 365 and this produces a daily interest factor and the number of days that the loan is outstanding is then multiplied by the daily interest factor. The 360-day year basis is known as the 360/360 method of calculation, where each month is treated as having the same number of days, and so interest for each month is the same. The third method of calculation of interest is a combination of the first two and is generally referred to as the 365/360 method of computation. Here, the interest rate is divided by 360 (30 days for each month) to create a daily factor. The number of days that a loan is outstanding is then multiplied by the daily factor. Thus, interest charged for months of different lengths varies, and interest charged for a calendar year is greater than interest charged under either of the first two methods.
<u>Id.</u>, at 45-46, 349 A.2d at 215.

amortized in this way, it just informs us how the amount of the monthly payment was arrived at. In fact, the creditor could have amortized it over any term it wanted and this would not impact either the method of computing interest or the interest rate. The third sentence clearly states that the interest rate is 7.74% per year. The Note fixes a Maturity Date on which all amounts are due. Thus the Note anticipates that there will be a balance remaining after 10 years and, whatever it is, it will be due.

Therefore, even though Debtor does not like the 365/360 method of computation because it results in a greater interest charge over time, <u>see</u> fn. 17, it is not ambiguous. Consequently, the Court need not employ the canon of contract construction that requires the language to be construed against the drafter. The Court will not rewrite the Note to have a different method of computation.

**DEFAULT INTEREST AND LATE FEES**

ORIX started charging default interest[18] as of January 6, 2009. On April 15, 2009, ORIX applied the escrow balances and paid all accrued scheduled and default interest, late fees of $13,133.48, and a $206.44 miscellaneous expense as well as a $622,267.97 principal reduction. ORIX Exhibit 22. The

---

[18]The interest rate on the Note was 7.74%, and after default the rate was 12.74%. The Court will follow ORIX's convention in its exhibits of calling 7.74% the "scheduled interest" and the additional 5% the "default interest."

Page -29-

bankruptcy was filed on April 22, 2009. Therefore, ORIX now seeks an additional seven days of default interest it earned prepetition, $7,339.08[19], and then 223 days of default interest it earned post-petition[20], $233,802.38[21], for a total of $241,141.46[22] default interest. It also seeks, and Debtor does not dispute, seven days of scheduled interest it earned prepetition, $11,360.91[23], and then 223 days of scheduled interest it earned postpetition, $361,926.09[24], plus an additional fifteen days of interest for the first half of April which had not been accrued at the time of the offset, see Orix Exhibit 22, $24,344.80[25]. These scheduled interest amounts total $397,631.80[26].

Debtor argues that ORIX should not be entitled to collect default interest or late fees because it would be inequitable.

---

[19]$7,548,776.47 * .05 * 7 ÷ 360 = $7,339.08.

[20]ORIX Exhibit 22 does not break out the 7 day prepetition period, but just calculates 230 days of postpetition default interest. The resulting charge is the same, but the analysis is different.

[21]$7,548,776.47 * .05 * 223 ÷ 360 = $233,802.38.

[22]ORIX Exhibit 22 claims $241,141.47.

[23]$7,548,776.47 * .0774 * 7 ÷ 360 = $11,360.91.

[24]$7,548,776.47 * .0774 * 223 ÷ 360 = $361,926.09

[25]$7,548,776.47 * .0774 * 15 ÷ 360 = $24,344.80.

[26]Orix's Exhibit 22 lists the amount due as $399,797.53. The difference, $2,165.73 is the result of a mathematical error on the row beginning "5/1/2009"; thirty days of interest on $7,548,776.47 at 7.74% is $48,689.61, not the $50,855.34 listed.

Doc 147-1, p. 9 (default interest), p. 10 (late fees). Rather, although the loan documents provide for default interest and late fees, ORIX's bad faith and improper actions should entitle the Debtor to an award of punitive damages. <u>Id.</u> at 9. Specifically, Debtor suggests that the loan went into default because the lender requested that Debtor default before it would address a loan modification. <u>Id.</u> at 10. The Court finds, however, that the Debtor defaulted because of a cash shortage due to a 29% occupancy rate at the shopping center. Whether the lender wanted a default or not, default appeared inevitable.

Debtor next argues that the way ORIX handled the reserve accounts demonstrates bad faith. Debtor asked ORIX to apply the reserves to assist in a workout. <u>Id.</u> ORIX refused. Debtor acknowledges that ORIX had the right to refuse under the loan documents. <u>See</u> ORIX Exhibit 2, ¶ 5. However, Debtor further argues that by waiting until April 15, 2009 to apply the reserves, ORIX orchestrated an entitlement for itself to four late payment penalties that could have been avoided if ORIX had cooperated with Debtor and applied the payments earlier. There was no evidence presented, however, of why ORIX waited, and there may be alternative explanations for ORIX having waited to take action. For example, ORIX may have been making a decision about how to deal with the loan and the debtor, not a simple matter in

this case.   On the facts presented, the Court does not find bad
faith.

Debtor's other main argument against default interest and
late fees is that ORIX has been intransigent by refusing to
dismiss its guaranty suit in California against Lahave and Top
Terraces, even after the Bankruptcy Court registry held an amount
of funds that was double the amount of ORIX's remaining claim.
Even if this is intransigence, it is not aimed at the Debtor or
its assets, which is not a party to the guaranty suit.
Therefore, the Court finds no inequity in allowing ORIX to claim
default interest if it is otherwise allowable under the
Bankruptcy Code.

Under Section 502(b)(1), the $7,339.08 of default interest
is allowable as part of ORIX's pre-petition claim unless "such
claim is unenforceable against the debtor and property of the
debtor, under any agreement or applicable law for a reason other
than because such claim is contingent or unmatured."  New Mexico
law allows default interest.  See <u>First Nat'l. Bank in
Albuquerque v. Energy Equities, Inc.</u>[27], 91 N.M. 11, 17, 569 P.2d
421, 427 (Ct. App. 1977):

_____

[27]The Court notes, however, that this is currently the only
published New Mexico case that discusses default rate interest.
And, in that case the interest went from 7.5% to 10.0% upon
default and no bankruptcy filing was involved.  The Court wonders
whether the New Mexico Court of Appeals would have noted possible
exceptions to the rule if the rate change were unconscionable or
if innocent third parties were impacted.

Page  -32-

An agreement to pay interest on a loan at a higher rate
after default is merely contractual and does not
provide for a penalty.  <u>Ruskin v. Griffiths</u>, 269 F.2d
827 (2d Cir. 1959), <u>cert. denied</u>, 361 U.S. 947, 80
S.Ct. 402, 4 L.Ed.2d 381 (1960); <u>Union Estates Co. v.
Adlon Construction Co.</u>, 221 N.Y. 183, 116 N.E. 984, 12
A.L.R. 363 (1917); <u>National Life Ins. Co. v. Hale</u>, 54
Okl. 600, 154 P. 536 (1916).

New Mexico law also allows "penalties" in real estate

transactions.  <u>See</u> N.M.S.A. 1978, §39-5-18(A):

> **Redemption of real property sold under judgment or
> decree of foreclosure; notice and hearing; redemption
> amount; priority of redemption rights**
> A. After sale of real estate pursuant to the order,
> judgment or decree of foreclosure in the district
> court, the real estate may be redeemed by the former
> defendant owner of the real estate or by any junior
> mortgagee or other junior lienholder whose rights were
> judicially determined in the foreclosure proceeding:
> (1) by paying to the purchaser, at any time within nine
> months from the date of sale, the amount paid at the
> sale, with interest from the date of sale at the rate
> of ten percent a year, together with all taxes,
> interest and penalties[28] thereon...

Therefore, ORIX's prepetition default interest claim and late

fees are presumably enforceable under New Mexico law and should

be allowed under section 502.

---

[28]"Penalty" has many meanings.  <u>See</u> Black's Law Dictionary
(8th ed. 2004) <mark>page #</mark>.  One definition is "an extra charge
against a party who violates a contractual provision."  Another
definition is "excessive stipulated damages that a contract
purports to impose on a party that breaches. If the damages are
excessive enough to be considered a penalty, a court will
usu[ally] not enforce that particular provision of the contract.
Some contracts specify that a given sum of damages is intended
'as liquidated damages and not as a penalty' — but even that
language is not foolproof."  The Court assumes that the statute
refers to the former type of penalty, not the latter.

Page -33-

Next, the Court will address the post-petition default interest claim. Because it is a post-petition claim of an oversecured creditor, Section 506 governs its allowance.

> The language in § 506(b) can be broken down into four basic requirements for the allowance of attorney's fees, costs, and charges to a secured creditor: (1) the claim must be an allowed secured claim; (2) the creditor holding the claim must be over-secured; (3) the entitlement to fees, costs, or charges must be provided for under the agreement or state statute under which the claim arose; and (4) the fees, costs and charges sought must be reasonable in amount.

Eastman Nat'l Bank v. Sun 'N Fun Waterpark, LLC (In re Sun 'N Fun Waterpark, LLC), 408 B.R. 361, 366 (10th Cir. BAP 2009). The default interest claim satisfies the first three requirements. The only issue is whether the claim is "reasonable in amount." The Court finds that it is.

