UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW MEXICO

In re:

MARKET CENTER EAST RETAIL PROPERTY, INC.,

Debtor.                       No. 11-09-11696 SA

**MEMORANDUM OPINION APPROVING IN PART
APPLICATION OF BARAK LURIE/LURIE & PARK
FOR COMPENSATION AS SPECIAL COUNSEL**

The Application by Attorneys as Special Counsel for Debtor

[in Possession] for Approval and Payment of Compensation

("Application") (doc 130), and the Debtor's Response to

Application for Compensation by Lurie and Park [sic]

("Objection") (doc 136), filed by Market Center East Retail

Property, Inc. ("Debtor"), came before the Court for an

evidentiary hearing on July 2, 2010, followed by briefing of

certain issues.[1]  The Court, having reviewed the evidence and the

---

[1]  In addition to the Application and Objection, the Court
has also reviewed Debtor's Memorandum in Opposition to
Adminsitrative [sic] Claim of Barak Lurie (doc 158) ("Debtor
Memorandum"), Post-Hearing Brief of Barak Lurie/Lurie & Park as
Special Counsel for Debtor Regarding Application for Approval and
Payment of Compensation (doc 160), Response Memorandum in
Opposition to Adminsitrative [sic] Claim of Barak Lurie (doc
165), Response Brief of Barak Lurie/Lurie & Park to Debtor's
Post-Hearing Memorandum in Opposition to Administrative Claim of
Barak Lurie (doc 166), and the subsequent arguments and proposed
evidence from Debtor (docs 200-202) including Debtor's Brief in
Support of Motion to Stay Award of Fees (doc 201) ("Debtor
Brief").  The Court has also taken judicial notice of (that is,
treated as evidence, pursuant to F.R.E. 201) the February 23,
2009 complaint against Lowe's Home Centers, Inc. filed in
California and the June 18, 2009 Joint Rule 26(f) Report filed in
the United States District Court for the Central District of
California, as requested by Debtor (doc 200), no objection having
been asserted by Applicant.

Case 09-11696-nlj11   Doc 215   Filed 03/30/11   Entered 03/30/11 11:11:15 Page 1 of 69

papers filed in the case, awards compensation and reimbursement of expenses totaling $350,752.06, and also rules that Barak Lurie and Lurie & Park (together, "Applicant") may file a supplement to the Application to take into account attorney fees incurred by Applicant in obtaining payment from the estate.[2]  In so ruling, the Court rejects Applicant's claim that it is entitled to an award of $1,473,236.75, comprised primarily of a contingent fee award of $1,462,500.00.[3]

**Background**

Most of the background is set out in the findings of fact already issued by the Court, and the Court assumes the parties'

---

[2] Attachment I attached to this opinion is the listing of the Applicant's hourly billings that the Court is allowing from June 10, 2009 through January 21, 2010.  Attachment II is the listing of the hourly billings from May 22, 2009 (petition date) through June 9, 2009, broken down into the segment of those billings that are allowed and the segment of the billings that are not.

[3] The Court has subject matter and personal jurisdiction pursuant to 28 U.S.C. §§1334 and 157(a).  This is a core matter pursuant to 28 U.S.C. §157(b)(2)(A) and (B); In re Fricker, 131 B.R. 932, 938 (Bankr. E.D.Pa. 1991).  This memorandum opinion comprises additional findings of fact, as may be necessary, and conclusions of law as may be required by Rule 7062, F.R.B.P.

familiarity with same.[4]  Additional fact-finding occurs as needed
below.

Briefly recapitulated, Danny Lahave, president and sole
shareholder of Debtor, together with Attorney Robert Diener, met
with Barak Lurie in February 2009 to arrange for Applicant to
represent (the soon to be) Debtor in an action against Lowe's
Home Centers, Inc. concerning Lowe's action to abandon its
purchase of the Debtor's commercial site.  Messrs Lahave and
Lurie signed a Legal Services Agreement ("Retainer Agreement")
(doc 16-1) which provided for a hybrid compensation arrangement
of $200 per hour plus a 15% contingency.  Applicant began working
on the case, and then Debtor filed its chapter 11 petition on
April 22, 2009.  On June 10, 2009, Debtor filed and noticed out
its Application to Employ Barak Lurie ("Employment Application")
(doc 16) to continue the litigation against Lowe's.[5]  Applicant

---

[4] Following the conclusion of the hearing but before the
briefing was completed, the Court on July 2, 2010 issued oral
findings of fact pursuant to Rule 7062, F.R.B.P.  (Amended
minutes, doc 161.)  A reasonably accurate set of notes of that
oral ruling is attached to the amended minutes, but of course the
electronic reproduction of the hearing on the Court's servers is
the actual record of the ruling.  A copy of the notes attached to
the amended minutes is attached to this memorandum opinion for
ease of reference; the attached notes have been slightly altered
to include full names instead of initials to make them more
readable.

[5] Two objections were filed to the Employment Application:
one by ORIX Capital Markets, LLC ("ORIX") (doc 38) and the other
by the United States Trustee (doc 41).  Both objections could
have been easily disposed of early in the case, especially by an
explanation by Debtor that the post facto employment issue was

continued the litigation, which ultimately resulted in a settlement whereby Lowe's went through with the purchase of the property for $9,750,000.  <u>See</u> Order on Debtor's Motion to Approve Sale of Real Estate Free and Clear of Liens to Lowe's Home Centers, Inc., docketed November 6, 2009 (doc 99).  Debtor never submitted an order approving the Employment Application; instead on November 9, 2009 it filed a Withdrawal of Application to Employ Barak Lurie (doc 100).  Applicant responded with its Motion for Order Disallowing Debtor's Purported Withdrawal of Application to Employ Barak Lurie/Lurie & Park (doc 107).  On June 25, 2010, the parties filed the Stipulated Order Regarding Professional Services Rendered by Barak Lurie[6] as Attorney for Debtor-in-Possession ("Stipulated Employment Order") (doc 128), by which the Court ruled that Applicant was entitled to an administrative claim for the services rendered, but that both sides were free to argue about what the compensation should be. Promptly thereafter Applicant filed the Application and noticed it out.  The only objection was filed by Debtor.

_____

Debtor's fault.  And it appears that both objections were in fact easily disposed of by means of the Stipulated Employment Order.

    [6] Although the title of the order identified only Mr. Lurie, the body of the order identifies Barak Lurie/Lurie & Park as the claimant.

**Analysis**

From June 10, 2009, when the Employment Application was filed, until January 21, 2010, when it appears that Applicant completed the fee application (Application exhibit A, page 23 of 37), Applicant expended 43.75 hours[7] as allowed herein by the Court[8], a total that is very close to the entire amount of the hourly charges requested by Applicant in Application exhibit A.[9] Most of the billing was by Mr. Lurie, although "SW" and "MR" also

---

[7] How this figure was arrived at appears at the end of this memorandum opinion.

[8] Unused to reading Carolingian minuscule, the Court worked its way through the tiny font and compact text of the Lurie & Park compilation of the bills submitted as Application exhibit A (January 28, 2009 through January 21, 2010) and Application exhibit B (November 10, 2009 through January 20, 2010). At a minimum the Application itself should have recited what the total hours were that had been expended in the relevant time periods, in 12 point font. Debtor trial exhibits A–H appear to be the identical bills but limited to the period from January 28, 2009 through October 30, 2009. Applicant trial exhibit 2 appears to be the same information in, and close to the same format as, Application exhibit A, except that Applicant trial exhibit 2 continues the time entries from January 22, 2010 through March 19, 2010. The additional billings, some in excess of $200 per hour, are for 13.3 hours. Most of these entries are for repeated revisions of the fee application, but also include conferences with Applicant's counsel and similar entries. The Court has not counted those charges in the totals it is allowing. By the same token, there is an "Additional courtesy discount per BL" of $650 noted on the last page of the time entries. The Court has disregarded that also.

[9] For reasons discussed below, the Court is not allowing any of the billings in Application exhibit B.

billed.[10]  With one exception all attorneys billed at $200/hour,
as permitted by the Retainer Agreement, page 1.  Applicant trial
exhibit 1 and Debtor trial exhibit K ("... for any attorney
working on this matter.").  The exception was that "SW" billed .2
hour on November 4 at $275/hour ($55.00), which $55.00 the Court
has reduced to $40.00.  The resulting totals are $7,990.00 in
fees and $53.98 in costs, for a total of $8,043.98 in hourly
fees.  <u>See</u> Attachment I.  The time allowed by the Court includes
the time that Applicant spent preparing the Application.[11]

    Debtor's objection raises a variety of issues, most of which
the Court will address seriatim.  There are, however, certain
issues that the two sides agree on.  They agree that the Retainer
Agreement was not assumed by the Debtor, that Applicant is
entitled to some compensation, that Applicant may file an
administrative claim for compensation under §503(b), and that
Debtor may object to the amount of the requested fees and the
methodology of calculating those fees.  Both sides also agree
that, with no compensation arrangements having already been
approved by the Court (whether by approval of the prepetition
Retainer Agreement or otherwise), the restriction on changing the

---

    [10] "SW" is apparently Stephen J. Weaver and "MR" Michele A.
Reikes.  Debtor's Request for Judicial Notice Pursuant to Federal
Rule of Evidence 201 (doc 200), Exhibit B (doc 200-5) Joint Rule
26(f) Report, cover page and certificate of service thereto.

    [11] That time is included in the Application exhibit A, pages
22-23 of 37, and is allowed by the Court at $200/hour.

compensation arrangements contained in the second sentence of
§328(a) is inapplicable.[12]  They also agree that Applicant has
been employed by the estate pursuant to a court order (Stipulated
Employment Order, at 2) approving that employment, thereby mostly
avoiding the consequences of a professional seeking compensation
from the estate without an employment order.  See, for example,
In re Albrecht, 245 B.R. 666, 671-72 (10th Cir. BAP 2000)

_____

[12] Section 328(a) provides as follows:
The trustee, or a committee appointed under section
1102 of this title, with the court's approval, may
employ or authorize the employment of a professional
person under section 327 or 1103 of this title, as the
case may be, on any reasonable terms and conditions of
employment, including on a retainer, on an hourly
basis, on a fixed or percentage fee basis, or on a
contingent fee basis. Notwithstanding such terms and
conditions, the court may allow compensation different
from the compensation provided under such terms and
conditions after the conclusion of such employment, if
such terms and conditions prove to have been
improvident in light of developments not capable of
being anticipated at the time of the fixing of such
terms and conditions.
See, e.g., In re Texas Securities, Inc., 218 F.3d 443, 445 (5th
Cir. 2000) (holding that "section 328 applies when the bankruptcy
court approves a particular rate or means of payment, and § 330
applies when the court does not do so."). Accord, Riker, Danzig,
Scherer, Hyland & Perretti v. Official Committee of Unsecured
Creditors (In re Smart World Technologies, LLC), 552 F.3d 228,
232-33 (2nd Cir. 2009) ("These two inquiries are mutually
exclusive, as there is no question that a bankruptcy court may
not conduct a § 330 inquiry into the reasonableness of the fees
and their benefit to the estate if the court already has approved
the professional's employment under 11 U.S.C. § 328."). 
(Citation and internal punctuation omitted.)  However,
notwithstanding the categorical tone of the quotation, the Court
does not read Smart World Technologies to preclude any review
whatever of the reasonableness of the requested compensation even
if counsel has been employed pursuant to §328.

(<u>Albrecht I</u>), <u>aff'd</u> <u>In re Albrecht</u>, 233 F.3d 1258 (10th Cir.)
(<u>Albrecht II</u>) (§327 approval prerequisite for award of
compensation under §503(b)) (citing <u>Interwest Bus. Equip., Inc.</u>
<u>v. United States Trustee (In re Interwest Bus. Equip., Inc.)</u>, 23
F.3d 311, 318 (10th Cir.1994)); <u>In re Channel 2 Associates</u>, 88
B.R. 351, 352 (Bankr. D.N.M. 1988) (same).