In Ron Pair Enterprises the Supreme Court ruled that under Section 506 "[r]ecovery of postpetition interest is unqualified." 489 U.S. at 241. In contrast, the Court stated that "[r]ecovery of fees, costs, and charges, however, is allowed only if they are reasonable[.]" Id. Ron Pair Enterprises did not, however, address the issue of what rate of interest to apply under Section 506(b). Bradford v. Crozier (In re Laymon), 958 F.2d 72, 74 (5th Cir.), cert. denied, 506 U.S. 917 (1992).

Travelers Casualty & Surety Co. suggests that the interest rate should be determined by the underlying law unless it is in direct conflict with the Bankruptcy Code. Travelers Casualty &

Surety Co., 549 U.S. at 450-51. Based on this passage, the federal courts have adopted a rule regarding default interest rates: "The bankruptcy court should apply a presumption of allowability for the contracted for default rate, 'provided that the rate is not unenforceable under applicable nonbankruptcy law.'" General Electric Capital Corp. v. Future Media Productions, Inc. (In re Future Media Productions, Inc.), 547 F.3d 956, 961 (9th Cir. 2008). See also In re Mountain Highlands, LLC, 2007 WL 4458175 at *6 (Bankr. D. N.M. 2007) (Court used the default interest rate of 18% instead of 12% non-default rate to calculate creditor's claim. "Since the loan was in default when the foreclosure action was initiated and the judgment rendered, that rate should apply to accruing post petition interest.") Following the federal rule, ORIX's interest is allowed under New Mexico law, so should be allowed in bankruptcy.

Some courts, however, have put a judicial gloss on the federal rule by asking whether equitable circumstances should impact the allowance of the default rate. See, e.g., In re Terry Limited Partnership, 27 F.3d 241, 243 (7th Cir.), cert. denied, Invex Holdings, N.V. v. Equitable Life Ins. Co. of Iowa, 513 U.S. 948 (1994)("What emerges from the post-Ron Pair decisions is a presumption in favor of the contract rate subject to rebuttal based upon equitable considerations.")(Citations omitted.); Laymon, 958 F.2d at 75 (Remanding case to allow bankruptcy court

to examine the equities of an 8% rate increase.) These cases usually find that if the increased rate does not impact the unsecured creditors and only impacts equity interests, there are no equitable reasons to not enforce the contract rate. See, e.g., Southland Corp., 160 F.3d at 1060 (" We find it especially significant-as did the bankruptcy court-that no junior creditors will be harmed if the Banks are awarded default interest."); Cliftondale Oaks, LLC v. Silver Lake Enter., LLC (In re Cliftondale Oaks, LLC), 357 B.R. 883, 886 (Bankr. N.D. Ga. 2006)("Because the Debtor's bankruptcy estate is solvent, no junior creditors would be impacted.")(Finding that the equities of the case did not favor disallowance.); In re Route One West Windsor Ltd. Partnership, 225 B.R. 76, 90-91 (Bankr. D. N.J. 1998)(If non-insider creditors will bear the adverse effects of default interest, court would not be inclined to allow it. However, in this case the only party to be adversely effected was the debtor's general partner. The default interest was allowed). In this case, allowance of the default rate will only impact the equity interests. Therefore, the Court also finds no equitable reason not to allow this charge.

**LATE FEE ON PRINCIPAL BALANCE**

The Maturity Date was May 1, 2009. The principal balance on that date was $7,548,776.47. ORIX claims a late fee of 5%, or $377,438.82 because the principal was not paid in full within

five days of May 1, 2009.  Debtor argues that this is an
unenforceable penalty and that it is duplicative of the accrual
of default interest and attorney fees.

The late fee on the principal balance presumably became due
post-petition on May 6, 2009, five days after the Maturity Date.
Therefore, its allowability hinges on section 506(b).

ORIX's late fee meets the first three requirements for
allowance set out in <u>Sun 'N Fun Waterpark</u>, 408 B.R. at 366.  The
question is whether it is reasonable in amount.  The Court finds
that it is not.

Black's Law Dictionary (8th ed. 2004) defines a "liquidated
damages clause" as:

> A contractual provision that determines in advance the
> measure of damages if a party breaches the agreement.
> Traditionally, courts have upheld such a clause unless
> the agreed-on sum is deemed a penalty for one of the
> following reasons: (1) the sum grossly exceeds the
> probable damages on breach, (2) the same sum is made
> payable for any variety of different breaches (some
> major, some minor), or (3) a mere delay in payment has
> been listed among the events of default.

Case 09-11696-nlj11    Doc 167    Filed 08/03/10    Entered 08/03/10 16:01:23 Page 37 of
77

Liquidated damages are generally allowable under the common law[29].

See Richard A. Lord, 24 Williston on Contracts § 65:1 (4th ed.):

> Under the fundamental principle of freedom of
> contract, the parties to a contract have a broad right
> to stipulate in their agreement the amount of damages
> recoverable in the event of a breach, and the courts
> will generally enforce such an agreement, so long as
> the amount agreed upon is not unconscionable, is not
> determined to be an illegal penalty, and is not
> otherwise violative of public policy.
> It is generally agreed that a liquidated damages
> provision does not violate public policy when, at the
> time the parties enter into the contract containing the
> clause, the circumstances are such that the actual
> damages likely to flow from a subsequent breach would
> be difficult for the parties to estimate or for the
> nonbreaching party to prove, and the sum agreed upon is
> designed merely to compensate the nonbreacher for the
> other party's failure to perform.  On the other hand, a
> liquidated damages provision will be held to violate
> public policy, and hence will not be enforced, when it
> is intended to punish, or has the effect of punishing,
> a party for breaching the contract, or when there is a
> large disparity between the amount payable under the
> provision and the actual damages likely to be caused by
> a breach, so that it in effect seeks to coerce
> performance of the underlying agreement by penalizing
> non-performance and making a breach prohibitively and

---

[29]In some jurisdictions they are also regulated by statute.
See Garrett v. Coast and Southern Federal Savings and Loan
Assoc., 9 Cal.3d 731, 735 n. 1, 511 P.2d 1197, 1199 n. 1, 108
Cal. Rptr. 845, 847 n. 1 (1973):
> Civil Code section 1670 provides: "Every contract by
> which the amount of damage to be paid, or other
> compensation to be made, for a breach of an obligation,
> is determined in anticipation thereof, is to that
> extent void, except as expressly provided in the next
> section."  Section 1671 defines and authorizes a
> liquidation of damages, stating, "The parties to a
> contract may agree therein upon an amount which shall
> be presumed to be the amount of damage sustained by a
> breach thereof, when, from the nature of the case, it
> would be impracticable or extremely difficult to fix
> the actual damage."

Page -38-

unreasonably costly.  In such cases the clause, rather
than establishing damages that approximate or are
proportional to the harm likely to flow from a
particular breach, actually constitutes a penalty, and,
since penal clauses are generally unenforceable,
provisions having this effect are declared invalid; and
this is generally true even where the provision is
negotiated in good faith, at arms' length and between
parties of equal bargaining power.

These rules are designed to allow the parties the
greatest freedom of contract while at the same time
preventing them from overstepping that freedom by
including illegitimate penal provisions.  As the
drafters of the Restatement (Second) of Contracts point
out, and as the cases make clear, "[t]he central
objective behind the system of contract remedies is
compensatory, not punitive.  Punishment of a promisor
for having broken his promise has no justification on
either economic or other grounds and a term providing
such a penalty is unenforceable on grounds of public
policy."

Thus, because the purpose of contract remedies is
to provide compensation for the harm caused by a
breach, and because a liquidated damages clause is
designed to substitute a sum agreed upon by the parties
for any actual damages suffered as a result of a
breach, it, too, must be calculated to compensate,
rather than to punish a breach.  As a result, the law
of most jurisdictions requires that a liquidated
damages provision, in order to be enforceable,
constitute the parties' best "estimate of potential
damages in the event of a contractual breach where
damages are likely to be uncertain and not easily
proven. "  Moreover, since a valid liquidated damages
clause is intended to substitute the sum agreed upon
for any actual damages that may be suffered as a result
of a breach, one "purpose of a liquidated damages
provision is to obviate the need for the nonbreaching
party to prove actual damages."  Thus, where the
liquidated damages clause represents a reasonable
attempt by the parties to agree in advance upon a sum
that will compensate the nonbreacher for any harm
caused by the breach, in lieu of the compensatory
contract damages to which the nonbreacher would
otherwise be entitled, the clause will be upheld.  By
parity of reasoning, because the goal of contract
remedies is compensation, not punishment, if the
purpose or effect of a provision stipulating damages is

to punish the nonperformance of a party's obligations
under the agreement, or to coerce or secure performance
of the agreement through the assessment of an
unreasonable sum payable upon nonperformance, the
provision will be not be upheld.

(Footnotes omitted.)  And, liquidated damages clauses are
generally enforceable in New Mexico.  Gruschus v. C. R. Davis
Contracting Co., 75 N.M. 649, 655, 409 P.2d 500, 504 (1965):

> There would seem to be no sound reason why persons
> competent and free to contract may not agree on the
> amount of liquidated  damages for failure to complete a
> contract within a specified time to the same extent as
> they may contract on any other subject, or why their
> agreement in this respect, when fairly and
> understandingly entered into, with a view to just
> compensation for an anticipated loss, should not be
> enforced.  As a general rule, enforcement of such a
> clause will only be denied when the stipulated amount
> is so extravagant or disproportionate as to show fraud,
> mistake or oppression.  The standard, however, is not
> furnished by plaintiff's actual loss or injury, but by
> the loss or injury which might reasonably have been
> anticipated at the time the contract was made.