From the papers, it would also appear that the parties are
agreed that Applicant seeks an award of approximately $1,400,000.
<u>E.g.</u>, Debtor Memorandum at 10 ($1,400,000 fee for 108 hours of
work) and Application at 7, ¶22 (request for $1,472,385.00 for
fees and $851.75 for costs). Since the Court has determined
instead to award most of the hourly fees dating from June 10,
2009 and 15% of the additional $2,250,000 obtained after the
filing of the petition, for reasons explained below, that after-
the-fact agreement by the parties (about the number they believe
they are arguing about) is irrelevant. See <u>Albrecht I</u> (court may
disregard agreement reached by parties on fee issue). The
Court's decision also means that the number of hours to be
compensated is 43.75 (detailed below) rather than the 108 that
Debtor argues about. And it also means that there need be no
proration of administrative expenses, as requested by Applicant.
Application at 6.[13]

_____

[13] The Application reads in part:
Applicant recognizes that this amount may exceed the
funds available for distribution from the Estate, in

The issues on which the parties are at odds are rather more numerous.  They include whether all the hours worked were necessary and of benefit to the estate; whether Applicant is locked into a "lodestar" methodology; whether Applicant met its burden of proof on various elements of proving up its claim, including meeting the requirements of §330(a)(3); whether Applicant needs to establish an alternative claim against the estate for promissory estoppel; and whether the Court can and should approve the Retainer Agreement on a nunc pro tunc or post facto basis  – that is, whether Applicant should be compensated (and if so, how much) in connection with the "gap period" between the petition date of April 22, 2009 and the date the employment application was filed on June 10, 2010.  There are other minor issues that the parties have argued, which the Court will address as needed.

**Effect of Stipulated Employment Order Employing Applicant**

Before proceeding to the contested issues, the Court needs to clarify what at least one consequence is of the history of this dispute.  By agreement of the parties[14], the Court is not

---

which case Applicant requests that the Court grant Applicant its administrative claim in the amount [of $1,473,236.75] to be paid pro-rata with other administrative expenses.
Id., ¶18.

[14] The Stipulated Employment Order provides at 2-3:
IT IS THEREFORE ORDERED AS FOLLOWS:
A. Barak Lurie/Lurie & Park is entitled to an

Page 9 of  69

deciding whether to approve the assumption by Applicant of the
Retainer Agreement, which was in essence the relief sought by the
Employment Application.[15]  The Retainer Agreement was presumably

administrative claim for professional services rendered
as special counsel for the Debtor-in-Possession,
effective June 10, 2009, pursuant to 11 USC §327(e).
The approval of terms of compensation is specifically
reserved for determination upon the submission of Barak
Lurie/Lurie & Park's administrative claim.
B. Barak Lurie and Lurie & Park shall be entitled to
submit an administrative claim for reasonable
compensation for professional services rendered to
Debtor-in-Possession for purposes of prosecution and
settlement of Debtors' lawsuit against Lowes
Home Centers, Inc. Any such administrative claim shall
disclose services rendered between April 22, 2009, the
date of the petition, and June 10, 2009. The
entitlement to fees incurred between the date of the
petition and June 10, 2009 shall specifically be
reserved for determination on submission of the
administrative claim.
C. The terms of the retainer agreement which are
contrary to the provisions of 11 USC §330 are void,
including the terms requiring that billings either be
paid or objected to within 15 days.
D. Any creditor or party in interest, including Debtor,
may object to the amount of the administrative claim
for compensation for professional services of Barak
Lurie and Lurie & Park.
E. The Court reserves ruling on the amount of any fees
sought by Barak Lurie/Lurie & Park.

[15] In relevant portion, the Employment Application recited:
5. In general, the professional services to be rendered
by Barak Lurie are to continue his prosecution of the
case against Lowe's Home Improvement currently pending
the District Court for the Central District of
California.
6. The Debtor desires the services of Barak Lurie to
continue his prosecution of the above pending case on
the terms previously agreed to before the bankruptcy
filing.
7. Accordingly, the Debtor desires to employ said
attorney at the rate of $200 per hour and 15% of any

an executory contract[16], which, if assumed, might well have

obligated the estate for an administrative expense measured in

part at 15% of $9,750,000, or about $1,400,000, as Applicant has

requested.  Alternatively, were the Retainer Agreement to have

been rejected and Applicant had filed a proof of claim for

(prepetition) damages arising from the rejection, the Court would

have needed to determine the liability of the estate and the

extent of damages, if any, arising from both the hourly and

contingent aspects of the Retainer Agreement.  See <u>Landsing</u>

<u>Diversified Properties - II v. First National Bank and Trust</u>

<u>Company of Tulsa (In re Western Real Estate Fund, Inc.)</u>, 922 F.2d

---

settlement, 20% of any settlement if it gets within 90
days of trial for attorney fees.
...
WHEREFORE, Debtor prays that it be authorized to employ
Barak Lurie to perform attorney services as needed.

[16] Neither Applicant nor the Retainer Agreement itself
appear anywhere in Debtor's schedules, including on Schedule G.
Doc 12 (filed May 6, 2009).  Article VI of the <u>unconfirmed</u> plan
(doc 64, filed August 30, 2009) explicitly lists executory
contracts and unexpired leases and purports to determine their
treatment.  Article 6.01(a) provides for Debtor to assume all the
listed leases and executory contracts in that Article.  The
Retainer Agreement is not listed.  Article 6.01(b) provides that
"Debtor will be conclusively deemed to have rejected all
executory contracts and/or unexpired leases not expressly assumed
under section 6.01(a) above, or before the date of the order
confirming this Plan."  However, section 6.01(a) lists only
commercial tenant leases in the shopping center; it is section
6.01(2)-(7) that lists the executory contracts for services.
Thus the Plan provisions for the assumption or not of executory
contracts are ambiguous concerning all executory contracts,
including the Retainer Agreement.  No other provision of the plan
nor any other filing explicitly assumes or rejects the Retainer
Agreement.

592 (10th Cir. 1990), <u>modified on other grounds</u> <u>Abel v. West</u>, 932
F.2d 898 (10th Cir. 1991) (Under Oklahoma law, client whose
attorney has already secured favorable settlement offer not
permitted to unilaterally reduce attorney's bargained for
contingency fee to much smaller hourly quantum meruit recovery
simply by breaching fee agreement before settling litigation on
which attorney had been employed; bankruptcy court was required
to determine damages and liability arising from the prepetition
hybrid fee agreement).

Instead, the Stipulated Employment Order effectively employs
Applicant for unspecified "reasonable compensation" for
professional services rendered from June 10, 2009 going forward,
Stipulated Employment Order, decretal paragraph A, and also
allows Applicant to attempt to obtain compensation for the period
from April 22, 2009 through June 9, 2009. Stipulated Employment
Order, decretal paragraph B. That is, the parties have
effectively limited the dispute to compensation for postpetition
services, a compromise which the Court considers eminently
reasonable on the part of both parties. In consequence, the
Court need not, and does not, consider the possible implications
of various other scenarios, such as if the Application to Employ
Barak Lurie had been approved by the Court or the Retainer
Agreement had been assumed by the estate, if Debtor had sought to

reject the Retainer Agreement and Applicant had filed a claim for

damages, etc.

**Statutory Standards**

Whether Applicant is entitled to compensation, and how much,

is determined by reference to the relevant portions of §§503(b)

and 330(a).

Section 503(b)(2) provides that

[a]fter notice and a hearing, there shall be allowed
administrative expenses, other than claims allowed
under section 502(f) of this title, including ...
compensation and reimbursement awarded under section
330(a) of this title....

Section 330(a)(3) provides as follows:

In determining the amount of reasonable compensation to
be awarded to an examiner, trustee under chapter 11, or
professional person, the court shall consider the
nature, the extent, and the value of such services,
taking into account all relevant factors, including--
(A) the time spent on such services;
(B) the rates charged for such services;
(C) whether the services were necessary to the
administration of, or beneficial at the time at which
the service was rendered toward the completion of, a
case under this title;
(D) whether the services were performed within a
reasonable amount of time commensurate with the
complexity, importance, and nature of the problem,
issue, or task addressed;
(E) with respect to a professional person, whether the
person is board certified or otherwise has demonstrated
skill and experience in the bankruptcy field; and
(F) whether the compensation is reasonable based on the
customary compensation charged by comparably skilled
practitioners in cases other than cases under this
title.

The Court finds that Applicant has sufficiently met the applicable standards of both sections of the Code, as explained below.

**Benefit to the Estate**

Debtor appropriately cites to <u>Rubner & Kutner, P.C. v. U.S. Trustee (In re Lederman Enterprises, Inc.)</u>, 997 F.2d 1321 (10th Cir. 1993) for the proposition that Applicant must establish benefit to the estate to receive any compensation. <u>Lederman</u> goes on to say that "...the lodestar analysis..., however, determines only the 'reasonableness' of counsel's fees, not its entitlement. The Bankruptcy Code itself sets out the standard to be used in determining counsel's eligibility for compensation." <u>Id.</u>, at 1323 (citations omitted). <u>Accord,</u> <u>In the Matter of Taxman Clothing Company</u>, 49 F.3d 310, 315-16 (7th Cir. 1995)(Attorney seeking to recover preferential transfer for estate not entitled to unreasonable additional fees calculated pursuant to lodestar after it became apparent that the recovery action would not be successful).

Benefit to the estate is a necessary condition for entitlement to compensation under §503(b)(2). By itself, Debtor's (reasonable) concession that Applicant is entitled to some compensation means that the <u>Lederman</u> test has been met. Beyond that, in its findings of fact (doc 161) the Court addressed this specific issue, and found that it was Applicant's

Case 09-11696-nlj11   Doc 215   Filed 03/30/11   Entered 03/30/11 11:11:15 Page 14 of 69

strategy for getting around the liquidated damages obstacle that
Lowe's had erected, plus initiating and pursuing the litigation,
that was largely responsible for the excellent result achieved
for the estate.

Debtor presents several arguments in opposition to the
Court's finding.  The arguments are not persuasive.

First, it argues that the small amount of time that appears
in Applicant's time records describing settlement negotiations
with Lowe's counsel (excerpted and condensed in Debtor Memorandum
at 14[17]) prove that Applicant cannot have contributed
substantially to the settlement negotiations, which settlement
negotiations, according to Debtor, were conducted primarily by
Mr. Diener and were the main cause of the amount of the
settlement.  Debtor Memorandum at 13-16.  Affidavit of Danny
Lahave in Support of Debtor's Motion to Stay Award of Fees, ¶4,
at 1 of 13 (doc 202) ("Lahave Affidavit").

---

[17] One might quibble with the listing as not complete
enough; see, for example, the April 28 billing entry ("Review
Review [sic] and respond to settlement offer from Lowe's and
Diener's response to same"; .25).  And while it appears the
critical settlement terms were agreed to by no later than the
late afternoon of August 27, Applicant trial exhibits 11 and 12
and August 28 billing entries ("Contact court to advise clerk of
tentative settlement"; "Arranged to advise district court re:
prospective settlement"), finalizing the settlement apparently
required additional negotiations. September 4 billing entry
("advise atty Mortimer re need to finalize settlelent terms and
plan for same by next week") and September 21 billing entry
("Telephone calls with atty Mortimer re settlement").
Nevertheless, the listing is sufficiently accurate to serve as
the basis for the argument.

Case 09-11696-nlj11    Doc 215    Filed 03/30/11    Entered 03/30/11 11:11:15 Page 15 of
69

The time listed, exclusive of "time spent reviewing Diener's work or talking to Lahave", Debtor Memorandum at 14, is slightly over six hours.  The Court initially considered this amount of time surprisingly low, and it formed that opinion based on the assumption that a matter of this financial magnitude, representing a $13,500,000 original purchase price, a liquidated damages clause of $115,000 and a settlement of $9,750,000, must have been intensely negotiated within the relatively short amount of time between initiation of the litigation and final settlement.[18]  Upon rethinking that issue, particularly in light of the exhibits and testimony submitted by the parties documenting the course of the litigation and settlement, the Court believes another conclusion is more likely; namely, that once the litigation was commenced, Lowe's conceded liability and some amount of damages more readily than expected.  This conclusion is supported by the fact that shortly after the filing of the complaint and after removal of the action to the United States District Court, and two days before the bankruptcy petition was filed on April 22, 2009, Lowe's offered to settle for $7,500,000.  Applicant's trial exhibit 8 (April 21, 2010 e-

---

[18] The Court notes again that neither side called anyone from Lowe's, including its counsel Ann Marie Mortimer, to testify about the amount of time spent in the negotiations and with whom they were conducted on behalf of Debtor.  At the trial Applicant did request that Ms. Mortimer be allowed to testify by telephone, but the Court denied that request.

mail from Lowe's counsel stating in part "As I indicated in my voice mail to you yesterday, Lowe's is prepared to settle this matter for a purchase price of $7.5 million...."). That in turn supports the conclusion that the negotiations to reach the ultimate figure of $9,750,000, while perhaps intense and certainly interlaced with discovery demands (themselves pressuring Lowe's toward settlement), were also relatively short and compact. Thus the 23 conversations with Ms. Mortimer (including voice mails and other messages) that Applicant has recorded were likely the bulk of the negotiations that effected the ultimate settlement figure.