(Citations omitted.)

In New Mexico, whether a contract provision is a valid
liquidated damages clause or a penalty is a legal question for
the court.  Thomas v. Gavin, 15 N.M. 660, 665, 110 P. 841, 843
(1910).  New Mexico has not yet formulated a specific "test"
regarding whether a liquidated damages clause is enforceable.
New Mexico does, however, follow the Restatement (Second) of
Contracts. ("Restatement").  See, e.g., Nearburg v. Yates
Petroleum Corp., 123 N.M. 526, 532, 943 P.2d 560, 566 (Ct. App.),

cert. denied, 123 N.M. 446, 942 P.2d 190 (1977)(citing

Restatement § 356). Restatement § 356(1) provides:

> Damages for breach by either party may be liquidated in
> the agreement but only at an amount that is reasonable
> in the light of the anticipated or actual loss caused
> by the breach and the difficulties of proof of loss. A
> term fixing unreasonably large liquidated damages is
> unenforceable on grounds of public policy as a penalty.

Comment a to Restatement § 356 provides, in part:

> The parties to a contract may effectively provide in
> advance the damages that are to be payable in the event
> of breach as long as the provision does not disregard
> the principle of compensation. The enforcement of such
> provisions for liquidated damages saves the time of
> courts, juries, parties and witnesses and reduces the
> expense of litigation. This is especially important if
> the amount in controversy is small. However, the
> parties to a contract are not free to provide a penalty
> for its breach. The central objective behind the system
> of contract remedies is compensatory, not punitive.
> Punishment of a promisor for having broken his promise
> has no justification on either economic or other
> grounds and a term providing such a penalty is
> unenforceable on grounds of public policy.

Restatement § 356 cmt. a.

Wisconsin, which also follows Restatement § 356, Wassenaar

v. Panos, 111 Wis.2d 518, 526-27 n. 8, 331 N.W.2d 357, 362 n. 8

(1983), applies the following test: "(1) Did the parties intend

to provide for damages or for a penalty? (2) Is the injury caused

by the breach one that is difficult or incapable of accurate

estimation at the time of contract? and (3) Are the stipulated

damages a reasonable forecast of the harm caused by the breach?"

Id. at 529-30, 331 N.W.2d at 363. (Footnotes omitted.)

Page -41-

Similarly, Arizona, which also follows Restatement § 356, applies the following test:

> The test for whether a contract fixes a penalty or liquidated damages is whether payment is for a fixed amount or varies with the nature and extent of the breach. <u>Miller Cattle Company v. Mattice</u>, 38 Ariz. 180, 298 Pac. 640 (1931), which means that an agreement made in advance of a breach is a penalty unless both of two conditions are met. First, the amount fixed in the contract must be a reasonable forecast of just compensation for the harm that is caused by any breach. Second, the harm that is caused by any breach must be one that is incapable or very difficult of accurate estimation. <u>Larson-Hegstrom & Associates, Inc. v. Jeffries</u>, 145 Ariz. 329, 701 P.2d 587 (App.1985). The difficulties of proof of loss are to be determined at the time the contract is made and not at the time of the breach. <u>Hutchison v. Tompkins</u>, 259 So.2d 129 (Fla. 1972); <u>Leeber v. Deltona Corp.</u>, 546 A.2d 452 (Me. 1988). Furthermore, the amount fixed is reasonable to the extent that it approximates the loss anticipated at the time of the making of the contract, even though it may not approximate the actual loss. Restatement (Second) of Contracts § 356, comment b (1981). However, the amount retained upon a contract's breach will be considered a penalty if it is unreasonable. <u>Marshall v. Patzman</u>, 81 Ariz. 367, 306 P.2d 287 (1957).

<u>Pima Sav. and Loan Ass'n v. Rampello</u>, 168 Ariz. 297, 300, 812 P.2d 1115, 1118 (App. 1991).

And, Tennessee which also follows Restatement § 356, applies the following test:

> The fundamental purpose of liquidated damages is to provide a means of compensation in the event of a breach where damages would be indeterminable or otherwise difficult to prove. <u>V.L. Nicholson [Co. v. Transcon Inv. & Fin. Ltd., Inc.]</u>, 595 S.W.2d [474] at 484 [(Tenn. 1980)]; 22 Am.Jur.2d Damages § 683 (1988); Restatement (Second) of Contracts § 356 cmt. (1979). By stipulating in the contract to the damages that might reasonably arise from a breach, the parties

Page -42-

essentially estimate the amount of potential damages likely to be sustained by the nonbreaching party. "If the [contract] provision is a reasonable estimate of the damages that would occur from a breach, then the provision is normally construed as an enforceable stipulation for liquidated damages." <u>V.L. Nicholson</u>, 595 S.W.2d at 484 (citing <u>City of Bristol v. Bostwick</u>, 146 Tenn. 205, 240 S.W. 774 (1922); 22 Am.Jur. Damages § 227 (1965)). However, if the stipulated amount is unreasonable in relation to those potential or estimated damages, then it will be treated as a penalty. 22 Am.Jur.2d Damages § 686 (1988); Restatement (Second) of Contracts § 356 (1979).

<u>Guiliano v. Cleo, Inc.</u>, 995 S.W.2d 88, 98 (Tenn. 1999).

The Court assumes that New Mexico would frame a test similar to these, and ask: 1) was the anticipated injury difficult or incapable of accurate estimation[30] at the time the contract was made[31]? 2) are the stipulated damages extravagant or

---

[30]<u>See</u> <u>Priebe & Sons v. United States</u>, 332 U.S. 407, 411 (1947)(Liquidated damages provisions "serve a particularly useful function when damages are uncertain in nature or amount or are unmeasurable[.]"); <u>Wise v. United States</u>, 249 U.S. 361, 365 (1919)(Liquidated damages may be enforceable when the damages are uncertain in nature or amount or are difficult of ascertainment.)

[31]Some states laws look at either the time the contract was made or at the time of breach.
　　　Although most jurisdictions disfavor the enforcement of penalties under contract law, there is a split in authority on the proper method for determining whether a liquidated damages provision constitutes a penalty. One method, commonly referred to as the "prospective approach," focuses on the estimation of potential damages and the circumstances that existed at the time of contract formation. Under this approach, the amount of actual damages at the time of breach is of little or no significance to the recovery of liquidated damages. 22 Am.Jur.2d Damages § 723 (1988). If the liquidated sum is a reasonable prediction of potential damages and the damages are indeterminable or
(continued...)

Page -43-

disproportionate[32] to the injury anticipated from a breach at the
time the contract was made? and 3) were the agreed upon
stipulated damages designed to punish, or have the effect of
punishing, a party for breaching the contract or merely to

_____

[31](...continued)
difficult to ascertain at the time of contract
formation, then courts following the prospective
approach will generally enforce the liquidated damages
provision.  See e.g., Gaines v. Jones, 486 F.2d 39, 46
(8th Cir. 1973) (applying Missouri law); Brazen v. Bell
Atl. Corp., 695 A.2d 43, 48 (Del. 1997).

    In contrast, a second approach has developed in
which courts not only analyze the estimation of damages
at the time of contract formation, but also address
whether the stipulated sum reasonably relates to the
amount of actual damages caused by the breach.  Under
this retrospective approach, the estimation of
potential damages and the difficulty in measuring
damages remain integral factors for the courts' review.
See e.g. Lake Ridge Academy v. Carney, 66 Ohio St.3d
376, 613 N.E.2d 183, 188-89 (1993); Highgate Assoc.,
Ltd. v. Merryfield, 157 Vt. 313, 597 A.2d 1280, 1282
(1991).  However, as part of that review, the actual
damages at the time of breach are also relevant in
determining whether the original estimation of damages
was reasonable.  See Kelly v. Marx, 44 Mass.App.Ct.
825, 694 N.E.2d 869, 871 (1998); Wassenaar v. Panos,
111 Wis.2d 518, 331 N.W.2d 357, 361-62 (1983).  If the
liquidated sum greatly exceeds the amount of actual
damages, then courts following this latter approach
will treat the estimated sum as a penalty and will
limit recovery to the actual damages.  Kelly, 694
N.E.2d at 871; Shallow Brook Assoc. v. Dube, 135 N.H.
40, 599 A.2d 132, 137 (1991).
Guiliano, 995 S.W.2d at 87-99 (Footnotes omitted.)  New Mexico
follows the "prospective approach."  Gruschus, 75 N.M. at 655,
409 P.2d at 504.

    [32]See Wise, 249 U.S. at 365 (Liquidated damages may be
enforceable when the stipulated damages are not extravagant or
disproportionate to the loss.)  See also Gruschus, 75 N.M. at
655, 409 P.2d at 504 ("extravagant or disproportionate.")

Page  -44-

compensate the nonbreacher for the other party's failure to perform[33]?

The Court finds that ORIX's 5% late fee as applied to the principal balance in this case is an unenforceable penalty. The anticipated injury is not difficult or incapable of accurate estimation. The stipulated damages are extravagant and disproportionate to the injury anticipated. And, the stipulated damages have the effect of punishing Debtor for breaching the contract.