In a related argument Debtor asserts that Mr. Diener and Robert (or "Bob") Feinberg, the real estate agent involved in the original sale transaction, did the bulk of the negotiating that resulted in the settlement figure reaching $9,500,000.[19] However, there is relatively little proof of that assertion. To begin, other than a claimed initial contact from Mr. Feinberg to Ms. Mortimer to put her and Mr. Diener in contact with each other, there is no evidence whatever of the role played by the

---

[19] Debtor initially conceded that Applicant was likely responsible for squeezing out the last $250,000. E.g., Debtor Memorandum at 14 ("Mr. Diener candidly agreed that he felt Lurie got the last $200,000 or $250,000 from Lowe's in August – from $9.5 to $9.75 million."). However, Mr. Lahave then withdrew that concession, giving all the credit to Mr. Diener. Lahave Affidavit at 1. With the passage of time, Mr. Lahave's recollection of events has grown clearer and more self serving.

real estate agent. Other than this snippet of information from Mr. Diener, neither Mr. Feinberg nor anyone else testified about what Mr. Feinberg did.

Mr. Diener also testified that he (Diener) did most of the negotiating with Lowe's.[20] He presented very few records that backed up his assertions, and no time records. Debtor trial exhibit N is comprised of three e-mails dated March 25, 2009. In the middle one Mr. Lurie discusses the import of Lowe's request for an extension of time to respond to the complaint, and Mr. Lurie recommends that Mr. Lahave engage Lowe's personally (presumably Mr. Moylan or Mr. Peters - Applicant trial exhibit 4) about settlement. The last e-mail is from Mr. Diener to Mr. Lurie, copied to Mr. Lahave, in which Mr. Diener tells Mr. Lurie that he (Mr. Diener) has spoken with Mr. Lahave and Ms. Mortimer and authorizes Mr. Lurie to grant Lowe's a 30-day extension to respond to the complaint conditioned on the immediate commencement (not continuation) of good faith negotiations. On April 20, Lowe's offered $7,500,00 by telephone voice mail, and followed that up in writing on April 21. Applicant trial exhibit

---

[20] Mr. Diener insisted that he originated the phrase "reasonable 'business solution'" to characterize the negotiations, Debtor trial exhibit N, which phrase was used in later e-mails by Lowe's counsel. That assertion was not disputed by Applicant. While a phrase may be very effective (e.g., "Remember the Maine!"), the extent to which the phrase "reasonable 'business solution'" by itself resulted in the settlement or determined the amount of the settlement was never quantified.

Case 09-11696-nlj11    Doc 215    Filed 03/30/11    Entered 03/30/11 11:11:15 Page 18 of 69

8. Debtor trial exhibit O is comprised of three e-mails dated April 28, 2009, the earliest of which is a "For Settlement Purposes Only" e-mail from Mr. Diener to Ms. Mortimer proposing an increase in the settlement amount to $8.5 million with Debtor retaining a portion of the real property. Mr. Lurie responds to Mr. Diener that afternoon by saying "When final terms are agreed to, let me know and I'll work on the settlement papers." After that date, the only records of settlement negotiations are in Applicant's time records,[21] suggesting that it turned out that Mr. Lurie, consistent with his testimony, played a much larger role in the settlement process than was perhaps initially contemplated, even by him. And, to be precise, Mr. Lurie's e-mail of March 25 (Debtor trial exhibit N), echoed in his e-mail of April 28 (Debtor trial exhibit O), is clear that he is expecting the "principals" to negotiate a deal – i.e., Mr. Lahave on behalf of Debtor, not Mr. Diener. (No one has claimed that Mr. Lahave did any serious direct negotiating with anyone from Lowe's. Indeed, what led Mr. Lahave to Applicant to begin with was that in December 2008 and January 2009, neither Mr. Lahave

---

[21] The exception to this statement may be the May 8, 2009 e-mail from Mr. Lurie to Mr. Diener, quoted and discussed at some length below.

Case 09-11696-nlj11    Doc 215    Filed 03/30/11    Entered 03/30/11 11:11:15 Page 19 of 69

nor Mr. Diener could get anyone from Lowe's to talk with either of them, particularly to Mr. Lahave.[22])

Mr. Diener also professed not to know whether it was normal for litigation counsel to also engage in settlement negotiations. He conceded that from about March through August that he had no idea what Mr. Lurie, litigation counsel, was up to. He denied that the discovery demands constituted pressure on Lowe's to settle. And at one point, asked why Lowe's counsel would send a settlement offer to Mr. Lurie rather than to him, he responded that he considered that a breach of professional courtesy, with no explanation of why Lowe's counsel would do that were she negotiating primarily with Mr. Diener.

None of that testimony is credible, partly based simply on the face of it. For example, Mr. Diener testified that in the

---

[22] In fact, Mr. Lurie testified that Ms. Mortimer would not deal with Mr. Diener. In Debtor trial exhibit N, Mr. Diener instructs Mr. Lurie to communicate to Ms. Mortimer that a "business solution" involves Lowe's closing the sale at a fair price to both sides within about 30 days. This supports Mr. Lurie's testimony that Ms. Mortimer would not deal with Mr. Diener, and is direct evidence that Mr. Diener was not negotiating with Lowe's. On the other hand, there was some negotiating going on between Ms. Mortimer and Mr. Diener, as illustrated by Applicant trial exhibit 6, the series of e-mails starting on August 12 with Ms. Mortimer telling Mr. Diener of the settlement negotiations and the offer she has communicated to Mr. Lurie, and ending with an instruction from Mr. Diener to Mr. Lurie not to speak further with Ms. Mortimer until he (Mr. Diener) had resolved the broker's claim that would have to be paid out of the settlement proceeds. Nevertheless, that series of e-mails clarifies that the considerable bulk of the negotiations were conducted by Mr. Lurie and not Mr. Diener.

Case 09-11696-nlj11    Doc 215    Filed 03/30/11    Entered 03/30/11 11:11:15 Page 20 of 69

first three and a half years of his practice litigation was all
that he did.  It is common knowledge that frequently litigators
also engage in settlement negotiations for their clients.  And
the suggestion that the discovery demands did not apply pressure
to Lowe's that led to the settlement is also preposterous.  See,
for example, the April 21, 2009 e-mail from Ms. Mortimer to
Messrs Lurie and Diener:

> Gentlemen:
> As I indicated in my voicemail to you yesterday, Lowe's
> is prepared to settle this matter for a purchase price
> of $7.5 million, with the expectation that we will be
> able to close this transaction relatively quickly, and
> on the express condition that your client agrees to an
> immediate stay in the litigation to allow the parties
> to negotiate to resolution.  Should your client wish to
> reject this offer, but continue with negotiations,
> continued negotiations are expressly conditioned on
> your agreement to stay the litigation.  I look forward
> to your prompt response.
> Regards,
> Ann Marie

Applicant trial exhibit 8.  Similarly, the e-mails exchanged on
July 17 and 23, and August 27, 2009 between Mr. Lurie and Ms.
Mortimer, Applicant trial exhibits 9, 11 and 12 respectively, are
merely seven more examples that demonstrate how effective was the
negotiating tactic of pressing the litigation (that is, the
discovery demands).[23]

_____

[23] See also Applicant trial exhibit 5, a July 10, 2009 e-
mail from Mr. Lurie to Mr. Lahave with a copy to Mr. Diener,
which reads in part:
> We should probably go forward with serving discovery at
> this point, just to put a little pressure on.  Among
> other things, we should schedule some depositions.  I

Further evidence refuting Debtor's claim is in the time records submitted by Applicant (Applicant trial exhibit 2), the accuracy of which were not challenged, which show Mr. Lurie involved in settlement negotiations – either with Lowe's counsel or consulting with Mr. Lahave and/or Mr. Diener – on March 24, March 26, April 7(x 2), April 13 (x 2), April 14, April 20, April 21, April 28, May 1, May 6, May 18, May 19, June, 1, June 4, and June 5.

Thereafter Applicant's time records show repeated communications between Messrs Lurie and Lahave about the status of the negotiations on June 29, July 2 (x 2), July 10, July 16 (x 2), July 31, August 7, August 10, August 11, August 12, August 14 (with a copy to Mr. Diener), August 18 (copy to Mr. Diener), August 19 (likely settlement discussed), August 20, August 24 (including the mention of a real estate broker's commission), August 25 (x 2), August 26 (correspondence to Mr. Diener), August 27 (apparently several updates to Messrs Lahave and Diener)[24],

---

> do want to show their pattern of conduct of making
> multiple deals at the same time.
> If I hear anything back from [Anne Marie Mortimer]
> positive or negative, I'll of course let you know that,
> too.

[24] This is the date on which the agreement on the $9,750,000 purchase price appears in the e-mails as agreed upon. Applicant trial exhibit 11. Thus it appears that Mr. Diener became significantly involved in the negotiations (as opposed to working out the transactional details) only after the "heavy lifting" was done.

Case 09-11696-nlj11    Doc 215    Filed 03/30/11    Entered 03/30/11 11:11:15 Page 22 of
69

September 1 (reviewing and responding to correspondence from Mr. Diener to Lowe's counsel), September 4 (reviewing and responding to correspondence from Mr. Diener), September 22 (telephone call with Mr. Diener), September 25, September 29, and October 2. The extent of this continual stream of communication between Applicant and client would be inexplicable if it were Mr. Diener who had been conducting the negotiations primarily.

This is not to say that Mr. Diener conducted none of the negotiations with Lowe's. The first April 28 e-mail in Debtor trial exhibit O is from Mr. Diener to Ms. Mortimer that starts with "[i]n our telephone conversation the other day" and goes on to counteroffer a settlement of $8,500,000 in return for conveying to Lowe's less than all of the parcel in question. And it is also true that time entries from March 26, March 27, March 30, April 1, April 10 and April 21 suggest, some more explicitly than others, that there were communications between Mr. Diener and Lowe's counsel. And there are two references in the time sheets – February 17 and February 19 – to "client's transactional attorney". What these time entries tell the Court is that, while the considerable bulk of the settlement communications were between Lowe's counsel and Mr. Lurie, Mr. Diener did have some involvement, but that most of that involvement was as the attorney for the client who knew the background of the original transaction, which was now being reactivated in the course of the

settlement[25], and who would be responsible for documenting the details of the sale and getting it implemented. Similarly, Mr. Diener undertook to factor in the commission to Mr. Feinberg as the real estate broker, something which he rather than Mr. Lurie would be more readily equipped to deal with.[26] Applicant trial exhibit 6 (August 12 e-mail from Mr. Diener to Mr. Lurie).[27]

In reaching this conclusion, the Court has taken into account the May 8, 2009 e-mail from Mr. Lurie to Mr. Diener (Diener Exhibit B attached to Affidavit of Robert Diener in Support of Debtor's Motion to Stay Award of Fees ("Diener Affidavit") attached as Exhibit D to Debtor Brief – doc 201-4 at page 6 of 6), and the February 2009 e-mail exchanges among Messers Diener, Lahave and Lurie and the September 30, 2009 e-mail from Mr. Lurie to Mr. Lahave (Exhibits B and C respectively

_____

[25] See Applicant trial exhibit 11, e-mail from Ms. Mortimer to Mr. Lurie, stating that the $9,750,000 offer was contingent on all the original terms of the deal staying the same, including government approval, zoning, permits, etc.

[26] In this context, the Court interprets Messrs Diener's and Lahave's care to factor in the real estate commission but not the attorney contingency fee, as implying an intentional plan to avoid paying Applicant the full amount owed.