1. **The anticipated injury is not difficult or incapable of accurate estimation.**

First, when a cash payment is not made it is not difficult to estimate the damage. Delay in the receipt of money is measured by interest. "Interest generally is of two kinds-it 'is compensation allowed by law or fixed by the parties for the detention of money, or allowed by law as additional damages for loss of use of the money due as damages, during the lapse of time since the accrual of the claim.'" <u>Bradbury & Stamm Const. Co. v. Bureau of Revenue</u>, 70 N.M. 226, 238, 372 P.2d 808, 816 (1962)

_____

[33]<u>See</u> <u>Priebe & Sons</u>, 332 U.S. at 413. (Liquidated damage clause had an <u>in terrorem</u> effect of encouraging compliance with the contract. It was not a fair estimate of damages to be suffered, but only served as an added spur to performance. "It is well-settled contract law that courts do not give their imprimatur to such arrangements.") (Citation omitted.) <u>See also</u> <u>Checkers Eight Ltd. Partnership v. Hawkins</u>, 241 F.3d 558, 562 (7th Cir. 2001)("[W]hen the sole purpose of the [liquidated damage] clause is to secure performance of the contract, the provision is an unenforceable penalty.")

(Citation omitted.)  See also Checkers Eight Ltd. Partnership,
241 F.3d at 562.  ("Absent exceptional circumstances, actual
damages caused by monetary payments being late are not difficult
to measure because interest rates can be used to estimate the
time value of money.")(Citations omitted.); Manhattan Syndicate,
Inc. v. Ryan, 14 A.D.2d 323, 327, 220 N.Y.S.2d 337, 340 (N.Y.
App. Div. 1961):

> [The] breach was a delay in the payment of money rents.
> In this context it is a relevant general rule that a
> failure to pay a sum of money due will rarely, if ever,
> justify a further sum, in excess of interest, to be
> paid by way of liquidated damages.  On the contrary,
> such a requirement is likely to be condemned as a penal
> forfeiture which the law will not recognize

(Citations omitted.); Manhattan Life Ins. Co. v. Wright, 126 F.
82, 86 (8th Cir. 1903)(An agreement to pay money in excess of
interest upon failure to pay a loan on a certain day is a
contract for a penalty and is void.  Interest is full
compensation for a delay in payment.)

The Note states that the purpose of the late fee is to
defray the expenses incurred by Payee in handling and processing
a delinquent payment and to compensate Payee for the loss of the
use of the delinquent payment.  But, as noted above, interest is
generally full compensation for the loss of the use of money.
ORIX continued to earn interest on the outstanding balance.
Indeed, ORIX earned default interest on the outstanding balance.
Therefore, the only remaining purpose of the late fee would be to

Page -46-

defray the expenses incurred by Payee in handling and processing
a delinquent payment.  But, another provision of the Note allows
ORIX to collect attorney's fees and costs.  Therefore, all the
late fee is designed to cover is administrative expenses.

The late fee, as applied in this case, came due after the
loan matured.  No more payments were due, only a balloon which
was in default.  Therefore, there would be little or no more
administrative expenses in handling and processing delinquent
payments.  All that is left to do is have the attorneys sue to
foreclose.  See Trustco Bank New York v. 37 Clark Street, Inc.,
157 Misc.2d 843, 844, 599 N.Y.S.2d 404, 405 (1993):

> Whether deemed a forfeiture or not, the disputed clause
> [a 6% late charge applied to a $220,000 balloon
> payment] must be construed by the Court to be relevant
> to defaults in monthly payments engendering collection
> expenses, not defaults ending payments, such as a
> balloon payment resulting in acceleration.  Such
> defaults, after all, terminate the mortgagor's right to
> correct the default.  Foreclosure was the predictable
> next step.  Expenses of administration of delinquent
> payments following default, essentially expenses of
> suit, are addressed in the mortgage, a right to charge
> and collect reasonable attorney's fees upon
> foreclosure.  (See Crest Savings and Loan Association
> v. Mason, 243 N.J.Super. 646, 581 A.2d 120 [1990].) To
> construe the contract otherwise would provide an
> unnecessary, second source for handling the account.

See also Garrett v. Coast and Southern Federal Savings and Loan
Assoc., 9 Cal.3d 731, 741, 511 P.2d 1197,1203, 108 Cal. Rptr.
845, 851 (1973)(A lender's charges could be fairly measured by
the period of time the money was wrongfully withheld plus the
administrative costs reasonably related to collecting and

Page  -47-

accounting for a late payment.  Consequently, the court held that
a late fee of 2% of the principal balance was punitive and an
attempt to coerce timely payments by a forfeiture not reasonably
calculated to compensate the injured lender.)

In conclusion, damages were not difficult to estimate if the
breach was failure to pay the balloon when due.  The damages were
accruing interest (at the default rate), attorneys fees and costs
(which are provided for), and minimal administrative costs.
There was no evidence put on of any direct administrative costs
except some travel expenses, which will be allowed.

**2.   The stipulated damages are both extravagant and
disproportionate to the injury anticipated from a failure to
pay the balloon when due.**

The Court finds the stipulated damages are extravagant for
several reasons.  First, as discussed above, the damages were not
difficult to anticipate if the balloon were not paid on time.
They consist of interest, fees and costs, and administrative
expenses.  The late fee is 5% of the entire balloon payment.  A
late fee of 5% of a missed monthly payment may be reasonable, but
as applied to the balloon it serves as a windfall for the
creditor.  See Ford v. Staats, 1998 WL 1184108 at *6 (Mass.
Super.):

> A late fee on an installment payment, in the amount of
> 3% of the overdue payment, provides a moderate
> alternative to the drastic remedy of acceleration. The
> nominal amount involved serves to encourage promptness,
> while compensating the obligee for short-term loss of
> use of the amount of the installment, along with any

administrative costs. ... As the calculations presented
above demonstrate, however, application of that
provision to payment of the principal produces a very
different result. ... Such a late fee would provide a
windfall to the obligee, and impose a forfeiture on the
obligor.  Moreover, such a late fee serves no apparent
purpose, since the principal, unlike the monthly
installments of interest, continues to accrue interest
until paid, and since no alternative to acceleration is
necessary once the principal balance has become due. It
is true that the provision in the note regarding late
fees refers to "any payment."  In context, however,
that provision appears directed at monthly installment
payments, not at the principal balance.

(Footnote omitted.)  See also Trustco Bank New York, 157 Misc.2d

at 844, 599 N.Y.S.2d at 405 ("[T]he disputed [late fee] clause

must be construed by the Court to be relevant to defaults in

monthly payments engendering collection expenses, not defaults

ending payments, such as a balloon payment resulting in

acceleration."); LaSalle Bank N.A. v. Shepherd Mall Partners,

L.L.C., 140 P.3d 559, 562-63 (Okla. Civ. App. 2005), cert.

denied, (2006) (A default interest rate combined with a provision

for attorney fees and a 5% late fee on the total sum due was

"clearly excessive."); In re Hernandez, 303 B.R. 342, 348 (Bankr.

S.D. Ohio 2003)(After maturity of loan, "five percent of the

outstanding balance of the Note is excessive as compensation for

the extra administrative costs associated with this Note.")

    Second, the Court finds that a creditor should not get both

an above market default interest rate and late fees on the same

debt.  Many courts agree: First Bank of Ohio v. Brunswick Apts.

of Trumbull County, Ltd. (In re Brunswick Apts. of Trumbull

Page  -49-

County, Ltd.), 169 F.3d 333, 335 (6th Cir. 1999)("[C]ase law developed under § 506(b) of the Bankruptcy Code ... applies the principle that a service charge based on percentage of the remaining balance is unreasonable when combined with default interest greater than the market rate of interest.")(citation omitted.); Cliftondale Oaks, LLC v. Silver Lake Enter. (In re Cliftondale Oaks, LLC), 357 B.R. 883, 887-88 (Bankr. N.D. Ga. 2006)(An additional 5% default interest rate compensated the creditor for the administrative costs of debtor's default. Payment of late charges in conjunction with default interest allows a double recovery and would be unreasonable.); In re AE Hotel Venture, 321 B.R. 209, 216 (Bankr. N.D. Ill. 2005)(A creditor cannot receive both default interest and late charges. This raises the spectre of double recovery.); Florida Asset Financing Corp. v. Dixon (In re Dixon), 228 B.R. 166, 177 (W.D. Va. 1998)("Thus, the case law is settled: 'oversecured creditors may receive payment of either default interest or late charges, but not both.'")(citing In re Vest Assoc., 217 B.R. 696, 701 (Bankr. S.D. N.Y. 1998)); Route One West Windsor Ltd. Partnership, 225 B.R. at 92 ("Since the court has already determined to allow the secured creditors interest at a default rate, late charges will not be allowed."); In re 1095 Commonwealth Ave. Corp., 204 B.R. 284, 305 (Bankr. D. Mass. 1997), aff'd, 236 B.R. 530 (D. Mass. 1999)("Both the late charge

and the default rate of interest are intended to compensate the
lender for the increased costs of administration caused by the
borrower's failure to make payment as and when it is due." 
Creditor could recover one or the other, but both would be
inequitable and unreasonable under § 506(b).); In re Consolidated
Properties Ltd. Partnership, 152 B.R. 452, 458 (Bankr. D. Md.
1993)("In this reorganization case under the Bankruptcy Code, it
is not reasonable to allow Citibank a secured claim for default
interest in addition to late charges of 5% on the entire
principal balance."); Raisin Memorial Trust v. Casey, 945 A.2d
1211, 1216 (Me. 2008)(Case remanded for trial court to determine
whether late fees and escalated interest rates are liquidated
damages or excessive penalties.)