[27] Mr. Diener's affidavit (doc 201-4) adds nothing to change these conclusions. Similarly, Mr. Lahave's statement that he only hired Applicant to apply pressure on Lowe's to hasten a response to the January 26, 2009 letter to Lowe's demanding that it honor the sale agreement, Lahave Affidavit at 1, is entirely new testimony that one would have expected to have been presented at trial, subject to cross examination. The Court does not find the statement credible.

to the Lahave Affidavit – doc 202-3 at pages 1-3 and doc 202-4 at pages 1-2).[28]

The May 8, 2009 Lurie to Diener e-mail potentially suggests a more robust role for Mr. Diener. (Debtor asserts that this e-mail demonstrates that it was Mr. Diener and not Mr. Lurie who obtained the settlement. Debtor Brief at 20-21.) It recites as follows:

> Robert, sounds good. Once we have a lock-up on the purchase price and the other basic terms you mentioned to Anne-Marie earlier, let me know. I'll then work up the settlement agreement. Let's cross our fingers. If you feel there is no chance of settlement at this point, let me know as soon as possible, as we will soon have Rule 26 obligations (exchange anticipated known documents and witnesses), and we should probably start discovery.
> Barak

The e-mail is presented in isolation; what the antecedent communication was that "sound[ed] good" to Mr. Lurie is unspecified, and the Court has not found an e-mail exchange or other communication that immediately preceded the May e-mail. But even assuming that the e-mail is what Debtor purports it to be, its effect is in good measure offset by the trial testimony and other exhibits. The trial testimony was clear that it was Mr. Lurie's focus on Lowe's tactic of optioning several properties in a given area as the avenue to bypass the

---

[28] These materials illustrate Debtor's pattern of continuing to submit evidence long after the trial on the merits, with the attendant questions of credibility that practice raises.

constraints of the liquidated damages clause. The February 19,
2009 e-mail from Mr. Lahave to Mr. Lurie, Lahave Affidavit,
Exhibit B (doc 202-3, page 2 of 3)[29], does not establish that Mr.
Lahave or Mr. Diener came up with the key strategy of charging
Lowe's with contracting for multiple sites with the intention of
using only one or two; that e-mail can just as easily be read as
confirming facts which fit the strategy that Mr. Lurie had
already come up with. And the September 30, 2009 e-mail from Mr.
Lurie to Mr. Lahave, offered primarily in an attempt to show that
Mr. Lurie unethically failed to inform Mr. Lahave of the hidden
cost of accepting the settlement with Lowe's (Lahave Affidavit at
¶9 – doc 202 at page 3 of 3), supports the conclusion that Mr.
Lurie was the attorney largely responsible for the negotiations
with Lowe's that resulted in the favorable settlement, and that
Mr. Diener was working more closely with Mr. Lahave on how to
make any settlement work best for Mr. Lahave.

Reinforcing Mr. Diener's already existing lack of
credibility, Mr. Diener changed his testimony during the trial

---

[29] The text of that e-mail reads as follows (quoted
verbatim):
     Barak.
     Just talked to the broker and he has confirmed as
     follow:
     Lowes have been negotiating 4-5 deals in Albuquerque,
     for the last 3 years, however only one deal (about 8
     miles away from us) was closed in late summer 2008.
     Just as we thought previously.
     Danny

Case 09-11696-nlj11    Doc 215    Filed 03/30/11    Entered 03/30/11 11:11:15 Page 26 of 69

from asserting that he represented Debtor to saying that he works for Mr. Lahave directly for $15,000 per year.[30]  But when Debtor filed its schedules, it listed its primary unsecured creditor as Mr. Diener, in the amount of $100,000.  How Debtor could end up owing Mr. Diener $100,000 when he worked instead for Mr. Lahave, and at the rate of $15,000 per year, has never been explained.[31]  This Court concludes that it was Applicant's efforts, including Applicant's settlement negotiations, that led to the $9,750,000 recovery for the estate.

Second, Debtor argues that a substantial component of the good result was Lowe's "greed" to obtain a property for $9,750,000 that they had originally decided to pay $13,500,000 for.  Thus, Debtor argues, Applicant was not the one responsible for the benefit that accrued to the estate.  Debtor Memorandum at 15.  There are several responses to this.  First, all the evidence suggests that Lowe's simply walked away from the deal in December 2008, with no intention of wanting to obtain the property or to renegotiate the price.  It was perfectly willing to let Debtor keep the $115,000, but there is no evidence that it even considered conceding any more than that.  Second, there was

---

[30] Then in his affidavit attached to Debtor Brief, Mr. Diener states that he was employed by both Debtor and Mr. Lahave. Diener Affidavit, ¶¶ 1-2, attached as Exhibit D to Debtor Brief (doc 201-4, at 2 of 6).

[31] As of the date of this memorandum opinion, no proof of claim had been filed by or on behalf of Mr. Diener.

Case 09-11696-nlj11    Doc 215    Filed 03/30/11    Entered 03/30/11 11:11:15 Page 27 of 69

no evidence whatever that the economy improved substantially enough, or Lowe's overall business strategy changed, such that suddenly Lowe's wanted this property.  Of course there was no testimony whatever from Lowe's itself on this issue; what Debtor argues is merely self-serving speculation.  Third, even if Lowe's "greed" was a factor, Applicant surely gets credit for having triggered that greed and using it to Debtor's considerable advantage.

Third, Debtor raises the argument that "the sad fact is that the result achieved is not really a 'good' result for the debtor. If Mr. Lurie wants to claim that he, and he alone, is responsible for the result, then he, and he alone, lost the debtor almost $4 million that it had invested."  Debtor Memorandum at 15-16.[32]  In other words, (1) Debtor invested and borrowed $13,500,000 for this project[33], (2) the economy crashed, (3) Lowe's walked away leaving Debtor faced with a complete loss of its investment other than the $115,000 and what it could get on the market in this

_____

[32] Immediately thereafter Debtor purports to disclaim this argument.  "Of course, this is not true. Many forces acted to cause the debtor's loss – market forces that devalued commercial real estate being not the least of them."  Id. at 16. But Debtor then goes on to make the argument anyway, citing as its reason for doing so Applicant's burden to prove up its entitlement to compensation.  Id.

[33] Debtor asserts that Mr. Lahave invested $4,000,000 above the $9,750,000 it recovered in the litigation.  Debtor presented no proof of any investment, but Applicant has not contested that assertion.

economy for a mostly empty shopping center[34], (4) Applicant

obtained a settlement of $9,750,000, and therefore (5) Applicant

is responsible for the almost $4 million loss.  An Escher-like[35]

argument that blames the party who mostly rebuilds the city after

it has been devastated by an earthquake, for causing the

earthquake in the course of rebuilding the city, is simply too

bizarre to be taken seriously.

Debtor also argues that one way to interpret the contract is

that the gain to the estate be measured by what is left over

after the secured claim of ORIX has been paid in full.  Debtor

Memorandum at 17-18.  By that standard, the estate will benefit

no more than $600,000 to $1,300,000, and thus to pay out the bulk

or at least a large amount of that sum to Applicant would be

"non-sensical" [sic].  Id.

To begin with, there is no need to resort to Black's Law

Dictionary to define the term "recovery", as Debtor does in its

brief, nor is there a need to resort to rules for interpreting

ambiguous contracts.  The Retainer Agreement is not ambiguous, at

least not with respect to the terms at issue here.  The Court

finds that Mr. Lurie is completely credible in stating the Mr.

---

[34] As of January 2009, with Sports Authority, the largest
tenant, leaving the shopping center, the vacancy rate shot up to
70%.  Debtor's Disclosure Statement for Chapter 11 Plan dated
June 16, 2009 (doc 65) at 4.

[35] Maurits Cornelis Escher (1898-1972). See, for example,
his lithograph "Relativity", published in December 1953.

Case 09-11696-nlj11    Doc 215    Filed 03/30/11    Entered 03/30/11 11:11:15 Page 29 of
69

Lahave came to him to get Lowe's to purchase the property; the Retainer Agreement is consistent with that understanding between the two of them.  This Court has already found that Mr. Lurie reached an agreement with Mr. Lahave to include the value of the sale of the property in calculating the amount of the recovery and then, with considerable prescience (or perhaps only good lawyering), made that mutual understanding quite specific in the Retainer Agreement.  Although everyone knew about the ORIX debt, there is nothing in the Retainer Agreement to support Debtor's argument that any "recovery" should be net of what ORIX collects.  Nevertheless, the recovery was sufficient to pay off the secured debt in full with Debtor remaining solvent.  And even if it were the case that after paying off ORIX, the recovery was not sufficient to pay all the administrative claims, that result would still be a success given where this Debtor was in January 2009.  The fact that the award of compensation and reimbursement to Applicant is $350,752.06 plus some supplemental attorney fees for Applicant's counsel, thus leaving enough to pay all the other creditors in full and put money back into Debtor's pocket, raises the success to the level of rousing.

What Debtor's argument illustrates is the pervasive inability of Mr. Lahave to distinguish between his personal interests on the one hand and the interests of the corporation

Case 09-11696-nlj11    Doc 215    Filed 03/30/11    Entered 03/30/11 11:11:15 Page 30 of 69

and its creditors on the other hand.[36]  A recovery large enough
to pay all the creditors in full is by almost any insolvency test
a success.  It is not a success, of course, from the perspective
of the sole shareholder of the company whose only concern is that
at the end of the day he recover all his original investment.
See Debtor Memorandum at 16-18.  And especially is that the case
when that shareholder still fails to recognize that he had
personal liability on the secured debt[37], which personal
liability has been mostly all eliminated by the payments made in
this case to ORIX.  That substitution of interests – the
shareholder identifying his own interests as those of Debtor and

---

[36] For example,
    Thirdly, the sad fact is that the result achieved is
    not really a "good" result for the debtor. ...  This
    was actually not a good "deal" for the debtor, but
    merely the least offensive of a wide range of possible
    disasters.
Debtor Brief at 15-16.

[37] Debtor argued that the shareholder was only liable if he
engaged in certain forbidden conduct, such as fraud.  Debtor's
counsel characterized this limited liability as a "bad boy
guarantee".  In fact, the correct or at least current usage of
the term "bad boy guarantee" includes a full recourse claim
against the individual.  See Julie Satow, "'Bad Boy' Guarantees
Snarl Billions in Real Estate Debt", The New York Times, January
18, 2011 (electronic edition).  So, probably inadvertently,
Debtor's counsel correctly used the term since the secured debt
was from the outset of the ORIX transaction fully recourse as to
Mr. Lahave.  In re Market Center East Retail Property, Inc., 433
B.R. 335, 371 (Bankr. D.N.M. 2010).  In consequence, contrary to
the arguments of Debtor, including in its Response Memorandum in
Opposition to Administrative Claim of Barak Lurie at 9-11 (doc
165), there is no factual basis for the argument that Mr. Lahave
would have been just as well off if he had not had the Debtor
pursue a recovery from Lowe's.

its creditors - is what leads the shareholder to argue, in

Debtor's voice, that paying off the secured debt should not be

recognized as part of the "recovery" for compensation purposes.

Debtor Memorandum at 17.  The argument may suggest that Mr.

Lahave is not the best person to manage the estate; it certainly

does not diminish the benefit rendered to the estate by

Applicant's efforts.[38]

---

[38] In fact, compared with January 2009 or even the date of the commencement of the chapter 11 case (April 22, 2009), Mr. Lahave has not done badly.  The ORIX claim of $8 million plus has been paid.  The balance of funds in the court registry as of December 31, 2010 was $1,058,737.41 (Clerk's Status Report of Registry Funds – doc 204).  The United States Trustee is owed $13,987.88 (doc 209); Debtor's counsel has been awarded fees and costs of $99,185.27 (doc 211), though it is not clear if counsel has already been paid a portion of that total; this decision awards Applicant $$350,752.06; and Schedule F (doc 12) lists total unsecured claims of $7,488.24 owed to trade creditors (exclusive of the $100,000 listed as owed to Mr. Diener).  Subtracting this total ($471,413.45) from the December 31 balance leaves Debtor/Mr. Lahave $587,323.96.  There remains some satellite litigation over fees and costs of the California guaranty litigation against Mr. Lahave personally and his company Top Terraces, Inc. (which the parties have agreed that this Court would not adjudicate – see Order Resulting from Preliminary Hearing on ORIX Capital Markets, LLC's Supplemental Application for Allowance of Attorney Fees as Part of Secured Claim (doc 180)), but that is for relatively small sums.  And Applicant may submit a further bill for its New Mexico counsel fees.  Whether Mr. Lahave pays Mr. Diener's anomalous claim of $100,000 is questionable.  Thus, Mr. Lahave as the shareholder still ends up with somewhat less than $600,000 from the estate, less any future Keleher and McLeod bill.  This is, of course, somewhat less than 15% of Mr. Lahaves's potential loss of approximately $4 million on this project.

**Lodestar**

Debtor does not explicitly assert that Applicant can only be compensated under a lodestar approach.[39] Nevertheless, Debtor's proposal that Applicant be awarded a fee of $28,000 calculated by multiplying 70 hours at $400/hour, its discussion of the 12 Johnson factors[40] and its (appropriate) emphasis on the lodestar

_____

[39] In its most recent decision addressing the lodestar, the Supreme Court defined that methodology as "the number of hours worked multiplied by the prevailing hourly rates". Perdue v. Kenny A. ex rel. Winn, ___ U.S. ___, 130 S.Ct. 1662, 1669 (2010) (in 42 U.S.C. section 1988 litigation, fee enhancements above lodestar figure are prohibited if based on factors incorporated into the lodestar calculation; fee enhancements above the lodestar consequently will be rare).