Third, the Court finds that it is unreasonable to interpret
a late fee provision as applying to a balloon payment.  Many
courts agree: Poseidon Development, Inc. v. Woodland Lane
Estates, LLC, 152 Cal.App.4th 1106, 1115-16, 62 Cal.Rptr.3d 59,
65-66)(2007):

> There is no reason to believe that processing and
> accounting expenses caused by failure to make an
> installment payment would vary appreciably depending on
> the amount of the overdue payment. Nevertheless, while
> overdue payment of an installment of $6,146.66 would
> have resulted in a late charge of $614.67, overdue
> payment of a final payment of $776,146.66 would result
> in a late charge of $77,614.67.  If the late charge
> provision was intended to apply to both interim
> installments and the final payment, it could not
> possibly be considered a reasonable estimate of the

damages contemplated by a breach.  Rather, it would be
an unenforceable penalty provision.
      "A contract must receive such an interpretation as
will make it lawful, operative, definite, reasonable,
and capable of being carried into effect, if it can be
done without violating the intention of the parties."
(Civ.Code, § 1643.)  The only interpretation of the
late charge provision that would make it lawful,
operative, definite, reasonable, and capable of being
carried out is one that would make it inapplicable to
the final payment.

"[W]e can state as a matter of law a late charge provision

covering administrative expenses that amounts to $614.67 for one

late payment and $77,614.67 for another is not a reasonable

attempt to estimate actual administrative costs incurred[.]" Id.

at 1116, 62 Cal.Rptr.3d at 66.; Green v. Trowbridge 1, Inc., 2003

WL 21508489 at 3 (Mich.App.)(unpublished)(Late charge of 5%

applied to balloon payment was unreasonable.)(Citing Brunswick

Apts. of Trumbull County, Ltd., 169 F.3d at 335.); Brunswick

Apts. of Trumbull County, Ltd., 169 F.3d at 335 ("[A] service

charge based on percentage of the remaining balance is

unreasonable when combined with default interest greater than the

market rate of interest.")

    Fourth, the Court finds that creditors are usually denied

late fees after acceleration or maturity.  Shepherd Mall

Partners, L.L.C., 140 P.3d at 563 (Application of a 5% late fee

to the entire amount due after acceleration constitutes an

unenforceable penalty.)  In re Hernandez, 303 B.R. 342, 348

(Bankr. S.D. Ohio 2003)(After maturity of loan, "five percent of

the outstanding balance of the Note is excessive as compensation for the extra administrative costs associated with this Note.")

The Court also finds the stipulated damages are disproportionate to the injury anticipated at the time the contract was made from a failure to make the balloon payment when due. The late fee is 5% no matter whether a payment is one day late, one year late, or never paid at all. Compare Lawyers Title Ins. Corp. v. Dearborn Title Corp., 118 F.3d 1157, 1161 (7th Cir. 1997):

> [T]he academic debate over penalty clauses, interesting as it is, is irrelevant in the here and now. The law is clear that penalty clauses are unenforceable, and so we must consider whether the 100 percent penalty for bounced checks can be viewed as liquidated damages, that is, as a bona fide estimate of the likely damages to United if Dearborn bounced a check.
>
> Clearly not. A simple example will show why. If Dearborn bounced a check to United for $150,000 and one day later replaced it with a check that cleared, United would be entitled to claim "damages" of $150,000. Yet its only loss would be one day's interest on $150,000, which at an interest rate of 10 percent a year would be less than $50. United is right to point out that depositing bounced checks could imperil its relations with its bankers, who might wonder what quality of people or firms United was dealing with. Such a harm-a loss of "good will," more concretely a diminution of future contractual opportunities-would be difficult to quantify, making a provision for liquidated damages highly appropriate. Bauer v. Sawyer, supra, [8 Ill.2d 351,] 134 N.E.2d [329] at 333 [(1956)]. But the harm is largely independent of the amount of the check that is bounced, and the sanction seems in any event highly disproportionate to any reasonable estimate of the harm, as our numerical example showed.

Case 09-11696-nlj11   Doc 167   Filed 08/03/10   Entered 08/03/10 16:01:23 Page 53 of 77

See also Heath v. U.S. Mortgage, LLC, 2006 WL 488642 at *5 (S.D. Ill. 2006)("Under Illinois law, ..., a cost-of-money provision not dependent on the length of delay of repayment-one that is simply a flat percentage levy-cannot escape the 'penalty' label."); Checkers Eight Ltd. Partnership, 241 F.3d at 562:

> The amount of $150,000 is unreasonable and excessive compared to the actual damages as estimated by using interest rates. The amount of damages under the agreed order also is insensitive to the magnitude of the defendants' breach. Regardless of whether the defendants were a day late in making the last payment or had refused to perform at all, they would have been required to pay $150,000 to the plaintiffs.

**3. The stipulated damages have the effect of punishing Debtor for breaching the contract.**

The provision for a late fee therefore appears to have no purpose other than ensuring the Debtor made the payments on time. The late fee provision is not a reasonable attempt to estimate the damages to be incurred upon breach. The late fee functions as a penalty to spur compliance rather than as a proportionate charge based on estimated damages. It is not a valid liquidated damages clause. It is an unenforceable penalty.

In conclusion, the Court finds that Orix's 5% late fee is an unenforceable penalty. The anticipated injury is not difficult or incapable of accurate estimation. The stipulated damages are extravagant and disproportionate to the injury anticipated. The stipulated damages have the effect of punishing Debtor for breaching the contract.

**ATTORNEY FEES AND RELATED COSTS INCURRED BY ORIX**

ORIX exhibit 8 is the billings to ORIX of Thuma & Walker, P.C., fka Jacobvitz, Thuma & Walker, P.C. Debtor initially objected to at least some of those fees but then in opening statement, and again in its Brief, at 7 (doc 147-1), stated it had no objection to the reasonableness and necessity of the fees. Therefore the Court will not discuss them further, other than to find that the exhibit shows $6,571.77 of prepetition fees and $42,115.75 postpetition fees through December 31, 2009.

ORIX exhibit 9 is the billings to ORIX from Jeffer, Mangels, Butler & Marmaro, LLP ("JMBM") starting in May 2009 and concluding with January 2010, totaling $140,261. ORIX exhibit 23 is the billings to ORIX from Atkinson, Thal & Baker, P.C. ("ATB") for February 2010 totaling $17,159.[34] Debtor contests these two fees. Each of them were incurred post petition and thus ORIX claims that they are allowable under section 506(b).

Section 506(b) of the Code provides as follows:

> To the extent that an allowed secured claim is secured by property the value of which ... is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

---

[34] The Motion to Allow includes fees only through the end of December 2009. However, at trial the parties usefully stipulated to the admission into evidence of the January 2010 bills from JMBM and the ATB bills for February 2010, thereby expediting a more comprehensive ruling.

Page -55-

In <u>Sun "N Fun Waterpark LLC</u>, 408 B.R. at 361, the court distilled the requirements of the statute:

> The language in § 506(b) can be broken down into four basic requirements for the allowance of attorney's fees, costs, and charges to a secured creditor: (1) the claim must be an allowed secured claim; (2) the creditor holding the claim must be over-secured; (3) the entitlement to fees, costs, or charges must be provided for under the agreement or state statute under which the claim arose; and (4) the fees, costs and charges sought must be reasonable in amount.

(Footnote omitted.)  <u>See also</u> <u>United States v. Ron Pair Enterprises, Inc.</u>, 489 U.S. 235, 241 (1989) ("Recovery of fees, costs, and charges . . . is allowed only if they are reasonable and provided for in the agreement under which the claim arose.).

There is no question that ORIX' claims, whether under section 506(b) or simply section 502, are allowed secured claims and that, thanks to the sale of the property to Lowe's, the value of the remaining cash is more than sufficient to pay any of the remaining interest, attorney fees and other costs incurred by ORIX.  Those conclusions are easily derived from the CM record in this case, as follows:

The Notice of Deposit into Court Registry dated December 2, 2009 (doc 110) recites that $9,331,056.63 was deposited into the Court registry on December 1, 2009, pursuant to the Order Approving Motion for Settlement of Lowe's Litigation filed November 17, 2009 (doc 105).  Since the funds were transferred to the Bankruptcy Court following the closing of the sale to Lowe's,

all parties knew with certainty no later than November 30, 2009
that there would be more than sufficient collateral proceeds to
pay in full the ORIX claims.[35]  On December 2, 2009, payment
issued from the Court registry to ORIX in the amount of
$7,948,574 (doc 112 and 113), and on December 21, 2009, an
additional payment of $45,000 went to ORIX (docs 117 and 119).
See also Exhibit A to ORIX's Motion to Allow.  Doc 120.  As of
December 29, 2009, ORIX was still owed, by its calculations,
$642,397.44.  Id.  The remaining balance in the Court registry on
that day was no less than ($9,331,056.63 - [$7,948,574 + $45,000]
=) $1,337,482.63.[36]  Thus, ORIX's claim, at most $642,397.44, was
secured by an equity cushion of at least $695,085.19, or more
than 100%.  It is with this background that the Court reviews

---

[35] The Debtor asserts that it had always scheduled the ORIX
claim as fully secured, and on that basis asserts that the
actions to collect on the guaranties were always unnecessary.  Of
course, merely scheduling a claim as fully secured does not in
reality make it so, and ORIX had no obligation to share the
Debtor's ostensible confidence.  Indeed, everyone's obvious
delight as it became more likely that the Lowe's litigation might
result in a settlement significantly in excess of the ORIX claim
suggests that even Debtor and everyone associated with the Debtor
had their doubts at some point about what would be recovered from
the property.