[40] Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974), adopted by the Tenth Circuit in First National Bank of Lea County v. Niccum (In re Permian Anchor Services, Inc.), 649 F.2d 763, 768 (10ᵗʰ Cir. 1981). In Perdue, the Supreme Court distinguished the lodestar methodology from the Johnson factors test. Perdue, ___ U.S. ___, 130 S.Ct. at 1671-72. Cf., e.g., Lederman, 997 F.2d at 1323, which appears to conflate (or at least combine) the lodestar and Johnson factors test.

> The lodestar test is presently used as the dominant method for assessing fees in fee-shifting disputes in federal court. See generally, Gisbrecht v. Barnhart, 536 U.S. 789, [801-02] (2002). Strictly speaking, trustee's fees in bankruptcy do not involve a fee-shifting rationale. This court has long applied the Johnson lodestar factors to assess "reasonableness" of attorney's fees in a variety of contexts, however, and has also specifically determined that the test applies to attorney fee determinations under § 330(a)(1).

Connolly v. Harris Trust Co. of California (In re Miniscribe Corp.), 309 F.3d 1234, 1243-44 (10ᵗʰ Cir. 2002) (emphasis added; citations omitted). Of course, regardless of what test the Supreme Court may dictate to flesh out the vague contours of a "reasonable" fee in civil rights litigation, the Court bases its decision on the Bankruptcy Code, including the factors Congress has specified in §330(a)(3), some of which appear to be Johnson

Case 09-11696-nlj11    Doc 215    Filed 03/30/11    Entered 03/30/11 11:11:15 Page 33 of 69

and Johnson requirements that Congress has written into
§330(a)(3), Debtor Memorandum respectively at 2, 10-13 and 7-9,
suggest the undercurrent of its arguments is that the Court may
employ only the lodestar methodology.  Such a position would of
course not be correct, given the explicit presentation of
alternatives in §328(a), which alternatives include as reasonable
terms and conditions such arrangements as a retainer, a fixed or
percentage fee, or a contingency fee.  These alternative
compensation arrangements make it obvious that the lodestar
methodology is not the only permitted compensation arrangement
for attorneys.  Houlihan Lokey Howard & Zukin Capital, LLC, v.
Unsecured Creditors' Liquidating Trust et al. (In re Commercial
Financial Services, Inc.), 298 B.R. 733, 749 n. 46 (10th Cir. BAP
2003) ("There is no requirement anywhere in the Bankruptcy Code
requiring an hourly rate compensation.") and Unsecured Creditors'
Committee v. Puget Sound Plywood, Inc., 924 F.2d 955, 959-961
(9th Cir. 1991) (court imposed a flat 30% contingency fee based
on the amount recovered, since a lodestar charge would have been
too high), but see Boddy v. United States Bankruptcy Court,
Western District of Kentucky (In re Boddy), 950 F.2d 334, 337
(6th Cir. 1991) (reversing bankruptcy court's award of fees based

---

factors.  Following the dictate of Permian Anchor Services, the
Court also specifically applies the Johnson factors.

Page 34 of  69

on the "usual and customary" limit of $650 for a chapter 13 case and mandating application of a higher lodestar figure).

In a similar vein, Debtor also argues that because there is no agreement in effect for a part contingency, the Court is limited to relying on the lodestar. Debtor Memorandum at 6 (arguing for a lodestar approach, "Lurie & Park may be entitled to compensation, but not pursuant to the terms of the agreement.") and Response Memorandum in Opposition to Administrative Claim of Barak Lurie at 14.

In fact, it is not clear to this Court that the default position for compensation must be the lodestar in the absence of a specific agreement otherwise. For example, if there had been no agreement on compensation for an attorney to perform a certain task, and a party proved to the court that the customary and usual compensation in the legal community as a whole for that sort of task was a flat fee of a certain amount, the court might well award that compensation, regardless of how many hours and at what rate the attorney had taken to accomplish the task.

Indeed, the automatic application of the lodestar to measure compensation raises another question; namely, just how applicable is the lodestar in all circumstances. Obviously it is seldom if ever used for certain types of professionals: appraisers often charge a fixed fee, auctioneers get a percentage of the gross sales price plus costs, and real estate agents often get an

agreed upon percentage of the gross sales price.  While hours
times rate is how many attorneys are paid, by no means is that
the only common method of compensation, which can routinely
include a fee contingent on the amount of recovery (personal
injury cases) or a flat fee (some criminal defense cases).

The lodestar is a method that takes an appropriate hourly
rate based on the market and multiplies that by some supposedly
reasonable number of hours for the work at hand.  Such an
approach makes sense when there is a no more specific mechanism
for assessing the value of the services rendered such as by
obtaining for the estate a specific sum of money, as happened in
this case.  Thus, for example, when counsel obtain a major
reorganization and improvement of a state's foster care system,
there is no immediate and easy quantifying in money terms that
result.  So attempting to reward the attorneys by paying them
what defense counsel would have gotten paid for the same number
of hours is one at least marginally adequate method of
compensating counsel.[41]  Similarly, assessing the value of, say,

_____

[41] The example is obviously drawn from <u>Perdue v. Kenny A. ex
rel. Winn</u>, ___ U.S. ___, 130 S.Ct. 1662.  Whether offering an
hourly contingent fee (the full hourly rate if the litigation is
successful, less or nothing if it is not) to undertake
potentially expensive, drawn out, demanding, risky litigation
will in fact attract any counsel other than those who do so as a
public service is, to put it mildly, questionable, but answering
that question is far beyond the scope of this memorandum opinion.
<u>Compare</u> <u>In re Abrams & Abrams, P.A.</u>, 605 F.3d 238, 246 (4th Cir.
2010) (in a personal injury case, trial court erred in reducing
1/3 contingency recovery of $6 million to a lodestar award of

Case 09-11696-nlj11   Doc 215   Filed 03/30/11   Entered 03/30/11 11:11:15   Page 36 of
69

administering an estate by getting a plan confirmed, or sales
approved, or operating reports filed, are not activities that are
easily valued in specific dollar amounts.  But there is no lack
of a concrete measure in the circumstances presented by this
request for compensation, and so the lodestar is less needed or
useful.

**Hybrid Compensation**

In this instance, as the Court has already found, the
parties had reached an arm's length agreement on the compensation
to be paid – the hybrid of an hourly rate of $200/hour and the
15% contingency fee on the total recovery – when they signed the
Retainer Agreement.  And they still had that understanding when
the employment application was filed June 10, 2010.[42]  Debtor's
subsequent attempts to evade the consequences of its agreement do
not change the stubborn fact that Debtor and Applicant reached an
agreement and in the process acknowledged the reasonableness of

_____

$600,000; "[P]laintiffs may find it difficult to obtain
representation if attorneys know their reward for accepting a
contingency case is merely payment at the same rate they could
obtain risk-free for hourly work, while their downside is no
payment whatsoever.").

[42] The Court notes that the notice that went out to
creditors and parties in interest announced the hourly rate as
$200/hour but made no mention of the contingency fee that was an
integral part of the compensation arrangement.  Doc 20.  This
defect, and the others like it such as the failure to file the
application timely, might be significant issues were it not for
the fact that the only entity affected is the Debtor, which knew
exactly what the arrangements were.

the compensation arrangements.  The Court treats that
acknowledgment as effectively an admission of reasonableness that
continues to bind the Debtor.

Thus, when Debtor argues that there is no proof pursuant to
§330(a)(3)(F) of "whether the compensation is reasonable based on
the customary compensation charged by comparably skilled
practitioners in cases other than cases under this title", Debtor
must first explain why the compensation was reasonable then but
not now.[43]  It has not done so.  In any event, the Court can and
does take judicial notice of the adjudicative fact, pursuant to
F.R.E. Rule 201, that perhaps the most frequently used percentage
for contingency fee purposes is 33% (before costs are accounted
for).  And that standard higher rate is effectively acknowledged
by the agreement that the contingency rate would be reduced to
15%.

**§330(a)(3) Requirements and the <u>Johnson</u> Factors**

"[E]ven if it is undisputed that a professional has provided
exceptional services, such as in this case, the bankruptcy court
may not award it more than a 'reasonable compensation.'"  <u>In re</u>

---

[43] The Court acknowledges of course that it is Applicant's
burden to demonstrate compliance with the requirements of
§330(a)(1)(A) and (3).  "The burden of establishing the
reasonableness of a fee rests upon the party making the request."
<u>In re Hamilton Hardware, Co., Inc.</u>, 11 B.R. 326, 329 (Bankr. E.D.
Mich 1991); <u>see also</u> <u>Johnson</u>, 488 F.2d at 720 "[I]t must be kept
in mind that the plaintiff has the burden of proving his
entitlement to an award for attorney's fees just as he would bear
the burden of proving a claim for any other money judgment.").

Page 38 of  69

<u>Commercial Financial Services, Inc.</u>, 298 B.R. at 747.[44]

Nonetheless, a remarkable outcome for the estate may generate a higher fee for the professional and still be perfectly reasonable.

    <u>Permian Anchor Services</u>, incorporating the <u>Johnson</u> factors, continues to be the governing law in the Tenth Circuit, albeit refined by the amendments to §330(a) that now comprise §330(a)(3).[45]  Thus, to determine the reasonableness of the requested compensation, the Court will consider the factors explicitly identified in §330(a)(3) and the remainder of the <u>Johnson</u> factors.

---

    [44] Debtor argues the fees requested in the Application are not reasonable under the standards set by California law.  Debtor Brief at 16, citing <u>Community Redevelopment Agency of the City of Santa Ana v. Matkin</u>, 272 Cal.Rptr. 1, 6, 220 Cal.App.3d 1087, 1099 (1990) ("In determining what would be a reasonable amount to award for fees, the court may consider a number of factors, including the nature and difficulty of the litigation, the skill required and employed, the attention given, the success or failure of the attorney's efforts, and the attorney's experience.").  This Court of course is bound to look to the Code and the Tenth Circuit for the applicable standards.  That said, the more succinct standards enunciated in <u>Matkin</u> do not differ significantly from those set out in <u>Permian Anchor Services</u>.

    [45] <u>Permian Anchor Services</u> was decided in 1981, when §330(a) was almost quaint in its brevity, and long before the amendments to the statute that now constitute §330(a)(3).  The amendments provide considerably more definition for the standards of deciding the reasonableness of compensation requests.  Were <u>Permian Anchor Services</u> to be decided today, the Tenth Circuit might well limit its consideration to the factors listed in the statute.  Nevertheless, <u>Permian Anchor Services</u> has not been overruled or abrogated, and therefore the Court will consider the <u>Johnson</u> factors in full.

Section 330(a)(3) includes a nonexclusive list of factors that a court may (or may not) consider. ... See 11 U.S.C. §§ 102(3) ("'including' [is] not limiting") & 330(a)(3) (in determining the reasonableness of compensation the bankruptcy should take "into account all relevant factors, including" those listed in subsections (A)-(E))....

Commercial Financial Services, Inc., 298 B.R. at 748 and note 42.

Subsection 330(a)(3)(A) requires a consideration of "the time spent on such services;...." Measured from June 10, 2009, the date the employment application was filed, through November 17, 2009, the date of entry of the Order Approving Motion to Approve Settlement of Lowe's Litigation (doc 105), Applicant spent approximately 40 hours over five months improving the recovery from $7,500,000 to $9,750,000. Were the compensation in this case calculated by a simple lodestar, that would constitute an hourly rate of ($2,250,000.00 ÷ 40 =) $8,637.25. But obviously the arrangement is not a simple lodestar; it is a partial contingency. And one role for a compensation award contingent on success is to encourage and reward big risk-taking: big risk should be met with big reward when the risk-taking has turned out to be successful. Abrams, 605 F.3d at 246.[46]

In this instance the parties thought initially that a $200,000 total recovery would be an excellent result, and that

---

[46] The Court was unable to find any Tenth Circuit cases that addressed the Johnson factors in the context of a contingent fee award. Cf. Commercial Financial Services, Inc., 298 B.R. at 750-51 (upholding bankruptcy court ruling to disapprove investment bank's fixed monthly fees irrespective of hours worked).

any recovery would likely be achieved only after considerable
time and effort.  The arm's length negotiations over the
compensation arrangements reflect that these modest expectations
were perfectly reasonable.  Mr. Lurie initially sought a straight
hourly compensation of $395 and Mr. Lahave sought a full
contingency (presumably the standard 33%).  Had the parties
anticipated a large return as likely, perhaps neither of them
would have taken the initial positions that they did.  But what
they did do was what parties do when they do not know the
outcome: negotiate a deal based on the best information they
have.[47]  The Court should take into account that fact.  So, while
the Court is not bound by the parties' agreement[48], as it

_____

[47] See Gisbrecht v. Barnhart, 535 U.S. 789, 810 (2002)
(Scalia, J., dissenting):
    I think it obvious that the reasonableness of a
    contingent-fee arrangement has to be determined by
    viewing the matter ex ante, before the outcome of the
    lawsuit and the hours of work expended on the outcome
    are definitively known. For it is in the nature of a
    contingent-fee agreement to gamble on outcome and hours
    of work – assigning the risk of an unsuccessful outcome
    to the attorney, in exchange for a percentage of the
    recovery from a successful outcome that will (because
    of the risk of loss the attorney has borne) be higher,
    and perhaps much higher, than what the attorney would
    receive in hourly billing for the same case.
(Emphasis in original.)  In Gisbrecht, the Supreme Court approved
contingent fee arrangements in social security appeals.