[36] In fact, it was certainly more, since a small amount of
interest would have accrued on the balance following the
disbursements to ORIX.  The next Status of Funds in Court
Registry report issued by the Clerk was filed February 11, 2010,
and showed $1,337,892.66.  Doc 135.  Subsequent reports show
continually increasing balances albeit in very small amounts.
Docs 153 and 162.

Page -57-

ORIX's claims for reimbursement from the collateral proceeds in the Court registry.

Both parties correctly assert that one must look to the contract documents – the Note, Deed of Trust and Guaranty, ORIX exhibits 1-3 respectively – as providing the basis for charging these fees to the collateral.  The Note (ORIX exhibit 1) states that "should [it] become necessary to employ counsel to collect the Debt or to protect or foreclose the security hereof, Maker also agrees to pay a reasonable attorney's fee for the services of such counsel whether or not suit be brought."  Paragraph 1 of the Deed of Trust (ORIX exhibit 2) identifies the Guaranty (ORIX exhibit 3) as one of the "Other Security Documents", and the opening paragraph of the Deed of Trust includes the guaranty obligations as among those that the collateral secures payment of.  As to the fees and costs incurred in enforcing the guaranty obligations, paragraph 1.2 of the Guaranty ("Guaranteed Obligations") provides among other things that the Note shall become recourse if "any petition for bankruptcy . . . shall be filed . . . by Borrower".  Paragraph 1.8 of the Guaranty, captioned "Payment of Expenses", provides that the guarantor shall pay all "costs and expenses (including court costs and attorneys' fees) incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder."  And paragraph

1.4, captioned Guaranteed Obligations Not Reduced by Offset,

recites that Guarantor's obligations

> shall not be reduced, discharged or released because or
> by reason of any existing or future offset, claim or
> defense of Borrower, or any other party, against Lender
> or against payment of the Guaranteed Obligations,
> whether such offset, claim or defense arises in
> connection with the Guaranteed Obligations (or the
> transactions creating the Guaranteed Obligations) or
> otherwise.

Debtor defaulted on the January 2009 payment, and

subsequently filed this chapter 11 case. After ORIX in August

2009 initiated a collection action against Lahave and Top

Terraces, see Verified Complaint for Breach of Guaranty (ORIX

exhibit 19), Lahave and Top Terraces in September 2009

counterclaimed for breach of contract, abuse of process and

declaratory relief (ORIX exhibit 21 at 15; ORIX exhibit 18 at 4),

and then in January 2010 initiated an action (a sort of

"countersuit") in the Second Judicial District Court in the State

of New Mexico for breach of contract (with strong overtones of

tort), malicious abuse of process and prima facie tort (ORIX

exhibit 20 at 1). In consequence the Court must decide whether

the attorney fees and costs incurred from JMBM in pursuing the

guaranty collection action, and the attorney fees and costs

incurred from JMBM and ATB in defending against the counterclaims

and the countersuit are covered by the loan documents, and

whether in any event the attorneys fees and costs incurred by

those firms were reasonable.

On the first issue, as outlined above, the Court finds that the loan documents contemplate the pursuit of the guaranty collection action in the event the Debtor files bankruptcy[37], and permit ORIX to reimburse itself for the attorney fees and costs of any guaranty collection action from the collateral. On the second issue, the Court finds that the defense of the counterclaims and the countersuit were sufficiently related to the guaranty collection action that those attorney fees and costs should be paid out of the proceeds of the collateral (assuming they are reasonable, the third issue addressed below). This conclusion is based on New Mexico law, as is required by the Deed of Trust, and on the documents themselves.

The mere fact that a legal action is initiated based on a contract which allows for the reimbursement of attorney fees and costs does not mean that the fees and costs incurred in connection with each cause of action or defense are reimbursable. Cf. Fortier v. Dona Anna Plaza Partners, 747 F.2d 1324, 1338 (10th Cir. 1984) (contract provided for attorney's fees for claims arising only under the contract, and claims of negligence and fraud did not give rise to fee award). The same is applicable when a counterclaim is filed in a collection action; the attorney's fees and costs in defending against the counterclaim

---

[37] Debtor resolutely ignores this provision of the "bad boy" guaranty in its Brief, doc 147-1, but then acknowledges the provision and its effect in its Reply Brief. Doc 151 at 1.

are not necessarily reimbursable from the collateral. "New
Mexico adheres to the so-called American rule that, absent
statutory or other authority, litigants are responsible for their
own attorney's fees." Montoya v. Villa Linda Mall, Ltd., 110
N.M. 128, 129, 793 P.2d 258, 259 (1990). (Citation omitted.)
However, New Mexico does allow recovery under a contract clause
if the contested action is closely enough related to the
contract. Id. ("[T]he language is broad enough to encompass suit
based on tort claims that relate to the contract in a direct
way...."); Fort Knox Self Storage, Inc. v. Western Technologies,
Inc., 140 N.M. 233, 241, 142 P.3d 1, 9 (Ct. App. 2006):

> Similarly, the language of the agreement in the present
> case is broad enough to include Fort Knox's claim of
> negligence against Western. It makes no difference that
> the jury found no breach of contract because the
> agreement does not limit recovery of attorney fees to
> claims for breach; instead, the agreement permits
> recovery if litigation is brought "in connection" with
> the agreement. Fort Knox's negligence claim was brought
> in connection with its agreement with Western because
> the claim came about as a result of Western's alleged
> failure to perform the work it was hired to do under
> the agreement.

Both the California counterclaims and the New Mexico
countersuit were essentially actions denying ORIX's right to
pursue the guaranty collection action. In consequence, defending
against them was in effect directly enforcing the Guaranty
provisions. As long as it was reasonable to pursue the
guaranties of Lahave and Top Terraces, it was reasonable to
defend against the counterclaims and countersuit, and to charge

Page -61-

the collateral (or the proceeds of the collateral) with those attorney's fees and costs.

JMBM began its representation in May 2009; the last billing in exhibit 9 is for January 2010. The total bills – fees and costs – were $140,417 for about nine months of services. Lahave and Top Terraces hired Lenske, Lenske & Abramson, A Law Corporation ("Lenske") to defend the collection action; that firm billed $49,466 for the last ten days of August and for September through November 2009. ORIX exhibit 17.

First, the Court notes that on a pro-rated monthly basis, the JMBM fees were not significantly higher. Lenske charged almost exactly $15,000 per month for its services; JMBM charged almost exactly $15,600.[38] This is despite the fact that the hourly billing rates of JMBM were markedly higher than the rates charged by Lenske. Debtor did not object specifically to the billing rates, and in any event, the Court finds for purposes of this case, based in part on testimony of another California attorney, Barak Lurie, in another hearing conducted in this case,

---

[38] The calculation is as follows: JMBM fees of $140,417 divided by 9 months, and Lenske fees of $49,446 divided by 3.3 months. The Court calculated the Lenske fees based on ORIX exhibit 17, verifying the accuracy of the cover sheet with the monthly billing summaries, as follows: $35,226 (balance due) + $7,920 (paid) + $6,300 ("courtesy reductions" based on a reasonable value review, and representing work done but which Lahave need not pay for) = $49,446. The Court did not add back into the Lenske bills the billing correction (reduction) of $1,631.

Case 09-11696-nlj11    Doc 167    Filed 08/03/10    Entered 08/03/10 16:01:23 Page 62 of 77

that hourly rates considerably above \$400 are commonplace in California.[39]  See <u>Fort Knox Self Storage</u>, 140 N.M. at 242, 142 P.3d at 10 (affirming award of \$240,000 in attorney fees based on a damage award of \$110,000):

> Here, Western cannot credibly challenge the reasonableness of Fort Knox's attorney fees because Western incurred a comparable amount of attorney fees in this obviously complex and hotly contested litigation.

What the billings show is that early in the collection action, JMBM asked a representative of Lahave if he could accept service on behalf of Lahave; the response was negative.  What followed was a difficult, time-consuming and expensive process of getting Lahave and Top Terraces served, requiring among other things at least one reset hearing in Los Angeles County Superior Court and the use of an investigator and a "surveillance process server".  Lahave, as the representative of Debtor and Top Terraces, certainly had no obligation to waive his right to be located and served personally, but he can hardly be heard to complain of the resulting increased expense which he easily could have avoided.

---

[39] Debtor contends that it was unreasonable for ORIX to dismiss the guaranty collection count in its foreclosure action in New Mexico and refile it in California where, for example, Lahave's home was located.  ORIX was entitled to pursue a collection action in a fashion that would be most effective.  To say that the California action was, and continues to be, effective, is a considerable understatement.

Page -63-

In a similar vein, the inquiries by Walter Gouldsbury of

JMBM for details about Lahave's Smith Barney account might have

led to a release of some of Lahave's collateral.  The total value

of the account was about $4.5 million, but Lahave testified that

he was not willing to disclose details of the sub-accounts.