[48] "The criterion for the court is not what the parties
agreed but what is reasonable."  Johnson, 488 F.2d at 718,
quoting Clark v. American Marine Corp., 320 F.Supp. 709, 711 (E.
D.La. 1970), aff'd, 437 F.2d 959 (5th Cir. 1971) (award of
attorneys fees in civil rights case).

probably would be had the agreement been "locked into place" by virtue of a §328(a) order, at the same time the Court is not precluded from determining in retrospect that the agreed upon terms were and are reasonable and enforceable.

Therefore, in summary, from the perspective of a simple lodestar, the comparatively few hours that it took to obtain the additional recovery work against approval of a large award of compensation. From the perspective of accounting for risk by means of a partial contingency, the result of the settlement argues in favor of the large award. This factor overall weighs in favor of Applicant.

Subsection 330(a)(3)(B) looks at "the rates charged for such services;...." $200 per hour, by itself, is quite inexpensive. A contingency rate of 15% is less than the standard 33% (or higher) charged in many contingency arrangements. Combining these two – roughly halving both the hourly rate and the contingency percentage – is not at all unusual. And as noted above, Debtor has already effectively admitted that this arrangement is and was reasonable. This factor supports the award.

Subsection 330(a)(3)(C) demands to know "whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;...." As discussed, the

answer to this question is "yes, in spades".  This factor weighs very heavily in favor of the award.

Subsection 330(a)(3)(D) asks "whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;...."  What this subsection targets is the bill for services that is too high for the work done, simply because the task was not that complex or important to the estate.  What is presented in this case is the polar opposite: a huge return to the estate for relatively few hours spent finishing up the implementation of a smart and persistent legal strategy.  Having created the condition for a successful chapter 11 case, Applicant meets this standard easily as well.  It weighs heavily in Applicant's favor.

Subsection 330(a)(3)(E) inquires "with respect to a professional, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field;...."[49]  Little evidence was presented about Mr. Lurie's credentials beyond being an attorney.  He did testify that earlier in his career he had extensive bankruptcy experience representing various parties in bankruptcy cases.  And he

_____

[49] It is not clear why the term "field" should be qualified by the adjective "bankruptcy" when the statute addresses compensation for a variety of professionals, including special counsel who often are hired specifically to do "nonbankruptcy" work.

certainly knew enough to understand that he needed an employment order if he was to be compensated. But this is all largely irrelevant, since his role was to be litigation counsel in the state court action (later removed to federal court).

Subsection 330(a)(3)(F) inquires "whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title."

The Court has already discussed Debtor's actions which constitute an admission that the rates in the Retainer Agreement were reasonable. There was no testimony about what rates were being charged by litigation counsel in California, although $395/hour probably ranges from reasonable to cheap. So this factor would ordinarily weigh against Applicant.[50]

Although the other <u>Johnson</u> factors are not incorporated explicitly into §330(a), Debtor has discussed all the Johnson factors in obedience to <u>Permian Anchor Services</u>, and so will the Court. In doing so, the Court includes the contingency aspect of

---

[50] Nothing in §330(a)(3) suggests that a failure to meet any single standard set out in the statute must result in a finding of unreasonableness or no compensation being awarded. Section 330(a)(3) is a multi-part test, and aside from the question of benefit to the estate, no single factor listed in the statute is a necessary requirement for compensation. <u>Compare, for example</u>, the requirements of §547(b), the failure to prove any one factor of which results in the failure to make out a prima facie case for relief.

Page 44 of 69

the agreement, which is not inconsistent with the <u>Johnson</u>
factors. <u>E.g.</u>, <u>Abrams</u>, 605 F.3d at 244.

1. <u>Time and labor required</u>: By the time the employment
application was filed on June 10, Applicant's strategy – charge
Lowe's with bad faith as a way of getting around the liquidated
damages clause and then press forward on the litigation,
especially discovery – was well along being implemented. As a
consequence, relatively little time after June 10, 2009 – roughly
40 hours – was expended completing the litigation and settlement.
Whether someone else could have stepped in and completed the
work, to obtain the additional $2,250,000 for the estate, is not
clear. What is clear is that it was Mr. Lurie who conceived the
strategy and carried it out. While the relatively small amount
of time expended by Applicant (even if one considers all the time
expended from January 2009 forward) weighs against the size of
the award (as stated above), the evidence suggests that Mr. Lurie
worked reasonably hard in obtaining the result. This part of the
factor favors Applicant slightly. Balancing off the two
considerations, the relatively small amount of time required of
Applicant outweighs the hard work factor and results in this
overall factor weighing in favor of Debtor.

2. <u>Novelty and difficulty of the questions</u>: Although
Debtor plays down the novelty and difficulty faced by Applicant,
the fact is that Applicant and Debtor alike considered this

Case 09-11696-nlj11    Doc 215    Filed 03/30/11    Entered 03/30/11 11:11:15 Page 45 of 69

litigation quite risky and thought that a recovery of perhaps $200,000 would be a good result. Such a result, whether by settlement or litigation, would of course leave the shopping center in the hands of Debtor. Mr. Lahave argued that he could have sold the shopping center (70% vacancy rate, in this economy) for $11 million to $13 million.[51] The Court has already found that assertion to be incredible, and that at the outset of the engagement breaking the grip of the liquidated damages clause appeared to be a daunting task indeed.

Debtor also argues that the Lowe's litigation was fairly simple, and required no motion practice, no receipt of discovery, no depositions, no filing of a summary judgment motion, and no trial preparation. Debtor Brief, at 16-17. What the argument does not acknowledge is the strategy that was devised by Applicant, and then filing the complaint and pressuring Lowe's for discovery, that triggered Lowe's apparent willingness to work out a settlement. Indeed, the alleged simplicity of the case is likely a testament to the effectiveness of Applicant's approach. Debtor also asserts that both parties to the Lowe's litigation admitted that the litigation was not "complex". That statement is disingenuous because it refers to that part of the Rule 26(f) report in which the parties inform the Court that the litigation

---

[51] In its complaint against Lowe's, Debtor assessed its prospects as far more dismal. Verified Complaint for Damages, ¶¶34-36 (doc 200-1).

will not need to be treated as "complex litigation" such as is implicated in a large class action or mass tort claim.

This factor weighs strongly in favor of Applicant.

3.  The skill necessary to perform the legal service properly: The results speak for themselves on this factor: obviously Applicant turned out to have what it took to get an excellent result. Debtor insists that little skill was required, and that Mr. Lurie was handed the factual background for the complaint and a complete set of the documentation needed for the complaint. Debtor Brief, at 17, 20 ("the Lowe's litigation was a pre-assembled case served to Barak Lurie on a platter".). Of course a client is expected to provide the attorney with everything it has available, but more to the point, and contrary to Debtor's current assertions, the background materials did not announce the strategy that Applicant devised for getting around the liquidated damages argument.

Further, once the complaint was filed, Applicant's pressuring Lowe's for discovery expedited and perhaps increased the settlement. This factor weighs in favor of Applicant.

4.  The preclusion of other employment by the attorney due to acceptance of the case: Whether one looks at about 108 hours over about nine months or 40 hours over five months (the bulk of the allowed post-petition work took place from early June through early November), clearly this employment did not preclude

Applicant from taking on other work. Nor is there any evidence that by taking on this litigation, Applicant was conflicted out of taking on any other work. This factor weighs against a large award.

5. The customary fee: The Court has already discussed this factor explicitly above in connection with §330(a)(3)(F) above. The lack of evidence weighs against the large award.

6. Whether the fee is fixed or contingent: The Court has already discussed this factor at length in connection with §330(a)(3)(A) and (B) above. It weighs heavily in favor of Applicant.

7. Time limitations imposed by the client or the circumstances: Mr. Lurie testified that Mr. Lahave wanted the work done quickly because the ongoing ORIX litigation was major and he (Mr. Lahave) was a guarantor of the debt to ORIX. Overall, however, there was no significant time pressure on Applicant. This factor weighs against a large fee.

8. The amount involved and the results obtained: The Court has already discussed this factor. "[T]he most critical factor in determining the reasonableness of a fee award is the degree of success obtained." Abrams, 605 F.3d at 247 (internal quotation marks and citation omitted). This factor weighs heavily in favor of Applicant.

Case 09-11696-nlj11    Doc 215    Filed 03/30/11    Entered 03/30/11 11:11:15 Page 48 of 69

9.  <u>The experience, reputation, and ability of the attorneys</u>: This is another factor that has at best only marginal relevance.  In the absence of a specific method to place a dollar figure on the results of the work, one could reasonably argue that a more experienced and able attorney should obtain better results in the same amount of time it would take a less experienced and able attorney, thereby justifying a higher hourly rate.[52]  Again, in this instance, regardless of how long Mr. Lurie has been practicing, or what his reputation may be, he obtained a superb result for the estate.  Bottom line, does the Code encourage payment for results or for reputation?

10.  <u>The "undesirability" of the case</u>: This factor has largely been addressed by pointing out how daunting a task that

_____

[52] The Court has some reservations about "reputation" as a fee enhancer.  This Court has seen numerous examples, dating back to when this judge was a law student, of attorneys with considerable reputations doing shoddy work and those with no reputation to speak of doing excellent work.  And "experience" is often measured by little more than years in practice.  The problem with that approach is that some twenty-year lawyers have learned more each year and gotten steadily better, while other twenty-year lawyers have simply repeated their first year twenty times.

Most fee scales reflect an experience differential with the more experienced attorneys receiving larger compensation. An attorney specializing in civil rights cases may enjoy a higher rate for his expertise than others, providing his ability corresponds with his experience. Longevity per se, however, should not dictate the higher fee. If a young attorney demonstrates the skill and ability, he should not be penalized for only recently being admitted to the bar.

<u>Johnson</u> at 718-19.

Case 09-11696-nlj11    Doc 215    Filed 03/30/11    Entered 03/30/11 11:11:15 Page 49 of 69

both Applicant and Debtor considered the case to be at the outset. However, as considered by the Fifth Circuit in Johnson[53], this factor is neutral.

11. The nature and length of the professional relationship with the client:[54] Messers Lurie and Lahave met each other for the first time in connection with this matter, and shortly thereafter Mr. Lahave began having second thoughts about Mr. Lurie and his firm based on the quality of the work being done. Debtor trial exhibit M. Nevertheless, by June 8, about a month and a half after the petition had been filed and the $7,500,000 settlement offer had been received, Mr. Lahave informed Debtor's

_____

[53] "Civil rights attorneys face hardships in their communities because of their desire to help the civil rights litigant. See NAACP v. Button, 371 U.S. 415, 443, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Sanders v. Russell, 401 F.2d 241 (5th Cir. 1968). Oftentimes his decision to help eradicate discrimination is not pleasantly received by the community or his contemporaries. This can have an economic impact on his practice which can be considered by the Court." Johnson at 719. This quotation illustrates that a decision addressed to prosecuting civil rights cases in an era when doing so could result in serious social opprobrium and financial retaliation (or worse) is not the perfect fit for determining compensation in an accepted commercial setting such as current bankruptcy practice. Nevertheless, it is part of the prevailing standard by which these decisions are to be made.

[54] "The nature and length of the professional relationship with the client. A lawyer in private practice may vary his fee for similar work in the light of the professional relationship of the client with his office. The Court may appropriately consider this factor in determining the amount that would be reasonable." Johnson, 488 at 719. As is apparent, some of the Johnson factors are at best marginally relevant. In re Tobis, 2009 WL 1607574 (Bankr. N.D. Ohio) at *7 ("[N]ot all of the Johnson factors are necessarily relevant in the bankruptcy fee context....").

counsel of the need to add Mr. Lurie to the roster of Debtor's
counsel. Applicant trial exhibit 3. And ultimately Mr. Lahave
instructed Debtor's counsel to attempt to prevent Applicant from
getting paid, a step that Mr. Lahave might not have taken had he
had a longer standing relationship with Mr. Lurie. In any event,
there is no indication whatever that Mr. Lurie negotiated a lower
fee structure out of friendship with Mr. Lahave. This factor is
also neutral.