Granted that the parties were, and are, so hostile to each other

that any agreements seem to be impossible and that Lahave

certainly has no obligation to cooperate with his creditor, the

fact is that the lack of agreement lead to continued litigation.

And in this instance, for whatever reason, ORIX has been

remarkably successful.  The Court can hardly penalize ORIX for

that success by not allowing otherwise allowable attorney's fees.

The Court has reviewed the bills from both JMBM[40] and Lenske,

and concluded that the JMBM bills, at least through September 30,

2009, are with very minor exceptions reasonable.[41]  For example,

---

[40] JMBM redacted the subject matter of most of the
conversations (by telephone and e-mail) between counsel and
client and among themselves, and many of the research projects
the firm engaged in for this litigation.  These redactions are
understandable and reasonably were not challenged by Debtor, but
they did make the Court's review more difficult.  Nevertheless,
the bills are sufficient for the Court to adequately apprise
itself of what was done at what cost.

[41] All the JMBM bills were for post-petition work.  Because
the "fees, costs or charges" represented by the bills are
provided for in the loan documents, they are, subject to
reasonableness (addressed below), collectible from the collateral
pursuant to section 506(b).  Gledhill, 164 F.3d at 1640; In re
Cummins Utility, L.P., 279 B.R. 195, 201 (Bankr. N.D. Tex. 2002);
In re Leatherland Corp., 302 B.R. 252, 258 (Bankr. N.D. Ohio
(continued...)

although Mr. Kaplan, the lead attorney, put in a lot of time
(including apparently on New Year's Day 2010), many of his
entries are only one-tenth of an hour, comprised of
communications with the client, New Mexico counsel, opposing
counsel, persons in his own firm in connection with work
assignments, etc. Even in communicating with persons in his own
firm, Mr. Kaplan's time records show very little duplication. He
did spend a significant amount of time revising documents prior
to filing, but that practice appears in the Lenske bills and in
the Lurie and Park bills as well.

    Other attorneys showed somewhat more duplication, but in
relatively minor amounts, and in any event, in a firm in which
several attorneys were working on the matter, some duplication is
inevitable. There was no evidence that suggested that the
assignment of different roles to counsel, such as, for example,
Neil C. Erickson as the trial attorney, was unreasonable.[42]   And

---

[41](...continued)
2003).

[42] The issue of multiple attorneys working on a matter
brings to mind Judge Leif Clark's practical advice on the
subject:
> This court is in no position to dictate which or how
> many attorneys a law firm may allocate to a particular
> matter. The way this court sees it, a firm may allocate
> as many attorneys to a particular matter as it
> considers to be in the best interest of its client.
> Only when the attorneys begin to duplicate work
> unnecessarily do the fees threaten to become
> unreasonable. And a risk that a law firm runs by
(continued...)

the significant amount of time devoted to researching and presenting to the California court out of state legal authorities presumably was necessitated by the fact that New Mexico law governed the documents.

Certain minor items are not allowable. It appears that a miscalculation or unfamiliarity with certain court procedures led to an extra billing of $575 on June 23, 2009 and of $345 on July 21, 2009. And the Donna Manning and Imelda Patts billings, totaling $868 (6.2 hours at $140, starting on July 14 and ending on November 20) for organizing the pleadings and otherwise maintaining the docket, are not allowable since that is clearly clerical work that is or should be part of overhead for a case.[43]

---

[42](...continued)
allocating multiple attorneys to a given matter is that those attorneys may need to confer with one another during the course of their representation to ensure that all attorneys are on the same page, as it were. Intra-firm conferences, while a good idea in general, may lead to unreasonable fees, or at least, unnecessarily duplicative time billed to the estate.... And, despite the debtor's argument to the contrary, having two attorneys kept apprised of the case may prove to be beneficial to all parties in some circumstances-e.g., when one attorney is suddenly unavailable due to unforeseen circumstances. In all events, there is no evidence of over-lawyering nor does the court find any evidence of unnecessary duplication of work in this case.
In re Pan American General Hosp., LLC, 385 B.R. 855, 873-74 (Bankr. W.D. Tex. 2008). (Internal citation omitted.)

[43] The Court has not deducted the fees incurred by Ms. Manning for preparing loan books from the documents received from the client early in the case, and for cite checking.

Page  -66-

Therefore a total of $1,788 should be deducted from the bills through the end of November 2009.

By the end of August everyone was on notice that a tentative settlement for a sale of $9.75 million had been reached, and no later than November 30, 2009, everyone knew that the Lowe's sale had closed resulting in what would be a deposit into the Court registry of an amount that was more than double the maximum amount still being claimed by ORIX. On December 1, 2009, the Court conducted a hearing on this issue, and on December 2, the Court issued an agreed upon order paying the principle balance and accrued but unpaid non-default interest to ORIX. This course of events raises the question of the reasonableness of the JMBM fees for September through December 2009 and January 2010. See Cummins Utility, 279 B.R. at 205 and n. 28 (reasonable certainty that the lender would be paid in full, including an offer from debtor's counsel to pay the lender its section 506(b) claim including contract interest, justified limiting the award of professional fees on lender's claim).

Certainly in hindsight the remarkable recovery from the Lowe's litigation suggests the collection actions on the Guaranty were never necessary to ensure ORIX's full recovery on its claim. But at the outset of the bankruptcy filing, there was no assurance whatever that there would be any recovery from Lowe's. And in fact, in the hearing on the Lurie and Park fee

Page -67-

application, the testimony of Barak Lurie, Robert Diener and Mr. Lahave was rather consistent in that all three of them thought initially (very early 2009) a damages recovery from Lowe's of perhaps $200,000 would be quite a successful outcome.  Lahave continues to insist that he could still have sold the property for somewhere between $11 million and $13 million, but the Court finds that assertion in the context of this economy little more than "California Dreamin'".

The Amended Disclosure Statement, filed August 30, 2009, announced the tentative purchase of the property by Lowe's for $9.75 million.  ORIX of course was entitled to wait to see if the sale resulting form the settlement actually closed, before it halted the guaranty action altogether.  But JMBM should have started to throttle back as it became clearer that the settlement was likely to be consummated.  Arguably the September and even October activities would have continued unabated while JMBM and/or ORIX confirmed the settlement details and the likelihood of consummation of the settlement, but a substantial abatement of activity should have been evident in the November bills, leading to virtually no billing in December 2009 and January 2010.  And of course once the closing contemplated by the settlement took place, the guaranty collection action should have ceased altogether.

Case 09-11696-nlj11    Doc 167    Filed 08/03/10    Entered 08/03/10 16:01:23 Page 68 of 77

It appears that in fact there was a substantial decrease in billing for November. The total that month for fees and costs was $7,037.67, down substantially from the two previous months.

The fees and costs for December were $3,395.65. The December time entries show that JMBM were considering the effects of the payoff, including questions relating to the uncertainty about what this Court would rule with respect to fees and costs, as well as negotiating with opposing counsel about going forward with the litigation or not. Understandably ORIX would be unwilling to give up the advantageous high ground it had obtained in the California litigation, but ORIX's collateral position vis-a-vis the registry funds was such that the California litigation was effectively now moot. While the December fees and costs were relatively paltry, they were still too high given the changed circumstances. JMBM should have charged no more than perhaps $1,000 for a quick analysis of the collateral situation and obtaining an agreement from Lenske for a joint dismissal of the California action. Thus the December billing should be reduced by $2,395.65.

A fortiori, the January 2010 billings are unreasonable in their entirety. The personal and real property which ORIX had attached was no longer needed.[44] In consequence, the Court finds

---

[44] Sometime on or before January 21, the Superior Court took the case management conference off its docket. It is not clear
(continued...)

that none of the January billings, $15,566.61, are reimbursable

from the collateral.

> It is inherently unreasonable to ask a debtor to
> reimburse attorney's fees incurred by a creditor that
> are not cost-justified either by the economics of the
> situation or necessary to preservation of the
> creditor's interest in light of the legal issues
> involved.

In the Matter of Nicfur-Cruz Realty Corp., 50 B.R. 162, 169

(Bankr. S.D. N.Y. 1985). Accord, In re Precision Tool and Die

Mfg. Co. Inc., 285 B.R. 621, 623 (Bankr. W.D. Pa. 2002):

> The Bank's right to reimbursement for legal fees
> incurred does not mean that the Bank has a blank check
> to pay for needless litigation. The Bank cannot pursue
> unnecessary litigation in an abundance of caution and
> expect to be paid for its services from the bankruptcy
> estate.
> The Bank was at all times an oversecured creditor. The
> value of its collateral was many multiples of the
> amount of its claim. There was never any question as to
> the validity of the Bank's secured claim. The Bank had
> little, if any, risk of loss. Debtor operated
> profitably during the case. The Bank's claim was
> steadily reduced. Debtor diligently made regular
> monthly payments.
> ...
> It is recognized that counsel must use diligence in
> protecting the client's interest. Larger claims impose
> on counsel a greater risk of loss. Time spent may be an
> important factor, but also the amount involved and the
> results accomplished are important. Here, there is very
> little that could have gone wrong. The criterion is the
> market rate. The question here is not how much can be
> successfully imposed on the debtor-obligor; the
> question is how much the market warrants if the client
> were paying the fees out of its own pocket.

---

[44](...continued)
whether this occurred as a result of the Superior Court learning
of the status of the bankruptcy court distribution to ORIX.