   12. <u>Awards in similar cases</u>: The Court has already
discussed this factor as well in connection with §330(a)(3)(F)
above.[55] The lack of evidence weighs against the large award.

   Combining the factors and their relative weights, the Court
attributes the most significance to the apparent difficulty of
the task at the outset, to Applicant's creativity in devising the
successful strategy, and especially to the excellent result
obtained. That assessment results in the approval of the hourly
rate of $200 and 15% of the post petition additional recovery of
$2,250,000. The other factors are pretty much indirect measures
of benefit to the estate. Those are more useful when gauging
benefit to the estate is more problematic. The factors

---

   [55] In <u>Johnson</u>, the Fifth Circuit explained that the
customary fee consideration (factor 5) addressed issues such as
whether there was a minimum fee that was standard in the
community, and then stated that the trial court could also take
into account fee awards in similar kinds of cases inside and
outside the circuit (factor 12). <u>Id.</u> at 718, 719. These factors
therefore overlap less than would appear at first glance.

emphasized by the Court in this decision on the other hand are the more direct and useful measures of benefit.

**Additional Hourly Compensation**[56]

As noted, the 43.75 hours represent the time beginning on June 10, 2009, for which everyone agreed that Applicant is entitled to some compensation. Stipulated Employment Order, ¶ A. The parties also agreed that Applicant could apply for (and Debtor could oppose) compensation from the petition date, April 22, 2009, through June 9, 2009. Id., ¶ B. If all of Applicant's hourly billing is allowed for the time in question, it will be entitled to an additional $840.00 (4.2 hours * $200 per hour) plus costs of $92.59 (billed at the end of April 2009). See Attachment II.

Applicant argues that it should be considered to have been employed effective on the date of the filing of the petition because Debtor should have filed an employment application for Applicant on the petition date or at least very shortly thereafter. Applicant vigorously contends that Debtor (through Mr. Lahave or Mr. Diener) deliberately did not notify it of the filing of the chapter 11 petition on April 22, the asserted

---

[56] In this order the Court awards a contingent fee effectively measured from the date of the petition, since it takes as its starting point the $7,500,000 offer extant on the petition date and awards the contingent fee based on the increase of $2,250,000. Therefore this part of the decision is limited to examining the hourly aspect of the compensation award for the eighteen days in question.

motivation being that Messrs Lahave and Diener sought to improve
the April 20 $7,500,000 offer and complete the settlement with
Lowe's, without further participation by Applicant.  Debtor
responded that Applicant knew of the bankruptcy filing ahead of
time, citing Mr. Lurie's fifteen-minute time entry of April 15:
"Draft email to client re status, bankr. implications follow up."
The Court also notes the June time entries of Mr. Lurie
concerning the effect of the bankruptcy filing and the need for
an employment order.[57]

The facts mostly support Applicant's version of the events.
A month and a half passed between the filing on April 22 and the
e-mail on June 8 from Mr. Lahave to Debtor's counsel informing
counsel that there was another attorney working for the estate.
Applicant trial exhibit 3.  The exchange of e-mails on April 28
among Messrs Diener, Lurie and Lahave make no mention of a
bankruptcy filing.  Debtor trial exhibit N.  The behavior of Mr.
Lahave in November in attempting to limit Applicant's fees by
withdrawing the employment application suggests that Messrs
Lahave and Diener may well have been pursuing that agenda from

---

[57] Those entries are as follows:
June 2: "Leave word with client re bankr. effect and need for
employment of counsel" (.15 hour); June 5: "Telephone call with
client re bankruptcy filing and estate's need to employ firm,
settlement prospects with Lowe's" (.25 hour); June 8: "Telephone
call with (leave word) atty for bankr. court re employment app;
exchange emails re same" (.35 hour); June 9: "Telephone call with
client bankr. firm re employment app request" (.25 hour).

the outset.  Mr. Lurie testified that he knew from past bankruptcy experience that Applicant needed an employment order to get paid.  The fact that the time sheets begin to mention this issue only in June, but then repeatedly, supports Mr. Lurie's testimony that he only learned of the bankruptcy filing in June when Mr. Diener mentioned the filing in passing.  And that same fact also suggests strongly that the April 15 entry about the "bankr. implications follow up" did not in effect inform Mr. Lurie before the fact of the filing of the petition five weeks later.  Thus, Debtor's assertion that the implication of the April 15 entry is that Applicant was on notice of the bankruptcy filing five weeks later is not tenable.  In consequence, the Court finds that June 2 was the date on which Applicant was on notice of the bankruptcy filing, and that for whatever reason, Messrs Lahave and Diener both concealed from Applicant the filing of the bankruptcy petition until that date.

The question thus presented is what is the effect of Debtor's nondisclosure of its status as a debtor (or debtor in possession) to a professional working for it?  The Court concludes that Debtor is liable to Applicant for the fees and costs incurred up to the date that Applicant was put on notice of the filing, particularly where as here the estate is solvent and thus the cost of those services will come out of Debtor's pocket rather than from any other creditor.  The Court also concludes,

Case 09-11696-nlj11    Doc 215    Filed 03/30/11    Entered 03/30/11 11:11:15 Page 54 of 69

in light of the fact that the case is administratively solvent, that the allowable fees and costs constitute an administrative claim on a par with the other fees and costs awarded.

The starting point of the analysis is the baseline proposition that ordinarily only those professionals that are approved for employment by Court order pursuant to §327 are entitled to be compensated from the estate. E.g., Albrecht II, 233 F.3d at 1260-61 ("§ 503(b)(1)(A) cannot serve as a basis for awarding fees to professional where employment was denied under § 327(a)."); In re Channel 2 Associates, 88 B.R. at 352 (same). The adverse consequences of a failure to obtain court approval is visited, at least initially, on the non-approved professional. See id. As a practical matter therefore, the burden falls on the professional to assure that it is employed. The professional hoping to be employed by the estate risks being treated as a volunteer until at least the employment application is on file. "[A]ny professional not obtaining approval is simply considered a volunteer if it seeks payment from the estate." Interwest Bus. Equip., Inc., 23 F.3d at 318 (citing 2 Collier on Bankruptcy ¶ 327.02, at 327-10 (15th ed.1993)).

Section 327 permits only the trustee (or debtor in possession pursuant to §1107(a)) to move for the employment of a professional ("[T]he trustee, with the court's approval, may employ...."). See Hartford Underwriters Ins. Co. v. Union

Planters Bank, N.A., 530 U.S. 1 (2000) (Trustee and not an administrative claimant is the proper party to seek recovery under § 506(c).). So court approved employment is not within the control of the professional, except in the minimal sense that the professional can cease, or not begin, working for the estate until an employment application is filed. See Albrecht I at 672 ("Although the Firm contends it had no reason to believe it would not qualify for employment, that is the risk any attorney bears when he or she undertakes work prior to obtaining court approval for employment."), citing Interwest Bus. Equip., Inc., 23 F.3d at 318.

All that being said, the foregoing cases do not address the circumstance here, in which a debtor in possession for a period of time knowingly misled the professional by failing to inform the professional of the filing of the bankruptcy case. However, at least two sources of authority provide a justification for awarding post petition fees to the professional for services rendered before the filing of an employment application: statements in cases dealing with employment and fee applications, and cases derived from Reading Co. v. Brown, 391 U.S. 471 (1968), a pre-Code case with continuing vitality.[58]

---

[58] In so ruling the Court does not need to consider whether the doctrine of promissory estoppel or the Court's residual authority under §105 would provide the authority to award compensation for work done before the filing of an employment application.

Case 09-11696-nlj11    Doc 215    Filed 03/30/11    Entered 03/30/11 11:11:15 Page 56 of 69

Any number of cases, in ruling against employment or fee applications for work done before the filing of the employment application, state that employment or compensation will be approved for such work in "extraordinary circumstances." E.g., In re Jarvis, 53 F.3d 416, 419-420 (1st Cir. 1995) (post facto employment permitted in extraordinary or exceptional circumstances but not when the failure to timely apply for employment arises from trustee's mere inadvertence), citing, inter alia, Land v. First National Bank of Alamosa (In re Land), 943 F.2d 1265, 1267-68 (10th Cir.1991):

> Even if the bankruptcy court, in its discretion, had authority to grant appellants' application for nunc pro tunc approval of the attorney's employment, nunc pro tunc approval is only appropriate in the most extraordinary circumstances. Simple neglect will not justify nunc pro tunc approval of a debtor's application for the employment of a professional.

(Citations and footnote omitted.) See Albrecht II at 1260 (citing conflicting authorities on post facto employment of professionals).

One of the cases cited by Albrecht I is F/S Airlease II, Inc. v. Simon, 844 F.2d 99 (3rd Cir. 1988), which states

> nunc pro tunc is informed in large measure by our recent decision in In re Arkansas, 798 F.2d 645 (3d Cir.1986), handed down after the bankruptcy court's decision in this case. In Arkansas, we held that "bankruptcy courts may, in extraordinary circumstances, grant retroactive approval of professional employment." Id. at 646 (emphasis added). We adopted a two-part test to determine the propriety of such retroactive approval: first, the bankruptcy court must find, after a hearing, that the applicant satisfies the

Case 09-11696-nlj11    Doc 215    Filed 03/30/11    Entered 03/30/11 11:11:15 Page 57 of 69

disinterestedness requirements of section 327(a) and
would therefore have been appointed initially; and,
second, the court must, in the exercise of its
discretion, determine that the particular circumstances
presented are so extraordinary as to warrant
retroactive approval. <u>Id.</u> at 650.

<u>Id.</u> at 105.  The court then held that the circumstances of that

case - mere oversight by the professional in question - did not

constitute a basis for post facto approval of employment.

However, other cases have approved employment post facto,

using roughly the same considerations as did the Third Circuit.[59]

Although it is an Act case, <u>Stolkin v. Nachman</u>, 472 F.2d 222

(7th Cir. 1973) somewhat closely portrays what is happening in

this case.  Nachman filed a chapter XI case for Stolkin,

"rendered yeoman service," <u>id.</u> at 224, and then sought to be paid

for his services.  Stolkin, emerging from the reorganization with

$10,000,000 in hand and all his creditors paid, sought to avoid

paying his attorney on the basis that no order had ever been

entered approving his employment.  The Seventh Circuit

acknowledged the principle that an attorney failing to ensure his

or her employment is responsible for the resulting hardship and

thus should not be compensated.  <u>Id.</u> at 266.  But it had little

---

[59] Debtor has not suggested any reason for which Applicant
would have been ineligible for employment as special counsel
pursuant to §327(e).

Page 58 of  69

trouble permitting an award of compensation in these circumstances. Id. at 266-67.[60]

The Court went on to comment:

We also note that Stolkin's behavior throughout much of these proceedings may have contributed to more than usual time and more than usual responsibility being involved. To the extent that it should develop that Stolkin's own behavior contributed to increased fees and expenses, he cannot be heard to complain. The Chapter XI arrangement is not to be undertaken as a sport and the debtor has responsibility which if fulfilled makes the completion of the arrangement significantly easier. That was not always the case herein.

Id. at 229. Stolkin's behavior was rather egregious, including a dispute with his attorney about whether Stolkin should comply with an agreed upon court order. The Court is certainly not suggesting that Mr. Lahave has done anything comparable in this case, but Mr. Lahave's cynical approach to the employment and compensation of Applicant justifies permitting Applicant to recover all its costs, including attorney fees, in defending its request for compensation.

Similarly, in Atkins v. Wain, Samuel & Co. (In re Atkins), 69 F.3d 970 (9th Cir. 1995), the chapter 11 debtors employed the accounting firm, Wain, Samuel & Co., on an emergency basis in litigation with the Internal Revenue Service. The firm scrambled

_____

[60] Nachman v. Stolkin as cited with approval in Fanelli v. Hensley (In re Triangle Chemicals, Inc.), 697 F.2d 1280, 1286-87 (5th Cir. 1983) (reversing the bankruptcy court which held that in effect there was a per se rule against nunc pro tunc employment orders).