Thus the fees and costs should be further reduced by the January 2010 bills, which results in a total reduction of $19,750.26.

In summary, JMBM sought $140,261.39. ORIX exhibit 9, February 10, 2010 billing summary.[45] The Court is disallowing $19,750.26 under section 506(b). Therefore, ORIX's claim for JMBM fees is $120,511.13, all incurred postpetition.

On January 29, 2010, Lahave and Top Terraces opened a new front in the war by filing the New Mexico countersuit. Had the California action been dismissed, ORIX would have had no need to resist that countersuit. The New Mexico action essentially constituted a defense, albeit a very proactive one, to ORIX's California guaranty collection action. The Court has reviewed the ATB bill as well – $17,159.43 all incurred in February 2010 – and finds nothing that is unreasonable[46] except for the fact that the defense need never to have taken place to begin with. In consequence, the Court finds the ATB bills incurred to defend the

---

[45] Invoice number 1470490. The summary shows total fees billed "lifetime" of $131,148.50, and total costs billed "lifetime" of $9,112.89. These numbers are the total of all the monthly bills starting in May 2009.

[46] The Court notes the frequent use of the word "incoming" in the ATB billing as a noun rather than an adjective, characterizing, probably inadvertently, the hostile relationship between the sides.

New Mexico countersuit are not reasonably payable out of the collateral.[47]

**OUT OF POCKET CHARGES**

ORIX contends that the charges it incurred for a variety of services are properly payable out of the collateral; Debtor objects that they were not necessary. For example, ORIX had in its files the appraisal that was done when the loan was first made in 1999. When the dispute arose between it and Debtor, it obtained another appraisal and related services (ORIX exhibit 12), at a cost of $8,500.00[48]. (The appraisal was admitted into evidence at an earlier hearing on modification of the automatic stay.) The reasonableness of this expenditure is apparent. See 1095 Commonwealth Ave. Corp., 204 B.R. at 305 ("[T]he necessity of the appraisals is self-evident: Citizens needed to know and monitor the value of the properties that secured its claim."). Indeed, the mere recitation of the two dates of the appraisals – 1999 and 2009 – makes the objection almost frivolous.

Orix exhibit 12 also contains two invoices that total $4,604.70, dated September 22, 2009 and November 25, 2009, related to expert witnesses and litigation over the appraisals.

---

[47] Nothing in this memorandum opinion is intended to suggest that JMBM and ATB were not faithfully and quite competently carrying out the instructions of their client. The Court expresses no opinion about any fee awards in the state courts.

[48] The two invoices for the appraisal are dated April 24, 2009 and June 23, 2009 and appear in ORIX's exhibit 12.

The Court finds these reasonable and necessary under Section 506(b).

In a similar vein, most of the other expenses are also reasonably related to allowing ORIX to protect and manage its collateral. A survey (ORIX exhibit 16, pages 3-4, for $10,800) would be needed to ensure there had been no encroachments since the previous survey years before; the encroachments would not necessarily announce themselves.[49] An environmental audit (ORIX exhibit 15, costing $2,300, and ORIX exhibit 16, pp. 1-2, costing $3,027.22) is an obvious necessity, given the insidiousness of environmental contamination and the enormous cost it can impose on an owner of contaminated property. The property condition report and ESA review report (ORIX exhibit 13) totaling $1100 would be standard and almost minimal in the scheme of things. Payment of the real estate taxes (ORIX exhibit 11) in the amount of $6,966.92 is not contested. Debtor's Reply Brief, at 6. Doc 151.

ORIX requests reasonable travel fees (travel, parking, food, lodging) in connection with managing the property and, later, the

---

[49] Purchase of the unsecured claim of Matt Grose dba The Lawn Barber in the amount of $4,932 for prepetition landscape care services would not appear to be reimbursable as a section 506(b) expense. However, Debtor does not oppose its being so treated, Reply Brief at 6 (doc 151), and therefore the Court will allow it to be collected from the collateral.

Page -73-

litigation (ORIX exhibit 10), in the amount of $4,605.68.[50]  See 1095 Commonwealth Avenue Corp., 204 B.R. at 304 (modest parking and travel expenses allowed as part of reimbursable attorneys' fees).  Finally, given that the guaranty collection actions were appropriately commenced, the Frizzel Group bills that total $4,850.96 searching for assets to be attached were not unreasonable.  See ORIX exhibit 14.  The delinquent tax search fees of $350 listed in ORIX's Motion to Allow seems to have not been put into evidence.  Nevertheless, they are de minimus and a totally reasonable expense that should be allowed.

**SUMMARY OF COSTS AND EXPENSES ALLOWED TO DATE**[51]

---

[50] ORIX exhibit 10 is comprised of documentation of travel expenses to the property, six trips incurred post petition and three prepetition.  The three prepetition trips cost $1,037.83.  Clearly these charges are not post-petition expenses, but are just as clearly an expense reasonably incurred in connection with maintaining the collateral and allowable under section 502.  The postpetition trips were reasonable under section 506, and total $3,567.85.

[51] In its post-hearing briefs, ORIX claimed that it was entitled to reimbursement for additional fees and costs incurred subsequent to those represented by the exhibits.  For example, ORIX may seek reimbursement of Thuma & Walker bills beginning in January 2010 (including for litigating the issues addressed in this memorandum opinion, though the Debtor is already objecting to those), for JMBM bills beginning in February 2010, for ATB bills for March 2010, etc.  At least some of those expenses might be reimbursable.  Debtor and ORIX should confer on this issue, and present the Court with a process for resolving that dispute, or at least request a hearing from the Court if they cannot agree on anything.

| ORIX'S 502 CLAIM | |
|---:|:---|
| **AMOUNT** | **TYPE OF CHARGE** |
| $ 7,548,776.47 | principal balance |
| $ 11,360.91 | prepetition scheduled interest |
| $ 24,344.80 | unaccrued interest 4/1/10 to 4/15/10 |
| $ 7,339.08 | prepetition default rate interest |
| $ 6,571.77 | prepetition Thuma Walker fees |
| $ 0.00 | prepetition late fees (all paid 4/15/10) |
| $ <u>1,037.83</u> | prepetition travel expenses |
| $ **7,599,430.86** | **TOTAL PREPETITION CLAIM** |
| | |

| ORIX'S 506(b) CLAIM | |
|---:|:---|
| **AMOUNT** | **TYPE OF CHARGE** |
| $ 361,926.09 | postpetition scheduled interest |
| $ 233,802.38 | postpetition default rate interest |
| $ 0.00 | postpetition late fees on balloon |
| $ 8,500.00 | appraisal |
| $ 4,604.70 | litigation fees relating to appraisal |
| $ 10,800.00 | survey |
| $ 5,327.22 | environmental study |
| $ 4,932.00 | Lawn Barber claim |
| $ 6,966.92 | real estate taxes |
| $ 1,100.00 | property condition and ESA report |
| $ 4,850.96 | Frizzell bills |
| $ 3,567.85 | postpetition travel expenses |
| $ 42,115.75 | postpetition Thuma Walker fees to 12/31 |

Case 09-11696-nlj11   Doc 167   Filed 08/03/10   Entered 08/03/10 16:01:23 Page 75 of 77

| | | |
|---|---|---|
| $ | 120,511.13 | postpetition JMBM fees[52] |
| $ | 0.00 | postpetition ATB fees |
| $ | 350.00 | lien/delinquent tax search fees |
| $ | **809,355.00** | **TOTAL 506(b) CLAIM** |
| | | |
| $ | 8,408,785.86 | **TOTAL PREPETITION AND POSTPETITION CLAIMS** |

Therefore, ORIX's prepetition and postpetition claims total $8,408,785.86. ORIX has received $8,143,574.00 (<u>see</u> p. 17 above). Therefore, the remaining unpaid balance owed to ORIX is $265,211.86.

ORIX filed its proof of claim for $7,594,379.71; the Court has found that the claim was actually for slightly more, $7,599,430.86. ORIX has been paid $8,143,574.00, so the Court deems that the allowed prepetition claim has been paid in full. The postpetition claim, based on section 506(b), has been paid in part – $544,143.14 – and the balance is $265,211.86.

The Court will enter orders 1) granting in part ORIX's Motion to Allow in the amount of $265,211.86 and ordering the Clerk to disburse that sum to ORIX, and 2) overruling Debtor's objection to ORIX's proof of claim, consistent with the findings

---

[52] ORIX originally sought payment of post-petition attorney's fees for services incurred only through December 2009. However, at trial ORIX submitted bills for services as late as January (JMBM) and February (ATB) 2010. ORIX exhibits 9 and 23 respectively. The Court has adjudicated the post-December 2009 bills since neither party objected to their adjudication and since those bills would have to be ruled upon (if not settled) before the case was over anyway.

and conclusions set out above.  The Court declines to award punitive damages against ORIX as requested in Debtor's Brief. Doc 147-1 at 13.

_____

Honorable James S. Starzynski
United States Bankruptcy Judge

Date Entered on Docket:  August 3, 2010

Copies to:

Daniel J Behles
Moore, Berkson & Gandarilla, P.C.
P.O. Box 7459
Albuquerque, NM 87194

David T Thuma
500 Marquette Ave NW Ste 650
Albuquerque, NM 87102-5309

Ronald Andazola
Assistant US Trustee
PO Box 608
Albuquerque, NM 87103-0608