Page 59 of 69

to prepare discovery responses for the estate, and then assisted
in further discovery and trial preparation. Debtors signed the
initial engagement letter with Wain, Samuel and repeatedly
promised that they would pay the Wain, Samuel bills. Id. at 972.
But although Debtors promised to have their counsel file an
employment application for Wain, Samuel, their counsel never did
so, apparently on instructions from the debtors. Id. at 973. In
good part due to the firm's work, the IRS claim was reduced from
$200,000 to $85,000. Debtors' case was ultimately dismissed with
all creditors paid and the debtors solvent. Id. The 9th Circuit
upheld the bankruptcy court's finding of exceptional
circumstances to justify compensation to the firm.[61] Id. at 976.
To have ruled otherwise would have bestowed a "windfall" on the
debtors. Id. at 978.

In In re Lee, 146 B.R. 13 (Bankr. E.D. Cal. 1992), the court
found that special counsel had been hired by the debtors
prepetition on a contingency basis, and that debtors did not
disclose to special counsel that they had filed a chapter 11 case
until counsel had obtained a very favorable settlement. At that
point debtors sought to employ and compensate counsel, which was
opposed by two creditors. The court, relying on In re THC

---

[61] The decision considers at length a nine-factor test for
deciding whether exceptional circumstances exist, and then
considers at further length whether that test is mandatory or
permissive. Id. at 974-78. The Court finds no reason to do the
same in this opinion.

<u>Financial Corp.</u>, 837 F.2d 389, 392 (9th Cir.1988), approved the employment post facto (under §330(a) rather than §328(a)), and then approved compensation based on a contingent fee rate rather than an hourly rate. <u>Id.</u> at 16-17. Specifically, the Court found that not being told of the filing of a bankruptcy petition justified counsel's employment post facto.

In <u>In re First Security Mortgage, Inc.</u>, 117 B.R. 1001, 1008 (Bankr. N.D. Okla. 1990), the court approved the post facto employment of a head hunter firm who had been requested by the debtor in possession mortgage company to obtain for it a loan closer, and who did so, but never obtained an employment order in reliance on the debtor's unfulfilled promise to obtain the employment order. In addition, the court approved a contingency fee compensation arrangement, as originally agreed to by the parties. <u>See also</u> <u>In re Western Real Estate Fund, Inc.</u>, 922 F.2d at 595 (when attorney obtained valuable settlement for the estate and then debtor in possession rejected the contingency fee contract with attorney and adopted the settlement, bankruptcy court erred in allowing attorney only lodestar compensation instead of recognizing claim for breach of contract damages measured by contract contingency rate).

The first two circumstances to note in the instant case are the most important ones: the failure to apply to employ Applicant was not due to the Debtor's oversight - it was intentional — and

Case 09-11696-nlj11   Doc 215   Filed 03/30/11   Entered 03/30/11 11:11:15   Page 61 of 69

there was nothing Applicant could have done about that problem,
since it had not been informed of the bankruptcy filing. These
facts are sufficient by themselves to justify the post facto
employment of Applicant at least for purposes of compensating
Applicant on an hourly basis for the period of time when it was
in the dark about the bankruptcy filing.[62]

The decision to award the fees in this case is made
particularly easy due to the fact that no innocent parties, such
as creditors, are adversely affected by the award.[63] Indeed,
that is a distinguishing factor between this case and, for
example, In re Lee, since the tug of war in that case, even if
not explicitly stated, arose in good part from the adverse effect
on other creditors.

Another source of authority for the post facto employment in
this case is Reading Co. v. Brown and its progeny. Reading Co.
had its origins in the postpetition negligence of a Chapter XI
receiver who operated a building that burned down and in the

---

[62] The Court emphasizes that once Applicant learned of the
bankruptcy filing, it had the obligation to look out for its own
interests, including by ceasing work until the employment
application was filed.

[63] For that reason the Court takes no position on what would
have been the outcome had its decision adversely impacted
creditors. The Court notes, however, that even if no innocent
parties such as unsecured creditors are affected, nunc pro tunc
or post facto employment may still be unwarranted. See Land, 943
F.2d at 1267 (repeated and obstinate failure by counsel to comply
with Code concerning his employment resulted in disgorgement of
compensation).

Case 09-11696-nlj11    Doc 215    Filed 03/30/11    Entered 03/30/11 11:11:15 Page 62 of 69

process caused surrounding property to be destroyed or damaged. The resulting claims against the estate far outstripped the value of the assets. The trustee argued that the damage claims did not arise from an "actual and necessary cost of operating the debtor's business". Id. at 476. The Supreme Court responded:

> In our view the trustee has overlooked one important, and here decisive, statutory objective: fairness to all persons having claims against an insolvent. Petitioner suffered grave financial injury from what is here agreed to have been the negligence of the receiver and a workman.

Id. at 477. The court went on to hold that "damages resulting from the negligence of a receiver acting within the scope of his authority as receiver give rise to 'actual and necessary costs' of a Chapter XI arrangement." Id. at 485.[64]

The intentional (or even negligent) failure to tell Applicant of the filing of the petition without filing an application to employ Applicant and knowing that Applicant would continue working on the case against Lowe's constituted a tort. McElhannon v. Ford, 134 N.M. 124, 128, 73 P.3d 827, 831, 2003-NMCA-091, {13} (Ct.App. 2003). See also Restatement (Second) of Torts § 551 (1977). Under the Reading doctrine, Applicant is clearly entitled to be compensated for the period of time it was kept in the dark. E.g. Copeland (trustee's use of and failure to

---

[64] Reading Co. retains its vitality after the enactment of the Code. Al Copeland Enter., Inc. v. Texas (In re Al Copeland Enter., Inc.), 911 F.2d 233, 239 (5th Cir. 1993).

Case 09-11696-nlj11    Doc 215    Filed 03/30/11    Entered 03/30/11 11:11:15 Page 63 of 69

promptly remit collected state taxes resulted in administrative treatment for statutory interest on the unremitted taxes) and <u>In re Hayes Lemmerz Intern., Inc.</u>, 340 B.R. 461, 480 (Bankr. D.Del. 2006) (postpetition damage to machinery leased from creditor and cannibalization by debtor in possession of the machinery resulted in administrative claim).

Thus, both the case law concerning employment of counsel and <u>Reading Co.</u> and its progeny entitle Applicant to be paid the hourly rate for the time entries from April 22 through June 1. Those entries total 2.3 hours, worth $460.[65]  Conversely, the work represented by the entries from June 2 through June 9, comprising 1.9 hours, cannot be compensated.

In consequence, the Court therefore adds up the following four elements of compensation and reimbursement to arrive at the preliminary figure that represents a reasonable amount of compensation for Applicant:

---

[65] More precisely, as shown in Attachment II, the total hours are 3.8 ($760) – 1.5 ($300 "additional courtesy discount") = 2.3 ($460) plus costs ($92.59) = $552.59.

1.  Contingency fee: 15% of $2,250,000:          $337,500.00

2.  For April 23, 2009[66] through June 1, 2009[67] for attorney fees
        ([hourly rate of $200/hour * 3.80 =] $760 – $300 [April
        30, 2009 "additional courtesy discount"] = $460) and
        costs ($92.59):                          $552.59

3.  For June 10, 2009 through January 21, 2010 for attorney fees
        ([hourly rate of $200/hour * 39.95[68] =] $7,990.00) and
        costs ($53.98):                          $8,043.98

4.  Keleher and McLeod attorney fees to date:    $4,655.49
    Preliminary Total                            $350,752.06

Applicant is also authorized to file a supplemental request for reimbursement of its Keleher & McLeod, P.A. attorney fees including but not limited to those incurred in preparing for and trying the evidentiary hearing on June 16, 2010 and the subsequent briefing.

The foregoing explanation and award leaves some questions that need to be answered, as follows:

Application exhibit B is Applicant's additional billing for the period November 10, 2009 through January 20, 2010 at the rate

---

[66] The Court has not included the only entry for April 22, 2009, which was one-tenth of an hour billed for "call to client for check not received".

[67] The billings for June 2, 2009 through June 9, 2009 totaled $380.00 for 1.9 hours. No costs were charged.

[68] 3.8 + 39.95 = 43.75, the figure that appears in the text accompanying note 7.

of $425/hour for Mr. Lurie in the amount (including costs) of $2,189.59. This billing was solely comprised of Applicant's efforts to obtain payment from the estate. The Court is not allowing any portion of this billing. No later than November 10, Applicant had hired counsel to represent it in connection with obtaining payment from the estate. Application exhibit C. Counsel continued to represent Applicant through December, Application exhibit D, and afterward. Once Applicant hired counsel, Applicant became the client and could no longer bill the estate as its counsel for purposes of collecting its fees. Obviously to the extent that it continued to complete the settlement, which it did through December 3 (telephone call to Lowe's attorney concerning dismissal of the federal court action), it should be compensated. It should also be compensated for the reasonable amount of time that it spent (2.6 hours) preparing its fee application, since it was far more efficient for Applicant to prepare that than to have its counsel perform that task. And the Court has also allowed minor bits of time expended in confirming whether it would get paid, arguing that it should get paid, etc. These are minor charges that are more akin to the charges allowed for filing a fee application. E.g., In re Heise, 436 B.R. 143, 147 (Bankr. D.N.M. 2010) (chapter 13 debtor's counsel fees), citing In re Ewing, 167 B.R. 233, 236 (Bankr. D.N.M. 1994) (chapter 7 debtor's counsel fees) and In re

Fibermark, Inc., 349 B.R. 385, 397 (Bankr. D.Vt. 2006) (chapter 11 professionals' fees). In any event the charges would not have been incurred but for the Debtor's mistreatment of Applicant. See In re American Preferred Prescription, Inc., 218 B.R. 680 (Bankr. E.D.N.Y. 1998) (Legal fees that Chapter 11 trustee's accountants incurred in defense of debtor's frivolous motion to disqualify them, based on an unsubstantiated conflict of interest, after accountants had already completed the majority of their work for trustee, represented an "actual and necessary expense," for which accountants were entitled to reimbursement from bankruptcy estate.). On the other hand, all the time spent as detailed in Application exhibit B, and some of the time spent as detailed in Application exhibit A, should not and will not be compensated.[69]

_____

[69] The referenced entries that are disallowed in Application exhibit A are as follows: November 9, 2009 (MR for .4 hours), November 10 (MR for .3), November 12 (MR for .2) and November 24 (MR at .8), for a total of 1.7 hours ($340.00). These billings are not included in Attachment I. The Court is not disallowing the November 9 entry of Mr. Lurie for 2.2 hours for reviewing the "Dear John" e-mail from Mr. Behles (.1) and then negotiating with Mr. Diener to get the issue resolved. First, it is not clear that Applicant had hired counsel at that point on November 9, and even if Applicant had hired counsel by then, Mr. Lurie was in a position to make the final attempt to negotiate a settlement far more efficiently than Applicant's newly hired counsel. In any event, the Court will not in effect punish Applicant for making that attempt to resolve the dispute and thereby to avoid the considerable cost to the estate that this compensation litigation has engendered.

Also, the parties have argued about Mr. Lurie's efforts to come up with a factually accurate complaint early in the course of the representation before the filing of the petition. In particular, Debtor has argued that Applicant did a poor job of getting the facts right in the complaint and then improperly billed the client for correcting its own work. _E.g._, Debtor Brief at 17-19. Since Applicant is not being compensated for that work, all of which occurred prepetition, that debate is moot.

**Conclusion**

The Court finds that Applicant's postpetition services have substantially benefitted the estate, generating additional proceeds of $2,250,000. The cost of those services were actual and necessary expenditures to obtain that amount. Thus, for the foregoing reasons, the Court awards to Applicant as an administrative claim, for post petition services rendered to the estate, compensation in the amount of $350,752.06. Applicant is also authorized to file a supplemental request for reimbursement of its Keleher & McLeod, P.A. attorney fees including but not limited to those incurred in preparing for and trying the evidentiary hearing on June 16, 2010 and all the subsequent briefing. Debtor may object to the supplemental application. The Court reserves the decision about whether to award some or all of the potentially requested attorney fees, particularly in

light of the fact that Applicant requested compensation of approximately $1,400,000 but was awarded about one-fourth of that amount.

An order will enter.

_Honorable James S. Starzynski_
Honorable James S. Starzynski
United States Bankruptcy Judge

Date Entered on Docket:  March 30, 2011

Copies to:

Daniel J Behles
Moore, Berkson & Gandarilla, P.C.
P.O. Box 7459
Albuquerque, NM 87194

Ronald Andazola
Assistant US Trustee
PO Box 608
Albuquerque, NM 87103-0608

Deron B Knoner
PO Box AA
Albuquerque, NM 87103

James Rasmussen
PO Box AA
Albuquerque, NM 87103-1626